UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KHAILAIRE ALLAH,

                              Plaintiff,

                                                          9:13-CV-0826

v.
                                                          (FJS/TWD)

B. HILTON, et. al.,

                              Defendants.

_____

APPEARANCES:                          OF COUNSEL:

KHAILAIRE ALLAH
Plaintiff *pro se*
01-B-0997
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403

HON. ERIC T. SCHNEIDERMAN              MELISSA A. LATINO, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for the Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This *pro se* civil rights action, commenced by Plaintiff Khailaire Allah pursuant to 42

U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn

T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.

L.R. 72.3(c).  Plaintiff claims that while he was in the custody of the New York State Department

of Corrections and Community Supervision ("DOCCS") and confined at Marcy Correctional

Facility ("Marcy C.F."), Defendants Dr. Khan ("Khan"), Medical Director, B. Hilton ("Hilton"),

Deputy Superintendent for Mental Health, and Diane L. Van Buren ("Van Buren"), Executive Assistant Commissioner, violated his Eighth Amendments rights and Fourteenth Amendment right to due process. (*See generally* Dkt. No. 1.) Plaintiff seeks declaratory relief, injunctive relief and compensatory damages. *Id.* at 17.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 54.) Plaintiff filed papers in opposition to the motion. (Dkt. No. 60.) Plaintiff also filed a second motion for the appointment of counsel. (Dkt. No. 64.) Defendants have not opposed the motion to appoint counsel. For the reasons that follow, the Court recommends that the motion for summary judgment (Dkt. No. 54) be granted in its entirety as to Defendant Khan. The Court further recommends that the motion for summary judgment be granted in part and denied in part as to Defendants Hilton and Van Buren. Plaintiff's motion for appointment of counsel is denied without prejudice. (Dkt. No. 64.)

## I.     FACTUAL BACKGROUND

In September 2010, DOCCS issued a Draft Directive on Inmate Exposure Control (No. 4939) ("Draft Directive"). (Dkt. No. 54-3 at 4, 14-18.) The purpose of the Draft Directive was to establish protections from an inmate with a history of engaging in lewd conduct by exposing private areas or public sexual activity/masturbation. *Id.* at 14. The policy provided administrators with "tools" to control lewd behavior including a one piece green jumpsuit with a zipper in the back secured with a small padlock. *Id.* This jumpsuit was defined in the Draft Directive as an "Exposer-Control Suit" (hereinafter, "jumpsuit"). (Dkt. No. 54-3 at 14.) The jumpsuit was designed to be worn over regular clothing and did not restrict movement but prevented the inmate from exposing his or her "private areas." (Dkt. No. 54-3 at 14.)

The Draft Directive included instructions regarding the procedure for use of an "Exposer Control Order." (Dkt. No. 54-3 at 15.) Specifically, the Draft provided:

> ## IV. PROCEDURE
>
> Inmates who engage in lewd conduct shall be provided a one time warning, Form #4939B, Attachment B, (*See note below for exception) by a security supervisor explaining that further conduct of this nature may result in the inmate being placed on an Exposer Shield and Exposer Placard order and/or Exposer Control Suit order. The original completed "Inmate Exposure Control - One Time Warning" Form, (Attachment B) will be forwarded to the disciplinary office as part of the Hearing packet, 1 copy to be retained in inmate's Guidance folder and 1 copy to the inmate.
>
> *Note: A warning is not necessary for Inmates who engage in lewd conduct or sexual activity in the visiting areas.

(Dkt. No. 54-3 at 15.)

With respect to the use of the Exposer Control Suit, the Draft Directive provided:

> ### B. Use of Secure Exposer Control Suit
>
> 1. The Deputy Superintendent for Security or, in his or her absence, the O.D. or higher ranking authority may issue an order (see Attachment A)[1] placing an inmate who has repeatedly and actively exposed his or her private area(s) to staff and or visitors or has engaged in sexual activity in the visiting areas on an Exposer Control Suit Order. The Secure Exposer Control Suit may be used for:
>
>    b. Inmates in Mental Health Programs whenever they are out of their cells for:
>       (1) Private interviews;
>       (2) Group Counseling;
>       (3) Visits; or
>       (4) Exercise.

(Dkt. No. 54-3 at 15.)

---

[1] "Attachment A" is entitled Exposer Control Order. (Dkt. No. 54-3 at 17.)

In February 2011, Plaintiff was transferred to Marcy C.F. (Dkt. No. 54-2 at 3.) Plaintiff was housed in the Residential Mental Health Unit ("RMHU") and was designated as a "Level II."[2] (Dkt. No. 54-3 at 7, 11.) As a "Level II" inmate, Plaintiff was required to be handcuffed from behind.[3] *Id*. at 11. At the relevant times referenced in the complaint, Defendant Hilton was the Deputy Superintendent of Mental Health at Marcy C.F. (Dkt. No. 54-3 at 2.) Hilton was advised by DOCCS Central Office that he was authorized to use the jumpsuit and therefore, he implemented Draft Directive No. 4939. *Id.* at 4-5. If an inmate at Marcy C.F. engaged in lewd conduct, a one-time warning was issued advising the inmate that if the behavior continued, the inmate would be required to wear the jumpsuit. *Id.* at 6. Marcy C.F. staff could issue warnings without a finding of guilt on a ticket for lewd conduct. (Dkt. No. 54-3 at 8.) Hilton, or another high ranking official, could issue a recommendation for an Exposer Control Order placing the inmate in the jumpsuit if the inmate exposed his private area(s) or engaged in sexual activity. *Id*. The recommendation was forwarded to the Superintendent for approval. *Id*. If approved, Hilton was charged with ensuring that the Exposer Control Order was issued to protect the safety and security of the staff and inmate. *Id*. Hilton conferred with the RMHU treatment staff and reviewed Exposure Control Orders every seven days. (Dkt. No. 54-3 at 8.)

At the relevant times referenced in the complaint, Defendant Khan was employed by DOCCS as a Clinical Physician and assigned to provide medical care and treatment to inmates at Marcy C.F. (Dkt. No. 55-1 at 1.) Khan attended to inmates approximately ten hours each month while the health care

---

[2] The RMHU is a program that includes separate housing within the facility to provide treatment of inmates with serious mental illness. (Dkt. No. 54-3 at 3.) Defendant Hilton supervised the mental health services provided to inmates in the RMHU. *Id.* Hilton made recommendations related to the services provided to those inmates. *Id.*

[3] The manner in which an inmate is handcuffed is determined by the RMHU Operational Manual and the inmate's "stage." (Dkt. No. 54-3 at 11.)

staff at Marcy C.F. provided the majority of the care and treatment. (Dkt. No. 55-1 at 2.) When Plaintiff arrived at Marcy C.F., Plaintiff suffered from contractures in both of his hands with a chronic contracture in his right hand. (Dkt. No. 55-1 at 4.) Khan reviewed Plaintiff's medical records and noted that while Plaintiff previously received occupational therapy, the treatment was not effective. *Id.* Khan was aware that Plaintiff had exposed himself inappropriately on multiple occasions and was required to wear an exposure jumpsuit and to be handcuffed from behind. *Id.* at 5. As part of Plaintiff's treatment, Khan provided Plaintiff with prescription medications including Neurontin. *Id.* at 7. On February 17, 2011, Plaintiff received an Inmate Medical Excuse for braces for his wrists.[4] (Dkt. No. 55-1 at 12.)

On February 17, 2011, Plaintiff was charged with lewd conduct in violation of Rule 101.20.[5] (Dkt. No. 54-4 at 6.) On March 11, 2011, after a disciplinary hearing, Plaintiff was sentenced to forty-five days in the Special Housing Unit ("SHU") with a loss of privileges.[6] *Id.* On March 25, 2011, OMH N.A. Makuch[7] issued a Misbehavior Report charging Plaintiff with violating Rule 101.20 and engaging in lewd conduct in the RMHU program area. (Dkt. No. 60-1 at 5.) After the Misbehavior Report was issued, Hilton "recommended" that Plaintiff wear the exposure jumpsuit for thirty days.[8] (Dkt. No. 60-1

---

[4] The name of the Health Representative who executed the Medical Excuse is illegible. (Dkt. No. 55-1 at 12.)

[5] Rule 101.20 states that an inmate shall not engage in lewd conduct by intentionally masturbating in the presence of an employee, or intentionally expose the private parts of their bodies. (Dkt. No. 63-1 at 7); *see also* N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(2)(iii).

[6] The record of Plaintiff's Inmate Disciplinary History indicates that Captain Harper presided over the disciplinary hearing. (Dkt. No. 54-4 at 6.) Harper is not a defendant herein.

[7] Makuch is not a defendant herein.

[8] The record does not include any documentation related to the recommendation including the date that the recommendation was made.

at 5; Dkt. No. 1 at ¶¶37-39.) Hilton was aware that Plaintiff had a "history" of engaging in lewd conduct while in the custody of DOCCS. (Dkt. No. 54-3 at 6.) DSS Barry McArdle[9] approved the recommendation, "effective immediately." (Dkt. No. 60-1 at 5.) Pursuant to the Exposer Control Order[10], Plaintiff was required to wear the jumpsuit when he left his cell for visits, programming time, callouts and interviews. (Dkt. No. 1 at ¶38; Dkt. No. 60-1 at 5.) The Exposer Control Order was scheduled to terminate in thirty days, provided Plaintiff did not receive any further misbehavior reports. (Dkt. No. 1 at ¶39.) After a Tier III hearing related to the March 25, 2011, Misbehavior Report, Hilton found Plaintiff "not guilty" based upon video tape evidence.[11] (Dkt. No. 1 at ¶40; Dkt. No. 60-1 at 5.)

On March 30, 2011, Plaintiff received a Misbehavior Report charging him with lewd conduct in violation of Rule 101.20. (Dkt. No. 54-3 at 31.) The report was issued by Sergeant Lansing.[12] *Id.* Lansing indicated that while Plaintiff was at St. Luke's Hospital, a nurse reported that Plaintiff exposed his erect penis in the emergency room. *Id.* Corrections Officers Relf and Bassett were assigned to Plaintiff, but did not witness the incident.[13] *Id.* On April 7, 2011, Hilton presided over a Tier III hearing related to the March 30, 2011, Misbehavior Report. (Dkt. No. 54-3 at 20.) Plaintiff did not attend the

---

[9] McArdle is not a defendant herein.

[10] The Exposer Control Order is not part of the record herein.

[11] The record does not contain any evidence related to this hearing, including the date that the hearing occurred. Hilton does not have any record of any such proceeding but does not dispute that he "may have" presided over more than one Tier III hearing related to Plaintiff and charges of lewd conduct. (Dkt. No. 54-3 at 7.) If a Misbehavior Report is dismissed, it is generally expunged from the inmate's records. *Id.* Moreover, a finding of "not guilty" is only maintained by the facility for a twelve month period. *Id.*

[12] Lansing is not a defendant herein.

[13] Relf and Bassett are not defendants herein.

hearing. (Dkt. No. 54-3 at 7, 20.) On April 14, 2011, Plaintiff was found guilty of the charges and sentenced to ninety days in keeplock. *Id.* The Exposer Control Order was in effect during, and after, the disciplinary hearing. *Id.* at 9.

On April 25, 2011, Plaintiff was charged with lewd conduct. (Dkt. No. 54-4 at 6.) On May 13, 2011, after a disciplinary hearing, Plaintiff was sentenced to forty-five days of SHU confinement with a loss of privileges.[14] *Id.*

Plaintiff filed a Freedom of Information Law request for a copy of the Draft Directive regarding the exposure suit. (Dkt. No. 54-3 at 9.) Plaintiff directed his request to Hilton. (Dkt. No. 1 at ¶41.) Hilton refused to provide a copy of the document and advised Plaintiff that it was not available for public review. (Dkt. No. 54-3 at 9.) Hilton withheld the document because it was a draft, not a final agency determination, and contained confidential information. *Id.*

On May 15, 2011, and May 16, 2011, Plaintiff was treated for left shoulder pain due to being handcuffed behind his back. *Id.* at 45. On May 18, 2011, an Inmate Medical Excuse was issued allowing Plaintiff to use bilateral wrist splints in his cell and to carry the splints in his pocket to utilize during programs. (Dkt. No. 55-1 at 13.) On May 29, 2011, Plaintiff complained of arm pain due to being handcuffed behind his back. *Id.* at 41. The medical provider advised Plaintiff that the placement of handcuffs was a "security issue." *Id.* On June 1, 2011, an Inmate Medical Excuse was issued for a "front cuff order for visits only." (Dkt. No. 55-1 at 14.) On June 9, 2011, Plaintiff received an Inmate Medical Excuse permitting Plaintiff to wear his bilateral wrist braces in his cell. *Id.* at 15. In June 2011, Khan ordered an x-ray of Plaintiff's left shoulder due to pain and swelling. (Dkt. No. 55-1 at 34.)

---

[14] Hilton did not preside over the disciplinary hearing related to the charges. (Dkt. No. 54-4 at 5-6.)

On June 13, 2011, Plaintiff forwarded correspondence to Defendant Van Buren regarding "Program Deprivation/Inconsistencies." Dkt. No. 63-1 at 14. In the letter, Plaintiff admitted, "[i]t is no secret I have a history of lewd conduct." *Id.* Plaintiff advised:

> On 6/8/11, I was released from security exception status; at which point an agreement was determined that either I wear the "jumpsuit" or attend program "with restraints." Needless to say, I opted to be cuffed to the desk and began programming immediately after I was released from security exception.
>
> All of a sudden, on 6/9/11, the option I chose which was to program in restraints rather than wearing the jumpsuit, was no longer an option for me. I was informed that I must wear the jumpsuit OR attend no mental health programs.

(Dkt. No. 63-1 at 14.)

Plaintiff claimed that his due process rights were violated because the rules regarding lewd conduct were not posted in the "DOCS rule book and/or RMHU manual." (Dkt. No. 63-1 at 14.)

On July 22, 2011, Van Buren responded to Plaintiff's letter and stated:

> The purpose of the exposure control suit is to keep an inmate from exposing himself to staff, including OMH clinical staff and others who are assisting in therapeutic programs beneficial for inmate-patients.
>
> On instances where you were placed in restraints, it was for conduct unrelated to exposing yourself, not staff changing their mind.

(Dkt. No. 63-1 at 17.)

Van Buren noted that Plaintiff was attending programming "more consistently" and had not engaged in any recent incidents of exposure. (Dkt. No. 63-1 at 17.) Plaintiff was advised that the Superintendent modified Plaintiff's Order so that he did not have to wear the jumpsuit on visits. *Id.*

In July 2011, Plaintiff made repeated requests to medical providers for occupational therapy. (Dkt. No. 55-1 at 37.) Plaintiff was continually advised that the issue was already discussed with the

8

doctor and that "therapy would not help at this point." *Id*. During a visit with Khan, Plaintiff received a recommendation for occupational therapy and bilateral wrist splints/braces for his hands.[15] (Dkt. No. 55-1 at 7,8.) In August 2011, Plaintiff met with an orthopedic specialist who took measurements for a glove/brace. (Dkt. No. 1 at ¶54.) Plaintiff was told that a future appointment would be "arranged." *Id*. On September 9, 2011, during a medical visit at his cell, Plaintiff asked about occupational therapy. (Dkt. No. 55-1 at 31.) The provider advised that Plaintiff's appointment was "pending." *Id*. On September 14, 2011, Plaintiff was told that the order for therapy was approved by "Albany" and that he needed to wait for "scheduling."[16] *Id*. at 35.

On October 11, 2011, Plaintiff complained of mental health issues. (Dkt. No. 55-1 at 27.) While the medical provider discussed Plaintiff's condition, Plaintiff "kept moving his hands down to his penis." *Id*. Plaintiff was told to keep his hands at chest level and the sick call visit was terminated. *Id*. On October 14, 2011, Plaintiff was directed to provide a stool sample. *Id.* at 23. While the provider was at Plaintiff's cell, Plaintiff began masturbating and exposed his penis to the provider. (Dkt. No. 55-1 at 27.) The encounter was terminated. *Id*. On October 14, 2011, Plaintiff was charged with lewd conduct in violation of Rule 101.20. (Dkt. No. 54-4 at 5-6.) After a disciplinary hearing related to the charges, Plaintiff was sentenced to sixty days of SHU confinement. *Id*.

On October 24, 2011, Plaintiff was scheduled to receive his glove. (Dkt. No. 55-1 at 16.) Due to transportation difficulties (the vehicle used for transport "broke down"), the appointment and occupational therapy had to be rescheduled. (*Id*.; Dkt. No. 1 at ¶55.) On October 26, 2011, October 27,

---

[15] The date of this visit is not clearly indicated in the record.

[16] Khan did not have any role or responsibility in providing occupational therapy or securing transportation for inmates. (Dkt. No. 55-1 at 31.)

2011, October 28, 2011, and October 31, 2011, Plaintiff inquired as to the status of his brace/glove and occupational therapy.  (Dkt. No. 55-1 at 16-17.)  Plaintiff was told that the delay was due to scheduling. *Id.*  In November 2011, Plaintiff left Marcy C.F. without the glove/brace or occupational therapy.  (Dkt. No. 1 at ¶56.)

## II.    PROCEDURAL HISTORY

Plaintiff filed his Complaint and applied for leave to proceed *in forma pauperis* in this action on April 22, 2013.  (Dkt. Nos. 1 and 3.)  In September 2013, Judgment was entered and the case was dismissed as Plaintiff failed to comply with the filing requirements.  (Dkt. No. 6.)  In October 2013, Plaintiff filed a motion to reopen the case and paid the filing fee.  (Dkt. No. 7.)  In a Decision and Order filed on July 28, 2014, the Court vacated the Judgment, reopened the action and reviewed the complaint in accordance with 28 U.S.C. § 1915A.  (Dkt. No. 16 at 5.)  The Court dismissed several causes of action and transferred portions of Plaintiff's Complaint to the United States District Court for the Southern District of New York and the United States District Court for the Western District of New York.  (Dkt. No. 16, *generally*.)  Upon review of the allegations that arose in the Northern District, the Court directed Defendants Khan, Hilton and Van Buren to respond to the allegations in the Complaint. *Id.* at 22-23.  In August of 2014, Plaintiff filed a motion for assignment of counsel.  (Dkt. No. 23.)  The Court denied the motion in a September 2014, Decision and Order.  (Dkt. No. 26.)  On November 27, 2015, Defendants filed the motion for summary judgment now before me for  Report and Recommendation.  (Dkt. No. 54.)  Plaintiff's second motion for appointment of counsel also before the Court was filed on February 25, 2016.  (Dkt. No. 64.)

## III.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-252 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Cordiano v. Metacon Gun Club, Inc*., 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise

the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) ("pro se parties are to be given special latitude on summary judgment motions.") (citations and internal quotation marks omitted). However, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[17]

## A.    Deficiencies in Plaintiff's Opposition Papers

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[18] Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[19] and (2) the nonmovant, if proceeding *pro se*, has been specifically

---

[17]   Copies of unpublished decisions cited herein will be mailed to Plaintiff as a *pro se* litigant. *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[18]   L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[19]   L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing

advised of the possible consequences of failing to respond to the motion.[20]  *See Champion v. Artuz*, 76

F.3d 483, 486 (2d Cir. 1996).  However, the Second Circuit, acknowledging a court's broad discretion to

determine whether to overlook a failure to comply with local rules, has held that "while a court is not

required to consider what the parties fail to point out in their [local rule statements of material facts], it

may in its discretion opt to conduct an assiduous review of the entire record even where one of the

parties has failed to file such a statement."  *Holtz v. Rockefeller & Co., Inc*., 258 F.3d 62, 73 (2d Cir.

2001) (citation and internal quotation marks omitted).  In deference to Plaintiff's *pro se* status, I have

opted to review the entire record in determining if there are material facts in dispute.

   A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v.

Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the

appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.")

(citation and internal quotation marks omitted).  Where, as here, the Court elects to conduct an

independent review of the record on a motion for summary judgment, a plaintiff's verified complaint

should be treated as an affidavit.[21]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified

complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether

material issues of fact exist . . . .") (citations omitted).  Plaintiff's Declaration in Opposition to the

---

the absence of a genuine issue for trial, the district court may not rely solely on the statement of
undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the
citation to evidence in the record supports the assertion.") (citations omitted).

   [20] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite
notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt.
No. 54 at 2.)

   [21] Plaintiff's Complaint was properly verified by declaration under 28 U.S.C. § 1746.
*See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999)
(use of the language "under penalty of perjury" substantially complies with 28 U.S.C. §1746).

Summary Judgment Motion (Dkt. No. 60-1), which was signed under penalty of perjury, also constitutes admissible evidence that can be considered in opposition to Defendants' motion. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used).

Plaintiff's unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827, 2009 WL 1033395, at *11 (E.D.N.Y. April 14, 2009) (holding that unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher,* No. 05 Civ. 503, 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012). In deference to Plaintiff's *pro se* status, the Court will consider Plaintiff's unsworn "Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion." (Dkt. No. 60-2.)

### B. Reply Papers

"Reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Briese Lichttechnik Vertriebs GmbH v. Langton*, No. 09 CIV. 9790, 2012 WL 5457681, at *6 (S.D.N.Y. Nov. 8, 2012) (citing *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000) (finding that the reply

submission was the first opportunity the plaintiffs had to rebut the defendant's argument)). A district court has broad discretion when considering whether to consider new evidence submitted for the first time in reply papers. *See Horanzy v. Vemma Nutrition CO.*, 87 F. Supp. 3d 341, 346 (N.D.N.Y. 2015).

Defendants' reply and Van Buren's Declaration were submitted in response to Plaintiff's arguments. Defendants have not raised new legal arguments in their reply. Accordingly, the Court will consider Van Buren's Declaration and exhibits annexed to that Declaration. *MPD Accessories, B.V. v. Urban Outfitters, Inc.*, No. 12 CIV. 6501, 2013 WL 5761421, at *5 (S.D.N.Y. Oct. 24, 2013), *objections overruled sub nom. MPD Accessories B.V. v. Urban Outfitters*, 2013 WL 7211833 (S.D.N.Y. Dec. 17, 2013).

## IV. ANALYSIS

Defendants move for judgment as a matter of law and dismissal of all of Plaintiff's allegations. Defendants argue that they were not deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendants also contend that the use of handcuffs, waist chains and the jumpsuit did not violate Plaintiff's Eighth Amendment rights. Defendants move for dismissal of Plaintiff's due process claims arguing that Hilton and Van Buren did not violate Plaintiff's procedural protections guaranteed by the Fourteenth Amendment.

### A. Eighth Amendment - Deliberate Indifference to Serious Medical Needs

The Eighth Amendment protects prison inmates from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim alleging that prison conditions violate the Eighth Amendment, including those claiming inadequate medical care, must satisfy both an objective and subjective requirement that the conditions must be "sufficiently serious"

from an objective point of view and, and the plaintiff must demonstrate that the prison officials acted subjectively with "deliberate indifference." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998). On an Eighth Amendment claim that prison officials have intentionally disregarded an inmate's serious medical needs, "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183 84 (2d Cir. 2003) (citation omitted).

Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester County Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 280).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id*. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith,* 316

16

F.3d at 185.  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing on the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.

Medical conditions vary in severity, so a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison v. Barkley*, 219 F.3d 132, 136  37 (2d Cir. 2000).  A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain."  *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin* (*"Hathaway I"*), 37 F.3d 63, 66 (2d Cir. 1994).  Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain.  *Chance*, 143 F.3d at 702  03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'"  *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin* ("*Hathaway II*"), 99 F.3d 550, 553 (2d Cir. 1996)).  "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm."  *Hathaway I*, 37 F.3d at 66.  To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Chance*, 143 F.3d at 702.  The inmate then must establish that the provider

consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at

835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate

indifference." *Estelle*, 429 U.S. at 105‑06. Moreover, "a complaint that a physician has been negligent

in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth

Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional

violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the

Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state

tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

However, malpractice that amounts to culpable recklessness constitutes deliberate indifference.

Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and

less efficacious treatment plan." *Chance,* 143 F.3d at 703 (quoting *Hathaway II*, 99 F.3d at 553).

### 1.     Claims Against Khan Related to Plaintiff's Splint/Brace and Occupational Therapy

Defendants do not dispute that Plaintiff suffered from contractures in his hands and do not

contend that Plaintiff's condition was not serious. Assuming Plaintiff's medical condition was

sufficiently serious to satisfy the objective component, the subjective analysis of the Eighth Amendment

test rests on whether Khan acted with a culpable state of mind. In that regard, Plaintiff claims that he did

not receive a customized brace or occupational therapy and thus, Khan was deliberately indifferent to his

serious medical needs in violation of the Eighth Amendment. (Dkt. No. 60-1 at 8; Dkt. No. 60-2 at 1-2)

Viewing the evidence in a light most favorable to Plaintiff, no reasonable juror could conclude

that Khan was deliberately indifferent to Plaintiff's medical needs. For the nine months that Plaintiff was

confined at Marcy C.F., Plaintiff's medical needs were not ignored. The undisputed record establishes

that from February 2011 through October 2011, Plaintiff was repeatedly treated by DOCCS staff for a

18

myriad of complaints including hand and wrist pain, constipation, nausea, vision problems, and left shoulder pain. (Dkt. No. 55-1, *generally*.) Plaintiff received prescription medications, sick call visits, emergency sick call visits, and x-rays.

Specifically, with regard to Plaintiff's hands and wrists, upon arriving at Marcy C.F., Plaintiff requested occupational therapy and braces for both wrists/hands. (Dkt. No. 55-1 at 50-53.) Plaintiff's requests were referred to the doctor and he received medication including Tylenol with codeine and Neurontin. *Id*. In February 2011, Plaintiff received an Inmate Medical Excuse to use braces for his wrists. (Dkt. No. 55-1 at 12.) During sick call visits in March 2011 and May 2011, Plaintiff complained of wrist and hand pain but Plaintiff did not complain or indicate, in any manner, that he was not wearing or unable to wear a splint or brace. *Id*. at 45-47. Indeed, Plaintiff attributed some of his discomfort to handcuffing. (Dkt. No. 55-1 at 45.) In May 2011, Plaintiff received another Inmate Medical Excuse permitting Plaintiff to use his bilateral wrist splints in his cell and during programs. *Id*. at 13. In June 2011, Plaintiff received a third Inmate Medical Excuse permitting Plaintiff to use wrist braces. *Id*. at 15. From March 2011 until July 2011, Plaintiff did not make any complaints or requests related to occupational therapy or a splint/brace. In July 2011, Plaintiff renewed his request for occupational therapy and Khan approved the request. *Id.* at 37.

The admissible record detailing Plaintiff's continuous medical treatment belies any claim of deliberate indifference. Moreover, during his confinement at Marcy C.F., Plaintiff concealed medication, refused to take his medication in "crushed" form as prescribed by medical staff, flushed his medication in the toilet and ingested unknown pills and liquid. (Dkt. No. 55-1 at 25-26; 51-53.) Plaintiff 's non-compliance with medical treatment further "undermines his deliberate indifference claims." *Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir.1986).

Plaintiff's complaints amount to nothing more than a quarrel over his course of treatment and do not rise to a level of deliberate indifference to provide a basis for relief under § 1983. *Guarneri v. Hazzard*, No. 9:06-CV-985(NAM/DRH), 2010 WL 1064330, at *13 (N.D.N.Y. Mar. 22, 2010); *see also Stevens v. Goord*, 535 F. Supp. 2d 373, 389 (S.D.N.Y. 2008) (finding that the defendants' denial of occupational therapy "falls squarely in the realm of disagreements regarding treatment, which do not provide valid bases for Eighth Amendment claims").

As discussed *supra*, Plaintiff was transferred from Marcy C.F. in November 2011. To the extent that Plaintiff claims that Khan violated his Eighth Amendment rights by not ensuring that his appointments for a brace and occupational therapy were rescheduled, that claim is subject to dismissal. Khan did not have the responsibility for arranging for Plaintiff to be transported from the facility to the occupational therapist or any other specialist. (Dkt. No. 55-1 at 8.) Delays caused by difficulties in scheduling outpatient appointments do not invoke deliberate indifference. *See Benjamin v. Schwartz*, 299 F. Supp. 2d 196, 200 (S.D.N.Y. 2004), *aff'd sub nom. Benjamin v. Koenigsmann*, 204 F. App'x 979 (2d Cir. 2006) (finding no deliberate indifference as the doctor did not have control over surgery schedule); *see also Henderson v. Sommer*, No. 08 Civ. 3440, 2011 WL 1346818, at *4 (S.D.N.Y. April 1, 2011) (dismissing Eighth Amendment claim where the delay in surgery resulted from scheduling constraints).

Upon review of the entire record, the Court concludes that Plaintiff's claims of deliberate indifference amount to nothing more than a disagreement with the prescribed medical treatment, which is not actionable under the Eighth Amendment. *See Chance*, 143 F.3d at 703. The record is devoid of any evidence even suggesting that Khan acted maliciously in delaying or denying Plaintiff access to

medical care. In light of the foregoing, the Court recommends that Khan be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim against him.

## 2. Claims Against Khan, Hilton and Van Buren Related to Front Cuff Order

Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they refused to issue a front cuff order despite his complaints of pain. (Dkt. No. 60-1 at 7-8.) As a result, Plaintiff suffers from arthritis and damage to his rotator cuff in his left shoulder. *Id.*

Before discussing Plaintiff's Eighth Amendment claims related to cuffing, the issue of personal involvement must be addressed. "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Supervisory officials may not be held liable merely because they held a position of authority. *Id.*; *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323 24 (2d Cir. 1986)). Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus*, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).

In this case, the record does not support Plaintiff's claim that Khan, Hilton or Van Buren were personally involved in any decision related to Plaintiff's medical treatment for pain associated with handcuffing. There is no evidence that Plaintiff made complaints to Khan, Hilton or Van Buren about arm or shoulder pain related to cuffing or that Defendants were made aware of any complaints through correspondence, reports or other documentary evidence. Morever, the record does not support the allegation that Khan, a clinical physician, had any role in determining how and where Plaintiff was cuffed. *See Bouknight v. Yee-Cheen Doung*, No. 09 CIV. 5817, 2011 WL 2682103, at *5 (S.D.N.Y. July 8, 2011) (citation omitted) (finding that the evidence failed to establish that the defendants had the authority to grant a front cuff order).

Even assuming that Defendants, as supervisors, were considered "personally involved," with decisions related to cuffing, the objective prong of the Eighth Amendment analysis has not been satisfied. The record lacks any proof that Plaintiff's shoulder injury was a serious medical condition. *Benjamin v. Galeno*, 415 F. Supp. 2d 254, 259 (S.D.N.Y. 2005), *aff'd sub nom. Benjamin v. Koeningsmann*, 204 F. App'x 979 (2d Cir. 2006) (holding that the plaintiff failed to present medical proof that his rotator cuff injury was urgent, life threatening, degenerative or the cause of extreme pain). Regarding the subjective element of the Eighth Amendment analysis, viewing the record in a light most favorable to Plaintiff, the evidence fails to suggest that Defendants were deliberately indifferent to Plaintiff's complaints related to cuffing. In May 2011, Plaintiff complained of left shoulder pain and requested a front cuff order. (Dkt. No. 55-1 at 43, 45.) In June 2011, an Inmate Medical Excuse was

issued for a "front cuff order for visits only" and Plaintiff was advised that decisions related to cuffing were more appropriately addressed with security.[22] (*Id*.; Dkt. No. 55-1 at 14.) After Plaintiff received the Inmate Medical Excuse related to front cuffing, Plaintiff did not make any further complaints or requests related to pain as a result of handcuffing. As discussed *supra*, Plaintiff's disagreements with the nature of his treatment cannot support a § 1983 action. *See Jones v. Bokor*, 443 F. App'x 327, 330 (10th Cir. 2011) (finding no Eighth Amendment violation where the evidence established, at most, that the plaintiff disagreed with the defendant's decisions related to alternate handcuffing procedures).

To the extent that the Complaint could be read to include the claim that the delay in providing the front cuff order and responding to Plaintiff's shoulder complaints amounted to deliberate indifference, those claims are also subject to dismissal. "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Demata v. NYS Dep't of Corr. Servs*., 198 F.3d 233 (table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999)). Here, the record lacks any proof establishing that the delay in receiving the front cuff order caused plaintiff any injury. There is no evidence that Plaintiff's daily activities were significantly affected or that his condition caused substantial pain. *See Smith v. Carpenter*, 316 F.3d 178, 185  86 (2d Cir. 2003).

---

[22] The name of the Health Services Representative who executed the June 2011 "Inmate Medical Excuse" related to a "front cuff order" is illegible. The record does not support, nor does Plaintiff allege, that Khan, Hilton or Van Buren executed that Inmate Medical Excuse. Khan avers that the medical staff did not have the authority to issue any permit. (Dkt. No. 55-1 at 8). Once a recommendation is made by the medical staff, the permit must be issued by the facility. *Id*.

I find that no reasonable factfinder could conclude that Defendants acted with deliberate indifference in depriving Plaintiff of adequate medical care related to the front cuffing issue and recommend that Defendants be granted summary judgment on this issue.

### B.    Eighth Amendment - Conditions of Confinement

Construing the complaint in a light most favorable to Plaintiff, Plaintiff claims that the Exposer Control Order created conditions of confinement that violated Plaintiff's Eighth Amendment rights.  To wit, the Exposer Control Order required Plaintiff to wear the jumpsuit when he left his cell.  (Dkt. No. 1 at ¶38.)  Plaintiff claims that when he refused to wear the jumpsuit during family visits, Van Buren and Hilton compelled Plaintiff to be handcuffed from behind with a waist chain.  As a result, Plaintiff alleges that he was deprived of food, water and bathroom breaks for five hours each week.  (Dkt. No. 60-1 at 8; Dkt. No. 60-2 at 2.)  Similarly, Plaintiff contends that when he refused to wear the jumpsuit to programs, Defendants required Plaintiff to be handcuffed to a desk and shackled to a chair for four hours each day during programs.[23]  (Dkt. No. 60-1 at 7.)   Defendants dispute these allegations and claim that Plaintiff was required to wear these restraints due to security measures unrelated to lewd conduct.  (Dkt. No. 54-3 at 11; Dkt. No. 63-1 at 7.)

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer*, 511 U.S. at 837; *Hathaway I*, 37 F.3d at 66.  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer*, 511

---

[23]  In his opposition to Defendants' motion, Plaintiff claims that "McCardle" subjected Plaintiff to cruel and unusual punishment.  (Dkt. No. 60-1 at 7.)  In July 28, 2014 Order, the Court dismissed Plaintiff's claims against McArdle for failure to state a claim.  (Dkt. No. 16 at 20.)  McArdle was dismissed from the action.  *Id.* at 31.

U.S. at 832. To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Id.* To establish an Eighth Amendment conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, a prisoner must show that the defendant's "act or omission . . . result[ed] in the denial of the minimal civilized measure of life's necessities." *Id.* Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 at 837.

Based upon the record before the Court, Plaintiff has not demonstrated that the use of the jumpsuit, handcuffs or waist chains deprived Plaintiff of basic human needs. The Exposer Control Order was issued due to security concerns raised by Plaintiff's own misconduct and indecent exposure. *See Selby v. Martin*, 84 F. App'x 496, 498 (6th Cir. 2003) (finding no Eighth Amendment violation due to the use of leg irons and belly chains that the plaintiff was directed to wear after being found guilty of attempted escape). The Exposer Control Order was not without limitations since it was scheduled to expire thirty days after it was issued; however, Plaintiff continued to engage in lewd conduct. Moreover, the Exposer Control Order did not restrict Plaintiff's movement, prohibit Plaintiff from leaving his cell or preclude Plaintiff from attending programs or visit. *See Harris v. Horel*, No. C 06-7761, 2009 WL 2761339, at *4 (N.D. Cal., Aug. 31, 2009) (finding no Eighth Amendment violation as the exposure

jumpsuit did not restrict the plaintiff from leaving his cell, but rather required the plaintiff to wear the jumpsuit when he was outside his cell). There is no evidence that Plaintiff endured any discomfort as a result of wearing the jumpsuit that posed a risk of serious injury. *See Barrow v. Buren*, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084, at *15 (N.D.N.Y. Jan. 30, 2015) (holding that the physical discomfort of the padlock on exposure jumpsuit did not pose an excessive risk of serious injury).

With regard to the waist chains, handcuffs and shackles, Plaintiff does not provide any evidence to support his vague claims regarding the deprivation of food and bathroom breaks. Even assuming Plaintiff provided evidence including dates and specific information regarding these deprivations, the temporary unpleasantries that Plaintiff allegedly suffered, i.e., being unable to take bathroom breaks or feed himself for four or five hour periods, are not serious deprivations of life necessities. *See Jones v. Marshall*, No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan. 19, 2010) (holding that the temporary denial of a bathroom does not establish the existence of an objective injury for the purposes of an Eighth Amendment claim) (citations omitted).

Given the foregoing, the Court recommends that Defendants be granted summary judgment on this issue.[24]

---

[24] Plaintiff claims, in his opposition, that Defendants utilized the jumpsuit "in retaliation to my request for OMH and complaints." (Dkt. No. 60-2 at 3.) "[A] plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint." *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495 (W.D.N.Y. 2007) (citing *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). Thus, the Court will not consider any retaliation claims in the context of the within motion.

### C.    Excessive Force

Plaintiff contends that Hilton and Van Buren subjected him to excessive force when he was handcuffed to a desk, handcuffed behind his back, and required to wear the jumpsuit.  (Dkt. No. 60 at 2; Dkt. No. 60-2 at 4.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency.*" Blyden v. Mancusi*, 186 F.3d 252, 262  63 (2d Cir. 1999) (internal quotation marks omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 [1992] ).  "While handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force."  *See Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).  "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff s] pleas that the handcuffs were too tight; and 3) the degree of injury [...]."  *Id.* (citations omitted).  To sufficiently plead an excessive force claim based upon handcuffing, the plaintiff must allege more than a temporary injury.  *Jackson v. City of New York*, 939 F. Supp. 2d 219, 231 (E.D.N.Y.  2013).

As discussed *supra*, to sustain a cause of action under § 1983, Plaintiff must establish that Hilton and Van Buren were personally involved in a constitutional violation.  With respect to excessive force, Plaintiff does not allege that Hilton or Van Buren personally applied restraints or that either Defendant was present during any incident involving restraints that resulted in injury to Plaintiff.  Rather, Plaintiff alleges, without support or specifics regarding date and time, that "the force utilized by defendants when handcuffing . . . was [not] applied in good faith effort or restore discipline" but "maliciously and

sadistically to cause harm." (Dkt. No. 60 at 2.) Plaintiff's conclusory allegations are insufficient to defeat a motion for summary judgment. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[M]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case."). Plaintiff has failed to present evidence establishing when the excessive force incidents occurred or facts proving that excessive force was used when he was restrained or that restraints were applied in a malicious or sadistic way to cause harm. The undisputed evidence establishes that the restraints and jumpsuit were utilized based upon Plaintiff's classification as a "Level II" inmate and in response to Plaintiff's lewd behavior. Defendants' actions do not amount to behavior in violation of the Eighth Amendment. *Chambliss v. Rosini*, 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (concluding that the plaintiff failed to satisfy the subjective prong with proof demonstrating that the alleged force used against him was employed maliciously and sadistically to cause harm) (citing *inter alia, Houston v. Horn*, 2010 WL 1948612, at *12 (S.D.N.Y. May 13, 2010) (the plaintiff failed to satisfy subjective element of excessive force claim where he failed to submit proof that contradicted evidence that force was only used to restore discipline after the plaintiff failed to comply with an officer's order)).

Based upon the foregoing, the Court concludes that there is no evidence in the record upon which a jury could reasonably find that Hilton or Van Buren violated Plaintiff's Eighth Amendment rights related to excessive force and recommends that Hilton and Van Buren be granted summary judgment on this issue.

### D. Fourteenth Amendment

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker*, 139 F.3d 329, 333

28

(2d Cir. 1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute, or regulations. *Arce*, 139 F.3d at 333. To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). In *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'") (quoting *Sandin,* 515 U.S. at 484).

### 1.      Due Process Claims Related to Restraints

Plaintiff claims that his liberty was restricted because he was compelled to wear the jumpsuit to all out of cell activities including programs, visits, and callouts without an opportunity to be heard. (Dkt. No. 60-1 at 3, 5.) Plaintiff asserts that he was ordered to be handcuffed behind his back for the

weekly visiting period (five hours each week) for three months, without notice or "the right to be heard." (Dkt. No. 60 at 3.)  Plaintiff also claims that after being found not guilty, the Exposer Control Order should have been terminated.  (Dkt. No. 16 at 22.)

The evidence does not support Plaintiff's claim that he was deprived of a cognizable liberty interest.  Plaintiff was not restricted from movement or subjected to significant hardship in relation to the ordinary incidents of prison life as a result of being compelled to wear the jumpsuit, handcuffs or waist chains.  Even if an inmate's movement is restricted, "restrictions of movement and/or access to privileges are quintessential to the nature of prison life." *See Smith v. Clary*, No. 12-1779, 2012 WL 4059977, at *2 (D.S.C. Aug. 16, 2012).  Plaintiff concedes that he was able to participate in out of cell activities including programs and visitation.  *See Barrow*, 2015 WL 417084, at *18 (finding no deprivation of liberty interest because the defendants did not prevent the plaintiff from attending programs while he was wearing the jumpsuit).  In *Barrow*, the Court held:

> [A]lthough [the plaintiff] was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting [the plaintiff's] movement. Therefore, [the plaintiff] failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." (citation omitted)

*Barrow*, 2015 WL 417084, at *19.

Plaintiff has failed to establish, with competent admissible proof, that he had a liberty interest in remaining free from restraints.  Even assuming Plaintiff possessed such an interest, the undisputed record establishes that the "degree and duration" of the restraints was not significant to amount to a due process violation.  *See Allah v. Goord*, 405 F. Supp. 2d 265, 277 (S.D.N.Y. 2005) (finding no due process violation because the plaintiff was restrained with handcuffs while being transported from the

facility to the hospital); *see also Barrat v. Joie*, No. 96 CIV 0324, 2002 WL 335014, at *9 (S.D.N.Y. March 4, 2002) (concluding that holding the plaintiff handcuffed in a cell for five hours did not violate the Fourteenth Amendment).

I find that Plaintiff's confinement to restraints does not give rise to a protected liberty interest. Therefore, I recommend that Defendants be granted summary judgment dismissing Plaintiff's claims for denial of Plaintiff's Fourteenth Amendment due process rights in connection with the use of restraints and the jumpsuit.

### 2.    Due Process Claims Related to Draft Directive No. 4939

Plaintiff alleges that Hilton recommended an Exposer Control Order in accordance with a Draft Directive in violation of his due process rights. Specifically, Plaintiff claims that due process rights were violated because the Draft Directive was not disclosed. (Dkt. No. 60-1 at 6; Dkt. No. 60-2 at 3.) Plaintiff relies upon New York State Correction Law §§ 138 (1) and 138(5).[25]

Upon a review of the record, the Court finds genuine issues of material fact regarding the use of the Exposer Control Order and Plaintiff's notice regarding the Draft Directive that preclude summary judgment. Plaintiff filed a FOIL request with Hilton for a copy of "jumpsuit policy and procedures." Hilton denied the request claiming that he was authorized to withhold the disclosure of the Draft Directive as it was an "intra-agency document . . . not a final agency determination." (Dkt. No. 54-1 at 10; Dkt. No. 54-4 at 9; Dkt. No. 60-1 at 6; Dkt. No. 1 at ¶41.) In support of the motion for summary judgment, Hilton and Van Buren provided declarations with factual assertions related to the Draft

---

[25] N.Y. Correction Law § 138(1) provides: "All institutional rules and regulations defining and prohibiting inmates misconduct shall be published and posted in prominent locations within the institution." N.Y. Correction Law § 138(5) provides: "No inmate shall be disciplined except for a violation of a published and posted written rule or regulation, a copy of which has been provided to the inmate."

Directive that are based "upon information and belief" and statements that are qualified with the phrase, "I have no reason to believe." For example, Hilton states, "[u]pon information and belief, the Deputy Superintendent for Security approved the use of the exposure control suit." (Dkt. No. 54-3 at 8.) Similarly, Van Buren asserts that, "upon information and belief, Inmate Allah was made aware that any future lewd conduct could result in the use of the jumpsuit." (Dkt. No. 63-1 at 8.) These assertions, and other similarly qualified statements, cannot be considered on this motion as the statements lack supporting evidentiary facts. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d at 643 (2d Cir. 1988) (holding that a Rule 56 motion must be supported with affidavits based on personal knowledge); *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 57 n. 8 (2d Cir. 2003) (a declaration stating "upon information and belief" is not "admissible evidence" required under Rule 56).

The record before the Court does not include a copy of any "Inmate Exposure Control - One Time Warning Form" related to Plaintiff or a copy of the Exposer Control Order. Indeed, nothing in the record proves that Plaintiff was provided with a warning before Hilton made his recommendation. Further, the record does not indicate that Plaintiff was charged or observed engaging in sexual activity or lewd conduct during visiting hours, thus eliminating the need for the warning. While Hilton claims he was aware of Plaintiff's "history" of lewd conduct and avers that Plaintiff "received multiple tickets for such misconduct," the record does not include evidentiary support for these statements.[26]

Based upon the record before this Court, issues of fact exist as to whether Plaintiff suffered an "atypical and significant hardship in relation to the ordinary incidents of prison life" as a result of being subjected to punishment pursuant to an undisclosed, unposted, and unpublished Draft Directive. "Due

---

[26] The Court notes that the record includes a copy of Plaintiff's history of disciplinary infractions while in DOCCS custody. (Dkt. No. 54-4.) However, the report is dated November 2014 and does not support Hilton's statements related to the information available in 2011.

process requires prison officials to provide inmates with adequate notice of what conduct is prohibited." *Collins v. Goord*, 581 F. Supp. 2d 563, 578 (S.D.N.Y. 2008) (holding that the punishment of an inmate in violation of § 138[5] deprives the inmate of a liberty interest in not being disciplined without notice of the rule or regulation the inmate is deemed to have violated). The record herein contains various questions of fact including: (1) whether Plaintiff received a One-Time Warning; (2) whether a published and posted rule or policy existed regarding the use of the jumpsuit; and (3) whether Plaintiff was notified of any such rule or policy. *See Chatin v. Coombe*, 186 F.3d 82, 87-90 (2d Cir. 1999) (holding that the evidence did not demonstrate that the plaintiff's conduct was proscribed by the Rule or that the plaintiff "believed it to be"); *see also Collins*, 581 F.Supp.2d at 578 (finding that it was "necessary" to determine which rules the plaintiff was given, whether those rules were used as the basis for the plaintiff's discipline, and whether those rules were posted) (citation omitted).

Accordingly, the Court recommends that Defendants' motion for summary judgment, on this issue, be denied to Hilton and Van Buren.

### E. Qualified Immunity

Defendants also seek dismissal of Plaintiff's claims on qualified immunity grounds.[27] (Dkt. No. 54-1 at 12.) Defendants in civil rights actions are entitled to qualified immunity from civil damages "unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Thus, the qualified immunity inquiry in a prisoner civil rights case involves two issues: (1) "whether the facts, viewed in the

---

[27] Defendants asserted qualified immunity as an affirmative defense in their answer. (Dkt. No. 37 at ¶13.)

light most favorable to the plaintiff, establish a constitutional violation;" and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton*, 380 F.3d 57, 68 69 (2d Cir. 2004) (citations omitted), *accord Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) (citations omitted).

Since Plaintiff cannot establish that Khan, Hilton and Van Buren violated his Eighth Amendment rights, it is unnecessary to consider the qualified immunity argument in the context of those claims. With respect to Hilton and Van Buren and Plaintiff's due process claim, as discussed *supra*, issues of fact exist as to whether Plaintiff's constitutional rights were violated when he was disciplined pursuant to the Draft Directive. Thus, the Court must address the second question: whether it would be clear to a reasonable officer that his conduct was lawful in the situation confronted.

In determining whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, courts in this circuit consider three factors: (1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

In determining whether the right in question in a particular case was defined with reasonable specificity, courts must avoid "framing the constitutional right at too broad a level of generality." *Redd v. Wright*, 597 F.3d 532, 536 (2d. Cir. 2010). On the other hand, "[t]his does not mean that there must be a factual equivalency between the case at issue and prior cases. The 'salient question' instead is whether the case law at the time in question would have put reasonable officers on 'fair warning' that

their conduct violated the plaintiff's rights." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, for the purposes of this motion, Defendants have not demonstrated that they are entitled to qualified immunity. New York Correction Law § 138 clearly provides that "rules and regulations proscribing inmate conduct be prominently posted and that an inmate shall be disciplined only for a violation of a posted rule or regulation." Therefore, I recommend that the Court reject Defendants' qualified immunity argument at this time. *Hodges*, 873 F.Supp. at 747 (holding that a "jury could reasonably conclude that it was not objectively reasonable for the defendants to believe that they were acting constitutionally if they in fact disciplined the plaintiff for violating a new rule that was not published or posted and as to which he had no notice.").

## V. MOTION TO APPOINT COUNSEL

Plaintiff moves, for the second time, for the appointment of counsel. (Dkt. No. 64.) Plaintiff claims that he is "serious mentally ill" and "lack[s] necessary comprehension and experience to navigate pro se." *Id.* at 5. Plaintiff also claims that he has a "physical disability" that impairs his "ability to write." *Id.* at 6.

On September 4, 2014, the Court issued an Order (the "September Order") denying Plaintiff's previous motion for the appointment of counsel, with leave to renew, because Defendants had not been served with the Complaint and the Court was unable to conclude that Plaintiff's position was "likely to be of substance." (Dkt. No. 26 at 3.) The Court also determined that the case did not present complex issues, the Plaintiff was able to litigate the action and if the case survived dispositive motions, "it is highly probable that this Court will appoint trial counsel at the final pretrial conference." (Dkt. No. 26 at 3.) The Court was unaware of any "special reasons" why counsel was necessary at that time. *Id.*

The Court has reviewed Plaintiff's second motion, with consideration of the factors outlined in the September Order, and finds no change of circumstances that would warrant appointment of counsel pro bono for the Plaintiff at this time. Plaintiff's physical and mental impairments have not prevented him from filing motions and responding to Defendants' motion. *See Candelaria v. Geifinger*, No. 96-CV-0017 (RSP/DS), 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (denying motion to appoint counsel as the plaintiff's health did not prevent him from effectively litigating the action.) Plaintiff's second request for counsel is not accompanied by documentation that substantiates his renewed efforts to obtain counsel from the public and private sector.[28] *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994); *Cooper v. Sargenti Co., Inc.*, 877 F.2d 170, 172, 174 (2d Cir. 1989). Moreover, even if the Court were to assume that Plaintiff's claims are likely to be of substance, the relevant factors, as discussed in the September Order, would, and do, weigh against the granting of Plaintiff's motion. At this juncture, it appears that the case does not present issues that are novel or more complex than those raised in most prisoner civil rights actions. *See Marino v. Koenigsmann*, No. 9:12-CV-1170 (GTS/RFT), 2014 WL 1239514, at *1 (N.D.N.Y. Mar. 25, 2014). Moreover, it is highly probable that this Court will appoint trial counsel at the final pretrial conference and the Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. *See Terminate Control Corp.*, 28 F.3d at 1341; *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir.1986). For all of these reasons, Plaintiff's second request for counsel is denied without prejudice.

**ACCORDINGLY**, it is hereby

---

[28] The March 3, 2014, letter from Nixon Peabody was previously annexed as an exhibit to Plaintiff's prior motion for the appointment of counsel. (Dkt. No. 23 at 3.)

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 54) be **GRANTED** in part and **DENIED** in part, as follows:

1. Summary judgment be **GRANTED** to Defendants Khan, Hilton and Van Buren on Plaintiff's Eighth Amendment claims and **GRANTED** to Defendants Hilton and Van Buren on Plaintiff's Fourteenth Amendment due process claims related to imposition of restraints and the jumpsuit; and

2. Summary judgment be **DENIED** to Defendants Hilton and Van Buren on Plaintiff's Fourteenth Amendment due process claims related to Draft Directive No. 4939; and it is further

**ORDERED** that Plaintiff's motion for the appointment of counsel (Dkt. No. 64) is **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam), the Clerks Office provide Plaintiff with copies of the following unpublished decisions:  *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876 (S.D.N.Y. Oct. 28, 1999); *Witzenburg v. Jurgens*, No. CV-05-4827, 2009 WL 1033395 (E.D.N.Y. April 14, 2009); *Hamm v. Hatcher,* No. 05 Civ. 503, 2013 WL 71770 (S.D.N.Y. Jan. 7, 2013); *Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574 (W.D.N.Y. June  25, 2012); *Briese Lichttechnik Vertriebs GmbH v. Langton*, No. 09 CIV. 9790, 2012 WL 5457681(S.D.N.Y. Nov. 8, 2012); *MPD Accessories, B.V. v. Urban Outfitters, Inc.*, No. 12 CIV. 6501, 2013 WL 5761421 (S.D.N.Y. Oct. 24, 2013); *Guarneri v. Hazzard*, No. 9:06-CV-985(NAM/DRH), 2010 WL 1064330 (N.D.N.Y. Mar. 22, 2010); *Henderson v. Sommer*, No. 08 Civ. 3440, 2011 WL 1346818 (S.D.N.Y. April 1, 2011); *Bouknight v. Yee-Cheen Doung*, No. 09 CIV. 5817, 2011 WL 2682103, at *5 (S.D.N.Y. July 8, 2011); *Harris v. Horel*, No. C 06-7761, 2009 WL 2761339 (N.D. Cal., Aug. 31, 2009); *Barrow v. Buren*, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084 (N.D.N.Y. Jan. 30, 2015); *See Jones v. Marshall*, No. 08 Civ. 0562, 2010 WL 234990 (S.D.N.Y. Jan. 19, 2010); *Houston v. Horn*, 2010 WL 1948612

(S.D.N.Y. May 13, 2010); *Smith v. Clary*, No. 12-1779, 2012 WL 4059977 (D.S.C. Aug. 16, 2012);

*Barrat v. Joie*, No. 96 CIV 0324, 2002 WL 335014 (S.D.N.Y. March 4, 2002); *Candelaria v. Geifinger*,

No. 96-CV-0017 (RSP/DS), 1998 WL 312375 (N.D.N.Y. June 8, 1998); *Marino v. Koenigsmann*, No.

9:12-CV-1170 (GTS/RFT), 2014 WL 1239514 (N.D.N.Y. Mar. 25, 2014).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of*

*Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 72, 6(a).


Dated:  May 9, 2016
          Syracuse, New York


Thérèse Wiley Dancks
United States Magistrate Judge

KeyCite Yellow Flag - Negative Treatment

**Disagreement Recognized by** Cunningham v. Rodriguez, S.D.N.Y., November 22, 2002

2002 WL 335014
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Herman BARRATT, Plaintiff,

v.

Police Officers William JOIE and
Thomas Fitzgerald, Defendants.

No. 96CIV0324LTSTHK.
|
March 4, 2002.

MEMORANDUM ADOPTING
REPORT AND RECOMMENDATION

SWAIN, District J.

**\*1** On March 29, 2001, Magistrate Judge Theodore H. Katz issued a Report and Recommendation ("Report") recommending that Plaintiff's action pursuant to 42 U.S.C. section 1983 against Defendants Police Officers William Joei and Thomas Fitzgerald ("Defendants") be dismissed with prejudice and that Defendants be granted summary judgment. On April 9, 2001, Plaintiff filed a timely objection to the Report and Recommendation.

In reviewing the Report and Recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(C) (2001). The statute provides that "[w]ithin ten days ... any party may serve and file written objections to such proposed findings and recommendations ...." *Id.* "To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985) (citations omitted). *See also Pizarro v. Bartlet,* 776 F.Supp. 815, 817 (S.D.N.Y.1991) (Court may accept report if it is "not facially erroneous"). The Court is required to make a *de novo* determination as to the aspects of the Report to which objections are made. *See id.; United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a

party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusory or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chabrier v. Leonardo,* No. 90 Civ. 0173(PKL), 1991 WL 44838 at \*1 (S.D.N.Y. March 26, 1991) (restatement of allegations before the Court and assertion that valid constitutional claim exists insufficient exists insufficient to form specific objections); *Schoolfield v. Dep't of Corr.,* No. 91 Civ. 1691(JL), 1994 WL 119740, at \*2 (S.D.N.Y. Apr. 6, 1994) (objections stating the magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report and recommendation). Objections to a Report and Recommendation "are to be specific and are to address only those portions of the proposed findings to which the party objects." *Camardo,* 806 F.Supp. at 381–82. Parties filing objections to recommendations are required to " ' pinpoint' specific portions of the report and recommendations to which [they] objec[t] ...." *Id.* at 382.

Plaintiff's responses to Magistrate Judge Katz's Report reiterate many of the claims asserted in his earlier submissions, including Plaintiff's Amended Complaint, dated January 27, 1997, Plaintiff's Memorandum of Law in Support to Deny Defendant's Motion, dated July 6, 2000, and Plaintiff's Affidavit in Opposition to Defendant's Motion, dated July 6, 2000. Those claims are addressed directly in the Report. Plaintiff's allegations and unsubstantiated assertions do not provide any basis for deviation from Magistrate Judge Katz's conclusions.

**\*2** The only specific objection raised by Plaintiff to the content of the Report is an assertion that there is a material disputed issue of fact, precluding summary judgment, as to whether Plaintiff was injured. Magistrate Judge Katz's recommendation that the complaint should be dismissed in its entirety rests in part on the conclusion that Plaintiff did not complain of any injuries in the days following the alleged incident. Judge Katz cites, among other things, a prison clinic intake form, dated June 12, 2000 (two days after the arrest), marked as a deposition exhibit and submitted by Defendants in support of their motion, that shows a negative response to the item "Have you been injured recently or have an injury now?" (Ex. C to Declaration by Elizabeth A.

Galani.) Plaintiff proffers, as an attachment to his objections, another copy of the form, showing a check mark indicating an affirmative response to the item "Have you been injured recently or have an injury now?" Plaintiff asserts that the copy submitted by Defendants was altered and that he has come forward with evidence of an injury resulting from the alleged excessive use of force. This supposed evidence is insufficient to demonstrate the existence of a genuine issue of fact. Far from supporting Plaintiff's unsworn assertions that Defendants altered the copy marked as a deposition exhibit and that his copy is genuine, Plaintiff's proffer shows clear signs of alteration. A check mark in the negative column is incompletely obscured and, unlike the other affirmative responses, no narrative detail explaining the response appears in the adjoining column on Plaintiff's submission.

The Court, having thoroughly reviewed the entire Report, adopts Magistrate Judge Katz's Report and Recommendation and finds that the grant of summary judgment in favor of Defendants is proper. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.

KATZ, Magistrate J.

This Section 1983 action was referred to me for general pretrial supervision and Reports and Recommendations on dispositive motions, in accordance with 28 U.S.C. sections 636(b)(1)(B) and (C) and Rule 72.1(a) of the Local Civil Rules of the Southern District of New York.

Plaintiff Herman Barratt, a New York state prisoner proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against Police Officers William Joie and Thomas Fitzgerald, alleging deprivation of his constitutional rights. Defendants Joie and Fitzgerald have moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P, arguing (1) that plaintiff fails to state a claim for false arrest against either Joie or Fitzgerald, as he was convicted of the charges stemming from his arrest; (2) that plaintiff fails to state a claim for excessive use of force against defendant Fitzgerald as he does not allege that Fitzgerald ever used force against him at all; and (3) that plaintiff's excessive force claim against defendant Joie should be dismissed because there is no evidence that the force allegedly used by Officer Joie caused injury to plaintiff. For the reasons set forth below, I respectfully recommend that defendants' motion for summary judgment be granted in its entirety and that this action be dismissed with prejudice.

BACKGROUND

**\*3** Plaintiff's claims arise from his arrest by Police Officers Joie and Fitzgerald on June 10, 1993. On that date, plaintiff, who was then 46 years old, met a 16 year old female in Jackson Park in Greenwich Village.[1] *See* Deposition Transcript of Herman Barratt ("Barratt Depo.") at 38. Upon learning that the girl was looking for a job, plaintiff presented himself as a clothing designer and invited her to go to his hotel room to look at T-shirts she could sell. According to plaintiff, he invited her to come to his room in the River View Hotel at 113 Jane Street in Manhattan, where the two drank vodka and the girl snorted cocaine; they then had sexual intercourse. Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Rule 56.1 Stmnt."). According to the girl, plaintiff refused to let her leave his room, threatened her and forced her to have sexual intercourse.

The girl escaped by telling Barratt that she needed to use the bathroom, which was located in the hotel corridor. She left his room and immediately called 911 from a pay telephone. The police arrived within five minutes and found the victim in the hotel lobby, hysterical and wearing her dress inside-out. When plaintiff went in search of her, he found her speaking to Police Officers Joie and Fitzgerald. Pointing out Barratt, they asked the victim, "Is that him?" When she replied, "Yes, that's him," Officer Joie arrested and handcuffed plaintiff. Barratt Depo. at 42. According to Barratt, Officer Joie "grabbed [his] hands and twisted" while handcuffing him. *Id.* Plaintiff claims that the handcuffs were very tight and were "embedded" in his wrists. *Id.* He alleges that, as a result, his hands were numb and bruised when the handcuffs were removed. *Id.* at 77.

The officers took Barratt to the 6th Precinct station house. Plaintiff claims that defendant Joie kicked him once in the back while placing him in a cell, *id.* at 104, a claim which Joie denies. *See* Trial Transcript of Plaintiff's Criminal Trial ("Trial Tr.") at 851. Plaintiff contends that he was kept in handcuffs for approximately five hours, during which time he was "tortured." *See* Barratt Depo. at 104. However, other than his conclusory use of the term "tortured," plaintiff's allegations about the use of force during his detention at the police precinct relate solely to his hands being twisted as he was cuffed (this would most likely have occurred during his arrest, since that is when he was placed in cuffs), being kept in tight handcuffs for approximately five hours, and being kicked once in the back by Joie.[2]

At his deposition, plaintiff stated that Fitzgerald remained at a desk while Joie took him to a cell, *id.* at 82, and that Fitzgerald never hit or kicked him. *Id.* at 106. Plaintiff testified, "Officer Fitzgerald didn't actually kick me, no. He didn't actually kick me, no. He saw me in a position that I was in." *Id.* at 106, lines 3–5. Plaintiff later made modifications to his deposition, changing the last line of that statement to read: "Officer Fitzgerald helped Officer Joie to use force on the plaintiff when the plaintiff was on the ground, with his hands twisted behind his back, while the plaintiff was handcuffed." *See* Affidavit in Opposition to Defendant's Motion, dated June 29, 2000 ("Barratt Aff.") at 5. Plaintiff did not alter his deposition testimony that Fitzgerald never hit or kicked him, Barratt Depo. at 106, lines 6–7, and did not alter his deposition testimony that the only force Joie used was in handcuffing plaintiff behind his back and kicking him once while plaintiff was entering his cell. *Id.* at 106.

**\*4** On June 12, 1993, two days after his arrest and arraignment, plaintiff was sent to a New York City Department of Corrections facility on Rikers Island, where he received a routine intake physical examination. He informed the examining physician that he had no injuries and had not been injured recently. *See* Correctional Health Services Intake History and Physical Examination, dated June 12, 1993, attached as Exhibit ("Ex.") C to the Declaration of Assistant Corporation Counsel Elizabeth A. Galani ("Galani Decl.").

In August of 1994, fourteen months after his arrest, plaintiff sought medical treatment for his back. When asked at his deposition why he had not sought medical treatment before that time, he claimed that he had been "getting medical treatment from another source" until that time. Barratt Depo. at 135. However, no competent evidence of any other medical treatment has been presented.

On October 20, 1994, plaintiff was convicted in New York State Supreme Court of one count of rape in the first degree, one count of sodomy in the first degree, one count of rape in the third degree, and one count of sodomy in the third degree, stemming from his June 1993 encounter with the 16 year old girl in his hotel room. *See* Miscellaneous Certificate No. 21622, attached as Ex. D to Galani Decl. The Appellate Division unanimously affirmed his conviction on September 25, 1997, *see People v. Barratt,* 663 N.Y.S.2d 821 (1st Dep't 1997), and the New York Court of Appeals denied leave

to appeal on December 29, 1997. *See People v. Barratt,* 91 N.Y.2d 869 (1997).

DISCUSSION

*I. Summary Judgment Standard*

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. of Reading, Pennsylvania v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). In addition, because plaintiff is acting *pro se,* the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nevertheless, to defeat a motion for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). A plaintiff must "come forward with enough evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely ... on the basis of conjecture and surmise." *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992). A party opposing a motion for summary judgment "may not rest on the pleadings, but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996); *see also* Fed.R.Civ.P. 56(c) and (e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).

*II. False Arrest*

**\*5** Although defendants have moved to dismiss plaintiff's claim of false arrest, the Court has difficulty discerning any such claim in plaintiff's pleadings or submissions in opposition to the motion. Nevertheless, in an abundance of caution, this issue will be addressed.

To succeed on a claim of unlawful or false arrest, a plaintiff must show that there was a lack of probable cause for the arrest. *See Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994); *Thomas v. Culberg,* 741 F.Supp. 77, 79

(S.D.N.Y.1990). The existence of probable cause to arrest is a complete defense to an action for false arrest. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983); *see also Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225 (1964); *Calamia v. City of New York,* 879 F.2d 1025, 1032 (2d Cir.1989); *Weyant,* 101 F.3d at 852. The rule of probable cause is a "practical, non-technical conception." *Beck,* 379 U.S. at 91, 85 S.Ct. at 226 (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311 (1949)).

The uncontested facts demonstrate that Officers Joie and Fitzgerald had sufficient information to justify an officer of reasonable caution in believing that plaintiff had committed a crime. *See Weyant,* 101 F.3d at 852 ("The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers ....") The victim called the police immediately after the rape had occurred, from the building in which it had occurred. When Joie and Fitzgerald arrived at that location, they found the victim in the hotel lobby, hysterical and wearing her dress inside-out. They waited with the victim until plaintiff appeared, asked her if he was "the one," and arrested plaintiff upon her confirmation. *See* Report of Investigation, dated June 11, 1993, attached as Ex. B to Galani Decl. (containing summaries of interviews with the arresting officers); *Barratt,* 2000 WL 1364352, at * 1. This sequence of events provided probable cause for the officers to effect plaintiff's arrest. *See, e.g., Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) ("[P]olice officers, when making a probable cause determination, are entitled to rely on the victim's allegations that a crime has been committed."); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995); *Brown v. City of New York,* No. 98 Civ. 1208(NRB), 2000 WL 1863707, at *2 (S.D.N.Y. Dec. 19, 2000) (The complainant's report of attempted robbery and police observation of defendant's disposal of weapon created probable cause; and police were "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.")

**\*6** Furthermore, plaintiff was subsequently convicted of rape and sodomy in the first and third degrees, the offenses for which he was arrested. Although a favorable resolution of

a defendant's criminal charges is not a necessary element of a claim of false arrest, *see Weyant,* 101 F.3d at 853, *Singer,* 63 F.3d at 118, when a criminal defendant has been convicted of the offense for which he was arrested and the conviction has not been overturned, probable cause is assumed and can no longer serve as the basis for damages under a Section 1983 false arrest claim. *See Weyant,* 101 F.3d at 852; *Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.1986)("Where the civil rights plaintiff has been convicted of the offense for which he was arrested, we have in effect accepted the fact of the conviction as conclusive evidence of the good faith and reasonableness of the officer's belief in the lawfulness of the arrest."); *Perlleshi v. County of Westchester,* No. 98 Civ. 6927(CM), 2000 WL 554294, at *3 (S.D.N.Y. Apr. 24, 2000); *Duamutef v. Morris,* 956 F.Supp. 1112, 1117 (S.D.N.Y.1997); *Gibson v. The City of New York,* No. 96 CV 4958, 1998 WL 960303, at * *2–3 (E.D.N.Y. Dec. 9, 1998), *aff'd,* 182 F.3d 899 (2d Cir.1999), *cert. denied,* ___ U.S. ___, 120 S.Ct. 2728 (2000).

Accordingly, I respectfully recommend that defendants' motion for summary judgment be granted with respect to any claim of false arrest by the plaintiff.

### III. Excessive Use of Force

#### A. Defendant Fitzgerald

Defendant Fitzgerald moves for summary judgment on the ground that he was not personally involved in any use of force against plaintiff Barratt on June 10, 1993. *See* Defendants' Memorandum of Law ("Deft.Mem.") at 7.

Because § 1983 imposes liability only upon those who actually cause a deprivation of rights, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *see also Blyden v. Mancusi,* 186 F .3d 252, 264 (2d Cir.1999); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1983).

Virtually all of plaintiff's allegations of excessive force are directed at defendant Joie. Plaintiff accuses defendant Joie of placing the cuffs on him, twisting his hands, and subsequently kicking him in the back. At his deposition, plaintiff testified that Fitzgerald never hit or kicked him, and that Fitzgerald was at a desk when Officer Joie was placing plaintiff in a cell and allegedly kicked him. Barratt Depo. at 106. Although plaintiff later altered his deposition testimony to indicate

that Fitzgerald helped Joie "use force on the plaintiff when the plaintiff was on the ground, with his hands [handcuffed and twisted behind his back]," Barratt Aff. at 5, this altered statement fails to create a genuine issue of fact. Plaintiff has not provided any description of the nature of the "force" Fitzgerald allegedly used. Moreover, plaintiff has failed to produce any evidence or testimony that Joie ever used force on plaintiff while plaintiff was handcuffed and on the ground; rather, plaintiff's testimony is that Joie gave plaintiff a single kick to his back as plaintiff was entering the cell. Thus, plaintiff's altered statement is not only conclusory, but is also inconsistent with his other testimony. [3]

**\*7** Because plaintiff has come forward with no competent evidence indicating that Fitzgerald was involved in any alleged use of force, no less excessive force, during or after plaintiff's arrest, I respectfully recommend that defendant Fitzgerald's motion for summary judgment be granted. [4]

### B. Defendant Joie

In contrast to his claims regarding defendant Fitzgerald, plaintiff alleges that defendant Joie was directly involved in the use of excessive force against him. Plaintiff bases his claim of excessive use of force on the following facts: (1) upon his arrest, Joie grabbed his hands and twisted them, while placing him in tight handcuffs; [5] (2) the handcuffs were very tight and were left on for approximately five hours, resulting in bruising of his wrists; and (3) Joie kicked him in the back while placing plaintiff in a cell at the police precinct. [6] Plaintiff's claims against Joie thus involve both his treatment during his arrest and his treatment while in custody, each of which is governed by a distinct legal framework.

### 1. Arrest Conduct

Plaintiff's claim regarding the use of excessive force during his arrest is analyzed under the "reasonableness" standard of the Fourth Amendment's guarantee against unreasonable seizures. *See Graham v. Conner,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1871 (1989); *Sullivan v. Gagnier,* 225 F.3d 161, 165 (2d Cir.2000); *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995); *Santiago v. City of New York,* No. 98 Civ. 6543(RPP), 2000 WL 1532950, at \*4 (S.D.N.Y. Oct. 17, 2000)("[P]laintiff was neither a pre-trial detainee nor a prisoner, but an arrestee in custody. As an arrestee, Plaintiff is protected from excessive force by the Fourth Amendment's prohibition on unreasonable seizures of the person."). Under a Fourth Amendment analysis, the relevant question is whether

the police officers' actions were " 'objectively reasonable' ' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U .S. at 397, 109 S.Ct. at 1872. Reasonableness is judged from the perspective of a reasonable officer on the scene, and it requires examining the circumstances of each case, including such factors as the severity of the crime at issue, the immediate threat the suspect poses, and whether the suspect is actively resisting arrest or attempting to flee. *See Graham,* 490 U.S. at 396, 109 S.Ct. at 1872; *Sullivan,* 225 F.3d at 165; *Soares v. State of Connecticut,* 8 F.3d 917, 921 (2d Cir.1993); *Sulkowska v. City of New York,* No.99 Civ. 4228(AGS), 2001 WL 62810, at \*10 (S.D.N.Y. Jan. 24, 2001).

Although the Second Circuit has refused to conclude that the handcuffing of an arrestee is *per se* reasonable, it has observed that "handcuffing will be the reasonable course in many, if not most arrest situations." *Soares,* 8 F.3d at 921. In the instant case, plaintiff has failed to offer any competent evidence to suggest that his handcuffing was unreasonable. Plaintiff was arrested on charges of rape and sodomy, obviously violent crimes. Although he contends that his hands were twisted while he was being cuffed and that the cuffs were too tight, these are normal incidents of handcuffing, and plaintiff has not alleged any special factors, such as a medical injury or pre-existing condition exacerbated by the handcuffing, that would support a conclusion that his handcuffing involved unreasonable or excessive force. *See, e.g., Sulkowska,* 2001 WL 62810, at \*10 (the use of handcuffs, which are "inherently tight on the wrists," to restrain an elderly woman who was screaming and yelling, was not unreasonable under the circumstances); *Perlleshi,* 2000 WL 554294, at \*6 (placing handcuffs on arrestee and holding his arms behind him to do so, even if it did cause momentary pain, was not excessive force as a matter of law); *Scott v. County of Nassau,* No. 94 CV 4291, 1998 WL 874840, at \*5 (E.D.N.Y. Dec. 11, 1998) (holding that is was reasonable to handcuff plaintiff's hands behind his back when placing him under arrest and during transport to the police precinct, where there were no "additional allegations of excessive force or blatant disregard for pre-existing injuries, complaints, or requests for medical treatment"); *cf. Lennon,* 66 F.3d at 425 (finding that the intrusion on Fourth Amendment rights, if any, was extremely limited where officer, in the course of effecting an arrest, wrapped his arm around a woman's neck, shoulder, and arm, causing injury to her wrist).

**\*8** Because no reasonable jury could conclude that Officer Joie acted unreasonably and used excessive force based

simply on plaintiff's perception that his handcuffs were too tight, plaintiff's claim of excessive force in the course of his arrest must fail.

*2. Use of Force in Custody*

Plaintiff's claims regarding the use of excessive force while he was in custody in the police precinct house is governed by the Fourteenth Amendment's Due Process Clause, which protects pretrial detainees from the use of excessive force that amounts to punishment. *See United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999) (citing *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861 (1979)); *Brown v. Doe,* 2 F.3d 1236, 1242 (2d Cir.1993); *Sulkowska,* 2001 WL 62810, at *11 ("[P]urported physical abuse ... while in custody at the 9th Precinct ... reflect[s] an alleged deprivation of plaintiff's Fourteenth Amendment rights, which protects pretrial detainees from punishment without due process."). The Second Circuit has held that the same standard applies to all excessive force claims, whether raised by a prisoner under the Eighth Amendment, or by a pretrial detainee under the Fourteenth Amendment. *See Walsh,* 194 F.3d at 48.

To establish a constitutional claim of excessive force, plaintiff must prove both an objective component (that the use of force by defendant Joie was objectively serious) and a subjective component (that defendant Joie acted with a sufficiently culpable state of mind). *See Walsh,* 194 F.3d at 49–50 (citing *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 999 (1992)); *Griffen v.. Crippen,* 193 F.3d 89, 91 (2d Cir.1999); *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996); *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994).

In addressing the subjective prong of this test, a court should consider the extent of the injury suffered as one factor in assessing whether the use of force could plausibly have been thought necessary, as opposed to the wanton or unjustified infliction of harm. Other factors to be considered are "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of the forceful response." ' *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999 (quoting *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 1085 (1986)). The core of the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999; *see also Branham,* 77 F.3d at 630; *Davidson,* 32 F.3d at 29; *Reynolds v. Goord,* No. 98 Civ. 6722(DLC), 2000 WL 235278, at *5 (S.D.N.Y. Mar. 1, 2000); *Green v. Aertex,* No.

94 Civ. 8281(DC), 1998 WL 106142, at *4 (S.D.N.Y. Mar. 10, 1998).

As to the objective prong, "[i]t is well established in this Circuit that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." ' *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)). "Alleged abuses of police power are sufficiently arbitrary to rise to constitutional magnitude only when the conduct at issue 'shocks the conscience." ' *Gabbay v. Gales,* No. 97 Civ. 7605(NRB), 2000 WL 28156, at *1 (S.D.N.Y. Jan. 14, 2000) (quoting *Medeiros v. O'Connell,* 150 F.3d 164, 170 (2d Cir.1998)).

**\*9** Although some degree of injury is ordinarily required to assert a claim of excessive force, *see Walsh,* 194 F.3d at 50, it is not necessary for a plaintiff to demonstrate "serious" or "significant" injury, provided the use of force is more than *de minimis* or involves force that is "repugnant to the conscience of mankind." *Id.* at 48 (citing *Hudson,* 503 U.S. at 7–10, 112 S.Ct. at 999–1001). "To satisfy the objective test ... a plaintiff need only allege conduct that violates "contemporary standards of decency." *Santiago v. C.O. Campisi Shield # 4592,* 91 F.Supp.2d 665, 674 (S.D.N.Y.2000) (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000).

*a. Continued Handcuffing at the Police Precinct*

Plaintiff has failed to provide any evidence that would suggest either objectively or subjectively that defendant Joie employed unconstitutional excessive force against him by keeping him handcuffed for approximately five hours in a holding cell. There is no evidence in this case that this handcuffing was either objectively shocking or violated contemporary standards of decency, so as to rise to the level of a constitutional violation. Plaintiff has provided no evidence indicating that Officer Joie acted maliciously or sadistically, solely to inflict suffering or discomfort, in keeping plaintiff handcuffed. To the contrary, plaintiff has submitted an excerpt of his criminal trial containing a portion of Officer Joie's testimony, in which Officer Joie explained that plaintiff was kept handcuffed because Joie was concerned about preserving evidence that might be contained in plaintiff's clothing, and that Joie was unable simply to remove plaintiff's clothing because a hospital gown was not immediately available. *See* Trial Tr. at 850.

Furthermore, the handcuffing did not result in any physical injury, other than the normal discomfort associated with

handcuffing. Plaintiff claims that when the cuffs were taken off his hands were numb and that he put cream or rubbing lotion on his wrists. However, he also asserts that "the main thing was really [his] back." Barratt Depo. at 77. When plaintiff was seen by medical staff two days later, he indicated that he had no injuries, and, in fact, his medical records contain no evidence of visible injuries.

Accordingly, no reasonable jury could conclude on this record that plaintiff's handcuffing in the precinct house shocks the conscience, was malicious, or was excessive force amounting to unconstitutional punishment. *See, e.g., Sulkowska,* 129 F.Supp. at 292 (Defendants' conduct did not violate the Fourteenth Amendment where plaintiff was kept handcuffed to the bars of a holding cell; the restraint was "an incident of her detention."); *cf. Johnson v. City of New York,* 940 F.Supp. 631, 637 (S.D.N.Y.1996) (applying Fourth Amendment analysis, court concludes that any intrusion on Fourth Amendment rights was extremely limited by maintaining an arrestee in handcuffs for the 4 or 5 hours of his detention, where hands were cuffed in the front and detainee's movement was not restricted); *compare Casaburro v. Giuliani,* 986 F.Supp. 176, 178, 180–81 (S.D.N.Y.1997) (on motion to dismiss, given early stage of the litigation, court determined that there were open fact questions meriting further discovery and proceedings on plaintiff's excessive force claim that (1) he was placed in a holding cage that had no seats, water, and poor ventilation; and (2) he was under a chiropractor's care for back pain and complained that cuffing behind his back was inhumane, and was nevertheless cuffed to a hook 12 inches above the floor, and subsequently to the front of the cell in a standing position for over seven hours); *Gonzalez v. City of New York,* No. 98–CV–3084, 2000 WL 516682, at \* \*4–5 (E.D.N.Y. Mar. 7, 2000) (while discomfort and pain alone are generally insufficient to render handcuffing unconstitutional excessive force, repeated cuffing of arrestee, combined with other allegations of force, complaints of pain and serious injury to wrist and hand gave rise to issues of fact that only a jury could resolve); *Clarke v. City of New York,* Nos. CV–96–5762, CV–98–7297, 1999 WL 608857, at \* \*12–13 (E.D.N.Y. July 22, 1999) (employing a Fourth Amendment analysis, and denying summary judgment on excessive force claim where woman was kept handcuffed behind her back for twenty-three hours, the entire duration of her detention).

*b. Kick in the Back*

**\*10** What remains, therefore, is plaintiff's allegation that as he was entering the holding cell, defendant Joie kicked him in the back. Although Officer Joie denies that he kicked plaintiff, viewing the evidence in the light most favorable to the plaintiff, which we must, we assume that the incident took place as plaintiff describes it. The relevant query is therefore whether such an act rises to the level of a constitutional violation.

As plaintiff has alleged an entirely gratuitous kick in the back, the Court will assume that he has satisfied the subjective prong of the Fourteenth Amendment punishment standard. There is no apparent legitimate rationale for Officer Joie's kicking plaintiff in the back while plaintiff was entering his cell on his own accord. This is not a situation in which the use of force was necessary for the maintenance or restoration of order or discipline. "Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir.1997).

Plaintiff cannot, however, satisfy the objective prong of the punishment test. Here, plaintiff complains of an isolated kick in the back as he was placed in a cell at the police precinct. No injury was alleged to have resulted from the kick either at the time or within the days that followed it, even when plaintiff was examined by a doctor. Moreover, plaintiff's medical records show that the first time he sought medical treatment for back pain was not until one year after the incident in issue, and even those records indicate that the only medication or treatment he received for his complaints of lower back pain was Motrin. In addition, the Cabrini Medical Center record from September 1994 indicates that plaintiff complained only of pain and numbness to his right leg, and that a MRI conducted at that time showed no sign of disc herniation, attributing any disc condition to degenerative disc disease—a condition that by definition did not arise from the alleged kick. If the kick by Officer Joie actually occurred, it is certainly not to be condoned. Nevertheless, this single kick, unaccompanied by any competent evidence of significant injury, is not a use of force that shocks the conscience or that can be viewed as repugnant to the conscience of mankind. *Cf. Santiago,* 91 F.Supp.2d at 674 (an open-handed slap in the face was found not sufficiently repugnant to the conscience of mankind to give rise to a claim of excessive force); *Boddie,* 105 F.3d at 861 (bumping, grabbing, elbowing and pushing plaintiff was *de minimis* use of force that did not rise to level of unconstitutional punishment); *Gabbay,* 2000 WL 28156, at \*1 (where police use of force did not shock the conscience and the alleged injury was slight, defendants found to be entitled

to judgment as a matter of law); *Brown v. Busch,* 954 F.Supp. 588, 593, 596 (W.D.N.Y.1997) (assuming inmate was hit in the back while being pushed into cell, causing aggravation of back problems and pain, force used was found to be clearly *de minimis* ) (citing cases); *Yearwood v. LoPiccolo,* No. 95 Civ. 2544(DC), 1998 WL 474073, at *7 (S.D.N.Y. Aug. 10, 1998) (The alleged beating was *de minimis* where unrebutted medical records established that the only perceived injuries were minor and unrelated to the beating. In any event, plaintiff "failed to adduce any admissible evidence that would enable a rational trier of fact to conclude that defendants employed force of such magnitude as to be repugnant to mankind."); *Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking inmate's ankles and feet was *de minimis* ).

**\*11** The Supreme Court's observation that "[not] every malevolent touch by a prison guard gives rise to a federal cause of action," *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000, is particularly apt in this case. I respectfully recommend that defendant Joie's motion for summary judgment as to the claim of excessive force be granted.

CONCLUSION

For the foregoing reasons, I respectfully recommend that defendants' motion for summary judgment be granted and that this action be dismissed with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Laura T. Swain, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Swain. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 149–52 (1985), *reh'g denied,* 474 U.S. 1111 (1986); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 335014

Footnotes

1    The facts underlying plaintiff's arrest and subsequent conviction are derived from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1; the transcript of plaintiff's deposition; various exhibits submitted by the parties; and the reported decision denying plaintiff's petition for a writ of habeas corpus. *See Barratt v. Garvin,* No. 98 Civ. 1532(NRB), 2000 WL 1364352, at *1 (S.D.N.Y. Sept. 21, 2000).

2    Plaintiff further alleges that he was forced to wear a hospital gown; that the officers used derogatory racial terms; that he was denied the right to see an attorney and forced to give a confession; that when he asked to use the bathroom, one of the officer's told him to "do it in his clothes;" and that one of the officers stated, "Let's drop him and dump him in Jersey City." *See* Plaintiff's Memorandum of Law ("Pl.Mem.") at 2–4; Barratt Depo. at 43. The Court notes that the admissibility of plaintiff's statement to the police was litigated in his criminal trial, and that the trial court determined that the statement was lawfully obtained. *See Barratt,* 2000 WL 1364352, at *7. Further, the police do not deny the fact that plaintiff was photographed in a hospital gown. They testified that this was done because plaintiff's clothing had been taken to use as evidence. *See* Trial Tr. at 850.

3    In plaintiff's Memorandum of Law opposing defendants' motion for summary judgment, he contradicts both his original and altered deposition testimony and claims that while Joie was kicking him, Fitzgerald "twisted ... plaintiff's hands". Pl. Mem. at 4. However, it is well-settled in this Circuit that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Company,* 125 F.3d 55, 63 (2d Cir.1997) (quoting *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996); *see also Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987). In this case, plaintiff's statement in his memorandum of law has even less evidentiary value than a sworn affidavit, and is clearly insufficient to create a genuine issue of fact.

4    Even if plaintiff's altered deposition statement is viewed as sufficient to create a genuine issue of fact as to Fitzgerald's personal involvement in any use of force, as discussed below, the evidence of Joie's alleged use of force is insufficient

to give rise to a claim of unconstitutional excessive force. Since Fitzgerald is alleged to have done even less than Joie, the same legal conclusion must follow with regard to Fitzgerald's liability.

5    Although plaintiff's allegations in his Amended Complaint and various submissions focus primarily on his treatment while in a holding cell at the police precinct, and he never specifically contends that it was unreasonable to handcuff him when he was arrested, he did testify, at his deposition, about being cuffed when arrested. *See* Barratt Depo. at 76–77. Therefore, construing his submissions liberally, the Court will assume that he is also challenging the defendants' conduct when he was arrested.

6    As set forth in the background facts, *supra,* plaintiff's allegation of being tortured is based upon the acts set forth above, supplemented with his allegations of being forced to wear a hospital gown, being told to relieve himself in his pants, and his being threatened and subjected to derogatory remarks. Even if true, these additional acts, however inappropriate, could not reasonably be viewed as giving rise to a claim of unconstitutional punishment under the Fourteenth Amendment. *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (claim of verbal harassment is not actionable under § 1983) (citing cases); *Brown v. Jacobson,* No. 98 Civ. 0565(LBS), 1999 WL 1125122, at *5 (S.D.N.Y. Dec. 8, 1999) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under 42 U . S.C. S 1983.") (citing *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S . D.N.Y.1998)).

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 417084
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Vincent BARROW, Plaintiff,

v.

Diane Van BUREN, Deputy Commissioner;
Brian Fischer, Commissioner; Bryan Hilton,
Superintendent of Programs; Charles Kelly, Jr.,
Superintendent, Marcy Correctional Facility; Dr.
Farago, Psychiatrist; Anthony Devitto, Executive
Director of Special Programing; BOB Lewis,
OMH Therapist; Lisa Kalies, Unit Chief, OMH,
Residential Mental Health Unit; Joseph Bellnier,
Deputy Commissioner of Program Service; Lucien
Lechaire, Assistant Commissioner; Maureen
E. Boll, Deputy Commissioner and Counsel; E.
Lindquist, Assistant Commissioner; Karen Ballamy,
Director, Inmate Grievance Program; Jeff McKoy,
Deputy Commissioner; Maureen Bossco, Executive
Director, Central New York Psychiatric Center,
Office of Mental Health; B. McArdle, Deputy
Superintendent of Marcy Correctional Facility;
Donald Selskey, Deputy Commissioner, Captain
Harper, Lieutenant Cory; Holanchuck, Defendants.

No. 9:12–cv–01268 (MAD/CFH).
|
Signed Jan. 30, 2015.

**Attorneys and Law Firms**

Vincent Barrow, Romulus, NY, pro se.

Office of the New York State Attorney General, Gregory J.
Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff *pro se* Vincent Barrow, an inmate in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), brought this action
pursuant to 42 U.S.C. § 1983, alleging violations of his
constitutional rights under the First, Eighth and Fourteenth
Amendment, as well as under Title II of the American
with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et
seq. and section 504 of the Rehabilitation Act ("RA"),
29 U.S.C. § 794. *See* Dkt. No. 50. Defendants, twenty
DOCCS employees, have moved to dismiss Plaintiff's Second
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). *See* Dkt. No. 67. Defendants have
also moved to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1). *Id.* In a Report–Recommendation and
Order dated September 25, 2014, Magistrate Judge Hummel
recommended that the Court grant in part and deny in part
Defendants' 12(b)(6) motion and deny the Defendants' 12(b)
(1) motion. *See* Dkt. No. 70.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Hummel's September 25, 2014 Report–
Recommendation and Order. *See* Dkt. No. 73.

**II. BACKGROUND**

The following facts are not in dispute. At all relevant
times, Plaintiff was incarcerated at Marcy Correctional
Facility ("Marcy"). Dkt. No. 50 at ¶ 2. During this time,
the Residential Mental Health Unit ("RMHU") at Marcy
implemented "The Lewd Conduct Program" for inmates who
engage in lustful and inappropriate behaviors. Dkt. No. 50
at ¶ 25. Inmates subject to the program are required to wear
a control suit, which consists of a neon-green jumpsuit that
has its only opening along the back, is laced with a heavy
string, and is fastened with a padlock at the neck. *Id.* Another
component of the program requires that a fiberglass sign
displaying the word "Exposer" be hung above the inmate's
cell door at all times. Dkt. No. 50 at ¶¶ 26, 30.

Plaintiff was required to wear the jumpsuit on several
occasions following the issuance of numerous misbehavior
reports for lewd conduct. *See id.* at ¶¶ 29–31. Plaintiff alleges
that several inmates and staff have verbally insulted and
ridiculed him for wearing the jumpsuit. *See id.* at ¶¶ 32–
33. As a result, Plaintiff has refused to wear the jumpsuit
out of his cell and has thus been unable to attend programs
and medical appointments. *See id.* at ¶ 36. Contrary to
Defendants' contentions that the lewd conduction program
has been implemented for security measures, Plaintiff argues
that the program is specifically targeted to humiliate and

lower the self esteem of inmates at Marcy. *See id.* at ¶¶ 34–35, 43.

Plaintiff commenced this civil rights action on August 13, 2012. *See* Dkt. No. 1. Upon leave of court, Plaintiff filed an Amended Complaint to include a description of new events that had taken place since the complaint's initial filing. *See* Dkt. No. 11, 12. On April 1, 2014, Plaintiff was permitted to submit a Second Amended Complaint for review. *See* Dkt. No. 50. In response, Defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 67. Plaintiff subsequently opposed the motion. *See* Dkt. No. 69.

**\*2** On September 25, 2014, Magistrate Judge Hummel filed a Report–Recommendation and Order recommending that Defendants' Motion to Dismiss be granted in part and denied in part. *See* Dkt. No. 70 at 40. Plaintiff filed written objections on October 10, 2014, objecting to Magistrate Judge Hummel's recommendations in full. *See* Dkt. No. 73 at 7.

### III. DISCUSSION

**A. Standard of Review**

When objections to a magistrate judge's report-recommendation and order are made, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). If, however a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the magistrate judge's recommendations are reviewed for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). The court will "ordinarily refuse to consider argument[s] that could have been, but [were] not, presented to the magistrate judge in the first instance." *Mosley v. Superintendent of Collins Corr. Facility,* No. 9:11–CV–1416, 2015 U.S. Dist. LEXIS 6985, \*5, 2015 WL 277133 (N.D.N.Y. Jan. 22, 2015) (citations omitted). Upon review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Analysis**

*1. Misapplication of Case Law*

Plaintiff contends that the cases cited in Magistrate Judge Hummel's Report–Recommendation and Order "could have been used in favor of Plaintiff" and "should be used in his favor." *Id.* Upon careful review, the Court finds that Magistrate Judge Hummel applied the appropriate legal standards, accurately recited the facts as presented by Plaintiff, and correctly applied the law to those facts.

Accordingly, Plaintiff's objection regarding the misapplication of case law is rejected.

*2. Misapplication of Rule 12(b)(6)*

Plaintiff further contends that Rule 12(b)(6) "should have been used in his favor" and that "legal conclusions," in these circumstances, should be sufficient to survive a motion to dismiss. *See* Dkt. No. 73 at 1. When a defendant files a 12(b)(6) motion to dismiss, the court must "accept all factual allegations as true and draw every reasonable inference from those facts in plaintiff's favor." *La. Wholesale Drug Co. v. Shire LLC,* 754 F.3d 128, 133 (2d Cir.2014) (internal quotation marks and citations omitted). Nevertheless, "this indulgence does not relieve the plaintiff from alleging 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Plaintiff admits that "the complaint is not without error," and that he "did his best to inform the court" of the alleged violations despite having been denied counsel. *See* Dkt. No. 73 at 6–7. The Second Circuit has stated, however, that *"pro se* status does not exempt a party from compliance with relevant rules of procedure and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (internal quotation marks and citations omitted). Upon review, the Court finds that Magistrate Judge Hummel correctly applied Rule 12(b)(6) and surrounding case law to the facts presented. In his thorough and well-reasoned Report–Recommendation and Order, Magistrate Judge Hummel correctly determined that the allegations in the Second Amended Complaint were insufficient to plausibly suggest the personal involvement of Defendants Bossco, Fischer, Harper, McArdle, VanBuren, Holanchuck, Perlman, LeClaire, Boll, McKoy, Bellamy, and Lindquist. Additionally, Magistrate Judge Hummel also correctly determined that the Court should grant Defendants' motion as to Plaintiff's First Amendment claims because some of the speech was not constitutionally protected and, even when it was, Plaintiff's allegations regarding the alleged retaliation are entirely conclusory.

**\*3** As to Plaintiff's Eighth Amendment conditions of confinement claim, Magistrate Judge Hummel correctly determined that the alleged deprivations were not sufficiently serious to amount to an " 'excessive risk' to his safety and health.' " Dkt. No. 70 at 24 (citing *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012)). The report also properly determined that Plaintiff has failed to plausibly allege claims of deliberate medical indifference regarding the denial of treatment for his foot arches and exhibitionism.

The Court has reviewed Plaintiff's remaining claims and finds them to be without merit; and, therefore, Magistrate Judge Hummel's September 25, 2014 Report–Recommendation and Order is adopted in its entirety.

### 3. Deliberate Indifference

Lastly, Plaintiff reiterates his concerns regarding the denial of necessary medical and mental health care. Dkt. No. 73 at 5. In this respect, the Court wholly agrees with Magistrate Judge Hummel's analysis governing Plaintiff's Eighth Amendment claim for medical indifference related solely to the denial of treatment for depression. *See* Dkt. No. 70 at 29. In order to have a valid claim under the Eighth Amendment for cruel and unusual punishment arising out of a claim for medical indifference, a plaintiff must show "that his medical condition is objectively a serious one" and that "[each] defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citations omitted). A finding of deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Plaintiff states that at the time he was admitted to RMHU he was diagnosed with "Major Depression Disorder." Dkt. No. 50 at ¶ 46. The Court is mindful that depression, in some circumstances, has been objectively deemed a serious medical need. *See Zimmerman v. Burge,* No. 06–CV–0176, 2009 U.S. Dist. LEXIS 88344, \*34–35, 2009 WL 9054936 (N.D.N.Y. Apr.20, 2009) (finding that depression is a "sufficiently serious" medical condition when it is not self-diagnosed). In light of these facts, the Court is satisfied that Plaintiff has met its burden under the first prong.

In or around May 2011, Plaintiff states that Defendant Farago stopped providing Plaintiff with depression medication and was instead "pretending" to treat him. Dkt. No. 50 at ¶¶ 47–48. Plaintiff had been taking this medication to treat his depression for over fifteen years. Dkt. No. 50 at ¶ 47. In his objections, Plaintiff attempts to substantiate his need for the medication by alleging "many 'crisis' situations,' " including two "attempted suicides" and a single occasion of hospitalization. Dkt. No. 73 at 4. Plaintiff does not, however, provide any specific dates or documentation regarding these events. Nevertheless, the Court agrees that "a complete ... cessation of medication that [Plaintiff] had been taking for fifteen years could pose a risk of serious harm to his mental well-being." Dkt. No. 70 at 29 (citing *Brock,* 315 F.3d at 162–63).

**\*4** Accordingly, the Court finds that Magistrate Judge Hummel correctly determined that the Court should deny Defendants' motion to dismiss as to this claim.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the September 25, 2014 Report–Recommendation and Order by Magistrate Judge Hummel is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for lack of subject matter jurisdiction is **DENIED;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim is **GRANTED** in part and **DENIED** in part; and the Court further

**ORDERS** that Plaintiff's following claims are **DISMISSED;** (1) all First Amendment claims; (2) all Eighth Amendment claims insofar as they allege inadequate prison conditions, inadequate treatment, and deliberate indifference to Plaintiff's exhibitionism and foot condition; (3) all Fourteenth Amendment claims; (4) the ADA claim; and (5) the RA claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is **DENIED** with respect to Plaintiff's Eighth Amendment claim insofar as it alleges deliberate indifference to Plaintiff's depression; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Vincent Barrow ("Barrow"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty DOCCS employees, violated his rights under the First, Eighth and Fourteenth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Second Am. Compl. (Dkt. No. 50), at 1–16. Presently pending is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 12(b)(1). Dkt. No. 67. Barrow opposed. Dkt. No. 69. For the following reasons, it is recommended that (1) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6) be granted in part and denied in part and (2) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(1) be dismissed.

## I. Background

The facts are related herein in the light most favorable to Barrow as the non-moving party. *See* subsection II(A) infra. At all relevant times, Barrow was an inmate at the Marcy Correctional Facility ("Marcy").

### A. Lewd Conduct Program

 **\*5** At Marcy, the Residential Mental Health Unit ("RMHU") had implemented "The Lewd Conduct Program" for inmates who had engaged in lewd behaviors. Second Am. Compl. ¶ 25. The program included use of a control suit, a neon-green jumpsuit that is laced up the back—its only opening—with heavy string and secured with a padlock at the neck. *Id.* Another component of the program is the placement

of a sign that says "Exposer" above the inmate's cell door. *Id.* ¶¶ 26, 30.

Although Barrow was advised by defendants Joseph Bellnier, Deputy Commissioner of Program Service; Lieutenant Cory; Captain Harper; Bryan Hilton, Superintendent of Programs; Lisa Kalies, Unit Chief, Office of Mental Health, Residential Mental Health Unit; and B. McArdle, Deputy Superintendent of Marcy, that the lewd conduct program was imposed for security reasons, Barrow contends that he was discriminated against because other inmates who had smuggled in contraband by concealing it in their groin area were not placed into the program. Second Am. Compl. ¶¶ 27–28. Barrow has informed Bellnier; Hilton; and Bob Lewis, OMH Therapist of this claim. *Id.* ¶ 35. Barrow further alleges that the program participants are disproportionately minority inmates. *Id.* at 15. Hilton advised Barrow that the lock prevents him from ripping off the jumpsuit, but also serves to humiliate and "change" his "cognizence [sic]." *Id.* ¶¶ 42–43. Barrow argues that a lock at one's neck is a symbol of hate and oppression of minorities harkening back to times of slavery and racial segregation. *Id.* ¶ 42. Thus, Barrow states that the lewd conduct program is imposed not for security purposes, but to humiliate inmates and deter future exhibitionist conduct. *Id.* ¶¶ 34–35, 43.

On March 28, 2011, Barrow was made to the wear the jumpsuit after being issued a misbehavior report for lewd conduct. Second Am. Compl. ¶ 29. A disciplinary hearing was not held in connection with that report. *Id.* On or about November 10, 2011, Barrow was again ordered to wear the jumpsuit and have the exposer sign hang on his door for thirty days. *Id.* ¶ 30. A disciplinary hearing was held regarding this alleged violation. *Id.* More recently, Barrow was ordered to wear the jumpsuit in January 2013 and from July 17, 2013 to August 17, 2013. *Id.* ¶¶ 31, 71.

In December, 2011, Barrow notified RMHU staff that he had not had a hearing for the March 28, 2011 lewd conduct allegations. Second Am. Compl. ¶ 38. After submitting this complaint, Barrow began to receive more misbehavior reports for lewd conduct. *Id.* ¶ 39. Between September 2008 and May 2011, Barrow had received eighteen misbehavior reports for lewd conduct. Dkt. No. 50, at 23 (CORC Grievance Denial), 26 (same). Barrow also contends that he was issued misbehavior reports for repeatedly requesting a prison transfer and filing sexual harassment charges against staff members. Second Am. Compl. ¶ 41.

**\*6** Barrow complained to defendants Anthony Devitto, Executive Director of Special Programming; Hilton; Michael Hoagan, Deputy Commissioner, Office of Mental Health, DOCCS; Kalies; Charles Kelly, Jr., Superintendent of Marcy; and Lewis that the lewd conduct program violated his rights under the Eighth Amendment and the ADA.[2] Second Am. Compl. ¶ 33. Barrow contends his condition, which he claims to be exhibitionism, is confidential, and only inmates being treated for this condition should be privy to this information. *Id.* He suggests that the sign and jumpsuit deprive him of confidentiality. *Id.*

Barrow is also upset that other inmates and staff ridicule and use racial epithets against him when he is in the jumpsuit. Second Am. Compl. ¶¶ 32–33. Barrow alleged that, on one occasion, in Hilton and Bellnier's presence, several inmates verbally insulted him regarding the jumpsuit, but neither defendant intervened. *Id.* ¶ 32.

Barrow alleges that the lewd conduct program, as applied to him, is over broad because he is required to wear the jumpsuit even when there are no females present, despite the fact that he has no history of lewd conduct toward male employees. Second Am. Compl. ¶ 34. Because Barrow is made to wear the jumpsuit when no females are present, Barrow claims that the jumpsuit is not a security measure. *Id.*

Because he is embarrassed by the jumpsuit, Barrow refused to wear it out of his cell. Second Am. Compl. ¶¶ 39, 42. Barrow is concerned that his absence from programming has adversely affected his parole release date. Second Am. Compl. ¶ 39. He informed defendant Kenneth S. Perlman, Deputy Commissioner of Program Services, of his parole concerns. *Id.* ¶ 59. Due to his refusal to leave his cell in the jumpsuit, Barrow was unable to attend programs or his medical appointments. *Id.* ¶ 36; *see* Dkt. No. 50 at 17–26 (prison documents pertaining to grievances filed and rulings on them). Barrow also contends that because he lacks arches in his feet, he requires the use of a lift in his right shoe, "otherwise [he] is in severe pain up and down the right side of his back." Reply (Dkt. No. 69), at 2. Barrow has been unable to receive medical treatment for his foot because he would not go to his appointments while wearing the jumpsuit. *Id.*

### B. Mental Diagnoses and Treatment

Barrow first arrived at RMHU with diagnoses of major depression and anti-social disorder and has since been diagnosed with poly-substance abuse. Second Am. Compl. ¶ 46. Three of Barrow's urine tests came back positive for cannabis, but he has never tested positive for any other substance; thus, he does not believe that poly-substance abuse is an accurate diagnosis. *Id.* Barrow contends that defendant Dr. Farago, his psychiatrist, attempts to "intellectually badger" him into wearing the jumpsuit; thus, he "only wished to talk about issues related to his profession" during their sessions. *Id.* ¶ 47. Shortly after telling Dr. Farago that he did not wish to discuss the lewd conduct program, Barrow's depression medication, which has been administered to him for approximately fifteen years, was terminated. *Id.* Barrow has since been "begging" for medication. *Id.* ¶ 48.

**\*7** In or around May or June of 2011, Barrow filed a complaint against Dr. Farago to Kalies, stating that Dr. Farago was conducting meetings outside of his cell in violation of his right to privacy. *Id.* ¶ 49.[3] Although Barrow was told that in the future Dr. Farago would hold meetings in private, Dr. Farago would arrive at Barrow's cell, wait for him to get up, then walk away. *Id.* ¶ 50. Kalies indicated that the log book indicates that Barrow was seen by Dr. Farago; however, she did not permit Barrow review of the videotapes of those meetings. *Id.* ¶ 51. Barrow contends that, rather than treat him, Dr. Farago would turn away from the camera and make comical faces at him when he asked for his depression medication. *Id.* ¶ 52. Barrow alleges that defendants Devitto, Hoagan, Kalies, and Lewis were aware of his concerns regarding Dr. Farago because he wrote to them and spoke with them. *Id.* ¶¶ 53–56.

Barrow alleges that the remaining defendants were involved in the alleged constitutional violations in various ways. Bellnier and Hilton initiated the Lewd Conduct Program at Marcy. Second Am. Compl. ¶ 57. Brian Fisher, Commissioner; Holanchuck; and Perlman were aware of Barrow's situation because he sent them letters and spoke with them. *Id.* ¶¶ 58–59, 71. Boll and LeClaire were aware of Barrow's concerns because he talked with them about the lewd conduct program. *Id.* ¶¶ 60, 61. E. Lindquist, Assistant Commissioner in charge of the programs at RMHU, knew about the program. *Id.* ¶ 62. Bellamy affirmed grievance determinations. *Id.* ¶ 63. Maureen Bossco, Executive Director of Central New York Psychiatric Center, and Jeff McKoy, Deputy Commissioner, were aware of the alleged constitutional violations because they spoke with him about the sign. *Id.* ¶ 64. Diane VanBuren, Deputy Commissioner, knew of Barrow's issues at RMHU because of her supervisory status. *Id.* ¶ 70.

Most of the misbehavior reports issued against Barrow were written for exhibitionism, but Barrow was refused treatment for such. Second Am. Compl. ¶¶ 66–68. RMHU had demanded that Barrow attend a sex offender program, but Barrow thinks it is inappropriate for his disorder because the sex offender program focuses on pedophiles and rapists —conduct of which he was never convicted. *Id.* ¶ 69.

Barrow seeks both compensatory damages and injunctive relief. Second Am. Compl. at 16.

## II. Discussion [4]

Barrow contends that defendants violated his: (1) First Amendment rights by retaliating against him for his expression of protected speech; (2) Eighth Amendment rights by (a) subjecting him to cruel and unusual punishment, and (b) denying him medical treatment; (3) Fourteenth Amendment rights by (a) failing to provide him due process prior to imposing the lewd conduct program, (b) treating him differently from similarly-situated inmates, and (c) violating his right to privacy regarding his exhibitionism. Barrow also argues that defendants have violated the ADA and section 504 of the Rehabilitation Act. [5]

### A. Legal Standard

**\*8** Under FED. R. CIV. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally." (internal citations omitted)).

### B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501

(2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

 **\*9** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

### 1. Bossco and Fischer

Here, Barrow alleged in a conclusory fashion that Bossco and Fischer were (1) aware at all times of his issues at Marcy and (2) that he spoke to them and sent several letters to them about such issues. Second Am. Compl. ¶¶ 58, 65. The gravamen of Barrow's complaints against these defendants is that they were in a position of power, thus, they were involved with all aspects of his incarceration. Nevertheless, attempts to establish personal involvement based upon the supervisory role that these defendants occupied is inappropriate. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003), quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.").

To the extent that Barrow seeks to establish defendants' knowledge of his complaints through letters, such an attempt must also fail. Until recently, a plaintiff's claim that he or she sent a letter or grievance to a defendant, where the defendant did not take action on the letter or respond, was generally insufficient at the pleading stage to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."; *but see Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). However, the Second Circuit recently concluded that,

> [a]t the pleading state, even if [plaintiff] had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means—that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [plaintiff] complained

 **\*10** *Grullon v. City of New Haven,* 720 F.3d 133, 131 (2d Cir.2013); *see also Toliver v. City of New York,* 530 F. Appx. 90, 93 (2d Cir.2013) (citing *Grullon,* 720 F.3d at 141–42); *Ferrer v. Fischer,* No. 9:13–CV–0031, 2014 WL 1763383 (N.D.N.Y. May 1, 2014). Barrow does not provide sufficient factual detail to support his claim that the letters establish personal involvement. He does not allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them. Thus, he has not established personal involvement through the sending of letters. *Grullon,* 720 F.3d 133 at 141–42.

Further, although Barrow alleged that he had spoken with the defendants, Barrow does not state when these conversations took place. *Eldridge v. Kenney,* No. 11–CV–6459, 2014 WL 2717982, at \*3 (W.D.N.Y. June 16, 2014) ("While Plaintiff's

Response ... contains references to the ... *Colon* factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the *Colon* factors and are wholly unsupported by facts."). Moreover, Barrow presents no factual allegations to support a claim that defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Barrow's rights. *Colon*, 58 F.3d at 873. Thus, Barrow has failed to plausibly allege that Bossco or Fischer had personal knowledge of the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

### 2. Harper, McArdle, and VanBuren

Barrow has also failed to establish personal involvement of Harper, McArdle, and VanBuren in the alleged constitutional violations. Barrow states that VanBuren was aware of the violations because she "was at all times aware of the actions and functions ... at the RMHU." Second Am. Comp. ¶ 70. Similarly, Barrow alleged that Harper knew about all programs at RMHU and, during a conversation, Harper told him that the lewd conduct program was implemented as a security measure. *Id.* ¶¶ 23, 27. Barrow contends that McArdle, as a "higher-up," advised him that the jumpsuit was imposed for security and failed to issue him a review notice for the lewd conduct program. *Id.* ¶¶ 27, 44.

With respect to the alleged conversations with Harper and McArdle, Barrow fails to provide details such as the date and manner of such conversations, rendering his claim insufficient to establish the requisite knowledge for personal involvement. *See Eldridge,* 2014 WL 2717982, at *3 (conclusory allegations are insufficient). Instead, Barrow merely contends that the lewd conduct program was discussed. *See Barnes v. Prack,* No. 11–CV–857, 2012 WL 7761905, at *5 (N.D.N.Y. Sept. 7, 2012) (same). To the extent that Barrow's complaint may suggest that Harper, McArdle, and VanBuren allowed for the continuance of a unconstitutional policy or custom, he does not demonstrate that defendants had investigated the program, were aware of his specific concerns and complaints regarding the jumpsuit and sign, or that they otherwise participated in decision making, policy making, or had any input relating to the alleged constitutional violations.

\*11 Furthermore, as noted, personal involvement cannot be established solely upon a defendant's supervisory role. *Wright,* 21 F.3d at 501. As such, Barrow has failed to plausibly allege the personal involvement of either Harper, McArdle, or VanBuren. Accordingly, defendants' motion on this ground should be granted.

### 3. Holanchuck, Perlman, LeClaire, Boll, and McKoy

Barrow has similarly failed to demonstrate the personal involvement of Holanchuck, Perlman, LeClaire, Boll, and McKoy. Barrow essentially argues that these defendants had personal knowledge of the alleged constitutional violations because (1) he spoke with them about the lewd conduct program and/or its negative effect on him and (2) they held supervisory positions at Marcy yet failed to address his concerns. Specifically, Barrow argues that Holanchuck had personal knowledge of the alleged violations because Barrow "had many talks with Defendant about the violation of plaintiff['s] rights, all to no avail." *Id.* ¶ 71. In response, Holanchuck told him that the lewd conduct program "was being done in other states." *Id.* Barrow also indicates that Holanchuck, as Deputy Commissioner, "was aware of all actions and functions here at the RMHU," and, thus, responsible due to his supervisory position. *Id.*

Barrow contends that LeClaire knew of the alleged violations because "Plaintiff talked to him about the "outright shocking racist presentment of this Lewd Conduct Program." Second Am. Compl. ¶¶ 22, 60. However, Barrow's reference to a conversation with LeClaire wherein he expressed his belief that the lewd conduct program was implemented in a racially-discriminatory manner does not demonstrate that LeClaire was aware of the personal affect the program had on Barrow.

Barrow states that Perlman "knew at all times [about the] situation" as he spoke to Perlman of "the need of programs to gain parole" and, in response, Perlman told him that "he should program in spite of the Control suit." Second Am. Compl. at 59. Barrow also argues that he spoke with Boll "upon visiting the RMHU" and that, as Deputy Commissioner, she "was in [a] position to stop and had the duty to stop the violation of plaintiff['s] 14th and 8th Amendments [sic]" *Id.* ¶ 61. Barrow additionally alleges that he spoke with McKoy about the "exposer" sign, yet McKoy allowed the sign to remain. *Id.* ¶ 64.

Barrow's passing references to conversations he alleges to have had with Holanchuck, Perlman, LeClaire, Boll, and McKoy are insufficient to establish their personal involvement. Barrow fails to specify when he had such discussions with defendants. Further, Barrow's attempts to establish personal involvement based upon the supervisory role the defendants occupied must fail. *Wright,* 21 F.3d at 501.

Accordingly, defendants' motion on this ground should be granted.

### 4. Bellamy

Barrow argues that Bellamy, as Director of the Inmate Grievance Program, violated and was "in gross deliberate indifference to [his] 8th and 14th Amendments [sic]." Second Am. Compl. ¶ 63. He contends that defendant Bellamy was aware of these alleged violations because he "appealed many grievances" to her, which she affirmed. *Id.* Merely affirming the denial of a defendant's grievance is insufficient to establish personal involvement, without more. See *Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (concluding that affirming *and modifying* the penalty imposed in an allegedly constitutionally infirm disciplinary proceeding can satisfy the second Colon factor). Moreover, insofar as Barrow appears to claim personal involvement based on defendant's status as a director, this does not establish that she was personally involved with the alleged Eigth Amendment violations. *Wright,* 21 F.3d at 501.

**\*12** Accordingly, defendant's motion on this ground should be granted.

### 5. Lindquist

Barrow argues that Lindquist, due to his supervisory role as Assistant Commissioner, was aware of the Lewd Conduct Program and "the grave harm it was doing" to him. Second Am. Compl. ¶ 62. Inasmuch as Barrow suggests that Lindquist was aware of the alleged violations because of his supervisory position, as noted, attempts to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501. Barrow further argues that the fourth *Colon* factor is implicated. He contends that Lindquist "was grossly negligent in that he did not adequately supervise the subordinates who violated Plaintiff['s] 14th and 8th Amendment [rights]."

Second Am. Comp. ¶ 62. However, Barrow does not provide any support for his claim that Lindquist negligently supervised his subordinates. Such a conclusory reference to a *Colon* factor is insufficient to support a claim of personal involvement. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (internal citations omitted)). Inasmuch as Barrow suggests that defendant was aware of the alleged violations because of his supervisory position, as noted, an attempt to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.

### C. Eleventh Amendment

Barrow brings all claims against all defendants in their official and individual capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an

official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Barrow demands money damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS, these claims are barred by the Eleventh Amendment. *Id.* at 169.

**\*13** Accordingly, Barrow's claims for money damages pursuant to section 1983 against all defendants in their official capacities should be dismissed.

### D. First Amendment

Barrow argues that expressing his concern over the lewd conduct program, requesting prison transfers, and filing sexual harassment charges against staff members is protected speech, and defendants filed false misbehavior reports against him in retaliation for his exercise of this speech.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St. LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). However, a retaliation claim may survive a defendant's motion to dismiss if a plaintiff alleges facts tending to establish that "(1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action." *See Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Adverse action has been defined objectively as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Further, an inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). Thus, to the extent that a plaintiff seeks damages because "he was subjected to an accusation that turned out not to stand up under scrutiny," such would not be an actionable claim under section 1983. *Jones v. Harris,* 665 F.Supp.2d 384, 400 (S.D.N.Y.2009).

Thus, Barrow fails to present a prima facie claim for a violation of his First Amendment rights.

First, it does not appear that Barrow's transfer requests were constitutionally-protected speech as an inmate has no constitutional right to be housed in a facility of his choosing. *See generally, McMahon v. Fischer,* 446 Fed. Appx. 354 (2d Cir.2011) ("A prisoner has no right to housing in a particular facility"). Although complaining about the lewd conduct program and filing good-faith sexual harassment charges are constitutionally-protected activities (*Carl v. Dirie,* No. 9:09–CV–724, 2010 WL 3338566 at \*5 (N.D.N.Y. Mar.29, 2010) (quoting *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("The Supreme Court has noted that the right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights' ")), Barrow's claim is wholly conclusory. He does not state which of the named defendants filed misbehavior reports against him, when most of these alleged misbehavior reports were filed, the temporal proximity between the constitutionally-protected behaviors and the misbehavior reports, the prison rule violations with which he was charged, or whether any action was taken as a result of the misbehavior reports filed against him. Second Am. Compl. ¶ 41; *cf. Shaheen v. McIntyre,* No. 9:05–CV–0173, 2007 WL 3274835 at \*9 (N.D.N.Y. Nov.5, 2007) (plaintiff demonstrated adverse action was taken by contending misbehavior reports were filed against him in retaliation of his exercise of speech, resulting in several days of keeplock confinement); *see also Mateo v. Fischer,* 682 F.Supp.2d 423, 435 (S.D.N.Y.2010) (filing of misbehavior report one day after prisoner filed sexual harassment grievance against corrections officer was sufficiently close in time to support causation element in retaliation claim). Furthermore, because Barrow does not specify which charges were filed against him in the misbehavior reports, he fails to demonstrate that the issuance of misbehavior reports was causally connected to his protected speech rather than an actual violation of prison rules. [7] *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (When it is undisputed that an inmate committed the prohibited conduct, no retaliatory discipline claim can be sustained)).

**\*14** Although Barrow contends that, "[w]hen and if [he] gets his day in Court, records of inmates misbehavior reports can easily inform the Courts of any information it may need," his conclusory claims as presented in his complaint are insufficient to withstand a motion to dismiss. Reply, at 3; *DeLeon v. Wright,* No. 10–CV–863, 2012 WL 3264932, at \*7 (N.D.N.Y. July 5, 2012) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone")).

Accordingly, defendants' motion on this ground should be granted.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A viable Eighth Amendment claim is twofold; the plaintiff must demonstrate both objective and subjective components. The objective question asks whether the deprivation of which the inmate complains was sufficiently serious. *Farmer,* 511 U.S. at 834. This component "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Thus, the prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The subjective component requires the inmate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834.[8] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The Supreme Court has held that "[p]rison administrators ... be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (internal quotation marks and citation omitted). However, although "the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities ... [d]isciplinary measures that violate civilized standards of human decency are proscribed." *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972).

### 1. Conditions of Confinement

**\*15** Addressing the objective component of the analysis, the alleged deprivation Barrow raises appears to raise is his denial of right to be free from humiliation, shaming, and verbal harassment from other inmates and staff. Barrow argues that he was subjected to cruel and unusual punishment because defendants forced him to wear the jumpsuit and have the exposer sign positioned above his cell door as a means to humiliate him and to perpetuate racism, rather than for genuine security concerns. Second Am. Compl. ¶¶ 34, 43, at 15. Barrow also contends that the jumpsuit makes him a target for verbal assaults and racially-fueled remarks from other inmates and staff. *Id.* at 15; Reply at 4. Barrow appears to argue that because the lock symbolizes oppression of African–Americans, being forced to wear it causes him grave harm, such as stress, reduced self-esteem, and "depression brought on top of [the] normal depression Plaintiff suffers from." Second Am. Compl. ¶ 40. Finally, Barrow states that the weight of the lock on the back of the jumpsuit requires him to continuously adjust the collar of the jumpsuit to "keep from being slowly choked." Reply at 1–2.

Barrow does not provide the names of any staff members who have verbally assaulted him while he was in the jumpsuit. Although Barrow states that defendants Bellnier and Hilton failed to intervene on one occasion where he was being harassed by inmates in their presence (Second Am. Comp. ¶ 32), there is no constitutional right to be free from verbal assault. *Lunney v. Brureton,* No. 04–Civ.–2438, 2005 WL 121720, at \*11 (S.D.N.Y. Jan.21, 2005) ("general allegations of threats and harassment are insufficient to state a claim because comments that are merely insulting or disrespectful do not give rise to a constitutional violation") (internal citations and quotation marks omitted); *see also Cuoco v. Mortisugu,* 222 F.3d 99, 109 (2d Cir.2000). Thus, although

infliction of mental anguish may sometimes rise to the level of cruel and unusual punishment (*see e.g. Hudson v. McMillian, 503 U.S. 1, 16, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)* (Blackmun, J., concurring)), it appears that the racially-fueled harassment Barrow has faced from fellow inmates and some staff while wearing the jumpsuit—even if it impacts his depression and lowers his self-esteem—does not amount to a disregard of an "excessive risk" to his safety and health. *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012).

Further, the physical discomfort of the lock pulling on the collar of the jumpsuit appears to be little more than an annoyance that is easily alleviated by adjusting the collar. There is no evidence that the padlock poses an excessive risk of serious injury. A *de minimus* discomfort is not a violation of an inmate's Eighth Amendment rights. *See e.g. Kearney v. N.Y.S. D.O.C.S.,* No. 9:11–CV–1281, 2013 WL 5437372, at *12–13 (N.D.N.Y. Sept.27, 2013) (a long walk to recreational yard, which caused discomfort for mobility-impaired inmate, along with bathroom facilities that required the plaintiff to lean in uncomfortable manner while using them, were not sufficient to rise to Eighth Amendment violations).

**\*16** Accordingly, defendants' motion to dismiss on this ground should be granted.

## 2. Medical Indifference

Next, Barrow appears to contend that he was denied access to adequate medical care because (1) he was denied treatment for exhibitionism, (2) Dr. Farago refused to provide him with treatment for depression, (3) he was refused his depression medication, and (4) he was unable to attend medical appointments for a foot condition.

The Eighth Amendment extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition

significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185. In claims for inadequate medical care, to satisfy the subjective component, the plaintiff must prove that defendant acted with deliberate indifference. Deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703.

### a. Denial of treatment for Exhibitionism

Barrow contends that, despite the fact that most of the misbehavior reports filed against him are for exhibitionism, defendants have "refused to treat Plaintiff for the disorder." Second Am. Comp. ¶ 67. Assuming Barrow can establish that he suffers from exhibitionism, he must demonstrate that "a reasonable doctor or patient would find it important and worthy of comment," that the condition significantly affects his daily activities, or the condition causes him chronic and substantial pain. *Chance,* 143 F.3d at 702 (internal quotation marks and brackets omitted). Although Barrow alleges that being made to wear the jumpsuit significantly impacts his daily activities, he does not demonstrate that the condition of exhibitionism itself significantly affects his daily activities or causes him chronic and substantial pain. *Id.* Although Barrow suggests that exhibitionism is "a living hell," he alleges that he was able to attend medical appointments without having any incidents of exposure; does not display exhibitionist tendencies toward males, and notes that there are often no females near him; and that he functions in the prison community for months at a time without lewd conduct infractions. Second Am. Compl. ¶¶ 34, 41–42; Dkt. No. 50, at 17; *Id.* at 25. Moreover, Barrow does not contend what harm, if any, the alleged inadequacy in treatment has caused or will likely cause him, beyond noting that a lack of programming has negatively impacted his parole date.[9] *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (in determining whether a condition is sufficiently serious, a

court is to examine how the omission in medical treatment has caused, or will likely cause, harm to inmate).

**\*17** Even assuming exhibitionism is a sufficiently serious medical condition, Barrow fails to demonstrate that defendants acted with deliberate indifference to his exhibitionism. Although Barrow contends that he was intentionally denied programming and treatment for exhibitionism, as he was only offered sex offender programming, he did not demonstrate that the programming offered had no relevance to his alleged conditions. Further, insofar as could be discerned, at some point, defendant Farago attempted to discuss the jumpsuit and lewd conduct program with Barrow, but Barrow refused to discuss it. *Id.* ¶ 47. Disagreement over the appropriate programming is an insufficient basis for a section 1983 claim, so long as the treatment offered is adequate. *Chance,* 143 F.3d 698 at 703. Moreover, to the extent that Barrow contends that he was denied access to all programming at Marcy, Barrow refused to leave his cell because of the jumpsuit. Second Am. Compl. ¶ 39, 42. Thus, any denial of programming was a direct result of his refusal to leave his cell.

Accordingly, defendants motion, insofar as it seeks to dismiss the claim of medical indifference to Barrow's exhibitionism should be granted.

### b. Denial of treatment for depression

Barrow also contends that he was denied treatment for depression in violation of the Eighth Amendment. Little case law exists discussing whether depression is a sufficiently serious medical condition for Eighth Amendment purposes; however, it appears that mental disorders are considered serious medical needs. *See generally Zimmerman v. Burge,* No. 06–CV–80, 2009 WL 9054936, at *6 (N.D.N.Y. Apr. 20, 2009),* "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need"; *Hamilton v. Smith,* No. 06–CV–805, 2009 WL 3199531, at *14 (N.D.N .Y. Jan. 13, 2009)* (same). Although Barrow provides little insight into the severity of his depression and how it impacts his daily activities, he contends that he received treatment and was medicated to alleviate these mental health symptoms for fifteen years. Second Am. Compl. ¶ 47. Taking these allegations as true, Barrow has alleged a sufficiently serious medical need as it necessitated medical and pharmacological intervention for a sustained and continuous period of time. Such a condition was clearly "perceived by a reasonable physician as important and worthy of comment ...." *Randle v. Alexander,* 940 F. Supp 457, 481 (S.D.N.Y.2013) (internal quotation marks and citation omitted). Thus, Barrow has satisfied the first prong of the Eighth Amendment analysis.

Next, Barrow must demonstrate defendants' deliberate indifference to his depression. Barrow states that he was denied therapy because defendant Farago pretended to treat him cell-side. Farago would "come to [Barrow's] cell, wait for [him] to get up to come to the gate and then walk away." Second Am. Compl. ¶¶ 50–51. Further, Barrow states that Farago "changed" his diagnosis of Major Depressive disorder and Anti-social disorder to poly-substance abuse, despite having only three positive urinalysis tests for cannabis in the past 15 years. *Id.* at 46. Farago also stopped providing Barrow's depression medication, which he had been taking for over 15 years. *Id.* ¶ 46. When Barrow "begged" for his medication, Farago would make "comical faces" at him while facing away from the camera. *Id.* ¶ 52. Assuming Barrow has a current diagnosis of depression and that the allegations against Farago are true, a complete denial of therapy and sudden cessation of medication that he had been taking for fifteen years could pose a risk of serious harm to his mental well-being. *Brock,* 315 F.3d at 162–63.

**\*18** Accordingly, defendants' motion to dismiss the medical indifference claim relating to the denial of treatment for depression, should be denied.

### 3. Denial of treatment for foot arches

Insofar as Barrow argues that defendants denied his access to medical treatment for his foot arches, this claim must fail. Even assuming Barrow's need for use of a shoe lift is a serious medical condition, Barrow was not denied medical treatment for his foot condition due to defendants' deliberate indifference to the condition, but for his choice to remain in his cell, rather than attend his appointment in the jumpsuit. *See generally Hardy v. Diaz,* No. 9:08–CV–1352, 2010 WL 1633379, at *6 n. 12 (N.D.N.Y. Mar.30, 2010)* (noting that skipping medical appointments and failing to comply with treatment directions can undermine an Eighth Amendment medical indifference claim).

Accordingly, any claim against defendants for a denial of treatment for Barrow's foot condition should be dismissed.

### F. **Fourteenth Amendment**

#### 1. **Procedural Due Process Claim**

Barrow argues that he was denied procedural due process because he was required to wear the jumpsuit after a lewd conduct misbehavior report was filed against him, but before a disciplinary hearing was held. Insofar as can be ascertained from his complaint, although a disciplinary hearing was held on at least one of the misbehavior reports, the lewd conduct program was never discussed as a part of his punishment. Second Am. Comp. ¶ 30.

To prevail on a procedural due process claim, "a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). However, the Supreme Court has held that such liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Marino v. Klages,* 973 F.Supp. 275 (N.D.N.Y.1997).

Here, Barrow fails to demonstrate that he was deprived of a cognizable liberty interest. Although Barrow states that he was held in his cell for a collective period of at least three months, he concedes that he independently made the conscious decision to refuse to leave his cell even though defendants permitted him to leave his cell in the jumpsuit. Barrow does not allege that he was otherwise restrained while wearing the jumpsuit. Similarly, defendants did not prevent him from attending programs while he was wearing the jumpsuit. In his grievance, which is incorporated by reference, Barrow states that he was offered the option of being "bonded to the restart chair, in 4 points" as an alternative to attending programming in the jumpsuit; however, he rejected this option as a "baric [sic] medieval form of bondage and sadism." Dkt. No. 50, at 25. Any lack of access to programming or services was self-imposed. [10] Thus, although Barrow was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting Barrow's movement. Therefore, Barrow failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship ... in

relation to the ordinary incidents of prison life." *Sandin,* 585 U.S. at 484.

**\*19** Additionally, although Barrow may not have been granted a hearing before the imposition of the lewd conduct program, it appears that the jumpsuit and sign were implemented as a necessary security measure. Here, defendants are charged with the responsibility of ensuring the safety of the prison staff, personnel, visitors, and inmates. "A prison regulation that inadvertently impinges on prisoners' constitutional rights is valid " 'if it is reasonably related to legitimate penological interests,' such as 'deterrence of crime, rehabilitation of prisoners, and institutional security' " *Davis v. City of New York,* 142 F.Supp.2d 461, 463 (S.D.N.Y.2001) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Because the jumpsuit and sign serve to prevent inmates with a history of exposure and public masturbation from committing such acts, and Barrow has an extensive history of such conduct, Barrow fails to create an issue of fact as to whether defendants were deliberately indifferent to a serious risk of harm when requiring his participation in the lewd conduct program. *Whitley,* 475 U.S. at 319. Barrow admitted that he has exposed himself repeatedly, and that this is a "compolsive [sic] habit." Dkt. No. 50, at 25. Thus, even assuming that Barrow had a protected liberty interest, legitimate security concerns outweigh this interest. *Id.; Turner,* 482 U.S. at 79.

Accordingly, defendants motion to dismiss the complaint on these grounds should be granted.

#### 2. **Right to Privacy**

Finally, Barrow argues that defendants violated his right to privacy. The basis for Barrow's claim on this ground is that the jumpsuit and sign expose his medical condition to other inmates, visitors, and prison personnel. It is not clear whether he raises this claim under the Eighth or Fourteenth Amendment. Second Am. Compl. ¶ 33; Reply, at 4. Generally, the right to privacy is based on the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action," (*Whalen v. Roe,* 429 U.S. 586, 598 n. 23 (1977); *Nolley v. County of Erie,* 776 F.Supp. 715, 729 (W.D.N.Y.1991)); however, claims relating to the disclosure of confidential medical information have also been reviewed under the Eighth Amendment. [11] *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–21 (S.D.N.Y.2003). The Supreme Court has recognized "that there exists in the

United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters,' " including " 'the right to protection regarding information about the state of one's health.' " *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir.1999) (quoting *Whalen,* 429 U.S. at 599). An inmate may prove a constitutional entitlement to protection from needless disclosure of a private medical condition if he demonstrates that (1) he suffers from an unusual or sensitive medical condition; and (2) if such condition were disclosed unnecessarily, he could be subjected to discrimination, intolerance, or violence. *Id.* at 111. The interest an inmate has in the privacy of his or her medical condition varies, depending on the condition. *Williams v. Perlman,* No. 9:06–CV–00936, 2009 WL 1652193, at *10–11 (N.D.N.Y. Feb.5, 2009) (citing *Rodriguez,* 287 F.Supp.2d at 229 (holding no qualified right to privacy in inmate's psychiatric condition and treatment)). Although disclosure of such a medical condition may, in some circumstances, be viewed as reasonably related to legitimate penological concerns, gratuitous disclosure may be a violation of privacy. *Id.* at 111–12 (discussing that disclosure of private medical condition for purpose of humor and gossip serves no legitimate penological interest and violates inmate's constitutional right to privacy).

### a. Fourteenth Amendment Right to Privacy

**\*20** Here, assuming Barrow can prove that he has been diagnosed with exhibitionism, he fails to demonstrate that exhibitionism is a condition on-par with HIV or transsexualism—conditions that other courts have found sufficient to trigger a constitutional right to privacy. *Compare Powell,* 175 F.2d at 112–13 (transsexualism protected); *Doe v. City of New York,* 15 F.3d 264, 266–67 (2d Cir.1994) (HIV-positive status protected); *Fleming v. State Univ. of New York,* 502 F.Supp.2d 324, 343 (E.D.N.Y.2007) (sickle cell amenia protected), *with Hamilton v. Smith,* No. 9:06–CV–805, 2009 WL 3199531, at *15 (N.D.N.Y. Jan.13, 2009), *adopted as modified by* 2009 WL 3199520 (N.D.N.Y. Sept.30, 2009) (Hepatitis A not protected), *and Wilson v. Brock,* No. 9:06–CV–528, 2008 WL 4239564, at *5 (participation in drug or alcohol rehabilitation not protected). Further, Barrow has not plausibly demonstrated that the prison community's knowledge of this condition could lead to discrimination, intolerance, or violence. *Powell,* 175 F.3d at 111. Although Barrow contends that he has suffered discrimination, harassment, and intolerance from fellow inmates, as noted, his complaint attributes this disparate treatment to the racist sentiment that the lock on the jumpsuit

triggers, not the condition of exhibitionism itself. Second Am. Compl. at 15. Thus, although exhibitionism could arguably be considered sensitive medical information due to the nature of the condition, because Barrow has not demonstrated that he faced or would likely face harm as a direct result of public knowledge of his alleged condition, he has failed to plausibly argue that defendants violated a constitutional right by revealing this condition to others through use of the lewd conduct program. *Cf. Powell,* 175 F.3d at 112 (disclosure of inmate's status as transsexual and HIV positive could place inmate at risk "especially given that, in the sexually charged atmosphere of most prison settings, such disclosure might lead to inmate-on-inmate violence.").

Additionally, although the lewd conduct program reveals to the prison community the fact that the Barrow exposes himself, Barrow does not demonstrate that the program is needless. Defendants have demonstrated that there are significant penological interests in the sign and jumpsuit —to prevent Barrow from exposing himself and to warn others of his proclivity to do so, which, as Barrow stated, is a compulsive behavior. Dkt. No. 50, at 25. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if reasonably related to legitimate penological interests. *Turner,* 482 at 89. *Turner* identified four factors to consider in making this determination:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it .... Moreover, the governmental interest must be a legitimate and neutral one .... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates .... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally .... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation .... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable ....

**\*21** 482 U.S. at 89–90 (quoting *Block,* 468 U.S. at 586).

Under the *Turner* analyis, it is clear that there is a valid and logical connection between mandating that offending inmates wear the jumpsuit—the inhibition and prevention of an inmate's ability to expose himself—and the prison's interest in maintaining institutional safety and security—preventing offending inmates from engaging in hostile, harassing, or sexually abusive behaviors in the prison community. *Id.* Next, there does not appear to be a less restrictive alternative to the jumpsuit. Absent the jumpsuit, in order to control compulsive acts of exposure and public masturbation, prisons would presumably have to resort to segregation or isolation of these inmates. *Id.* Segregation and isolation is not preferable to the lewd conduct program, which allows inmates to remain a part of the general prison population. In addition, the lewd conduct program as a *de minimus* impact on participating inmates. Although there exists a relatively minor discomfort for inmates, as discussed *supra,* the inmates are not restricted in their movement. Further, this ability to manage the conduct of inmates who demonstrate exhibitionist behavior, prison guards and other inmates would remain at risk of being subjected to this sexual misconduct. *Id.* Thus, for the reasons previously discussed, because the lewd conduct program is reasonable and there are no less restrictive "ready alternatives," the lewd conduct program is valid. *Id.* at 90.

Accordingly, defendants' motion to dismiss under the due process clause of the Fourteenth Amendment should be granted.

### b. Eighth Amendment Right to Privacy

Barrow also appears to argue that he was denied his right to privacy of his exhibitionism under the Eighth Amendment. As noted, it does not appear that Barrow's claim of exhibitionism demonstrates a sufficiently serious medical need. However, even if this condition constituted a serious medical need, the disclosure of the fact that Barrow exposes himself does not constitute deliberate indifference. As these measures were put in place to restrict Barrow's ability to expose himself and warn and protect others from being victimized this conduct, the lewd conduct program was limited enough in scope and purpose. *See generally Hamilton,* 2009 WL 3199531, at \*15 (disclosure of medical condition was not deliberate indifference where disclosures were limited in scope and purpose and were necessary to investigate a grievance).

Accordingly, defendants motion to dismiss should be granted on this ground.

### 2. Equal Protection

Barrow argues that he was denied equal protection because (1) inmates who have smuggled in drugs or weapons in their groin did not have to wear the jumpsuit, (2) inmates who kick or spit on staff are not made to wear relevant restrictive devices, and (3) a disproportionate number of minorities were made to participate in the lewd conduct program.

**\*22** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Barrow fails to demonstrate that similarly-situated inmates are treated differently. Despite Barrow's contention, inmates who have smuggled in drugs or weapons in their groin-area are not similarly situated to Barrow. Similarly, inmates who spit on or kick staff are also not similarly situated to him. Although inmates who smuggle in contraband by concealing it in their groin may pose a security risk, this risk differs from that presented by an inmate who compulsively exposes his genitals to staff, visitors, and other inmates. As such, those inmates do not necessarily require the same security measures to be taken. Because Barrow does not argue that other inmates who have exposed themselves were excused from participation in the lewd conduct program, he has failed to state a claim for an equal protection violation. *See Id.*

Finally, Barrow fails to plausibly argue that the lewd conduct program is intentionally made up of a disproportionate number of minorities. Reading the facts in the light most favorable to him, Barrow presents no evidence to support his argument that racial minorities who have exposed themselves are being treated differently from Caucasian or other inmates who have committed the same lewd conduct infractions. *See Id.* at 129 (2d Cir.2005) ("[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional discrimination").

Accordingly, defendants' motion to dismiss on this ground should be granted.

## G. Americans with Disabilities Act and Rehabilitation Act

Barrow argues that defendants violated the ADA and RA because the lewd conduct program improperly exposes his medical condition—exhibitionism—to members of the prison community. Second Am. Compl. ¶ 33. He contends that the lack of confidentiality regarding his exhibitionism has resulted in "scorn and ridicule and verbal assaults of all kind [sic]." *Id.* It appears that Barrow contends that the denial of programming or treatment for his exhibitionism also violates the ADA and RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity

**\*23** *Byng v. Campbell,* No. 907–CV–471, 2010 WL 681374, at * 17 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)); 42 U.S.C. § 12132. Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, ... [or] denied the benefits of," any federally-funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").

For multiple reasons, Barrow fails to plausibly state a claim. First, Barrow cannot satisfy the first prong of the analysis. Barrow contends that his disability is exhibitionism; however, Barrow presents no evidence that his exhibitionism is anything other than self-diagnosed. The complaint provides

that his diagnosed conditions were major depressive disorder, anti-social disorder, and poly-substance abuse. Second Am. Compl. ¶ 46. Moreover, exhibitionism is specifically excluded from consideration as a disability under the ADA. 42 USC § 12211(b)(1). Thus, Barrow is not a qualified individual with a disability.

Further, Barrow does not establish the second prong—he does not allege that he was excluded from a service or program at Marcy due to his alleged exhibitionism or any of his diagnosed conditions. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 443 (S.D.N.Y.2003). As noted, Barrow states that he was not denied access to programming and medical trips because of lewd conduct, but because he refused to leave his cell while wearing the jumpsuit. Second Amend. Compl. ¶ 39. [12] Barrow's choice not to participate in the programming and services made available to him cannot now be transformed into unlawful acts by defendants serving as a basis for liability.

Accordingly, defendants' motion to dismiss on these grounds should be granted.

## III. Conclusion

**WHEREFORE,** based on the findings set forth above, it is hereby:

1. **RECOMMENDED,** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No 67) be **GRANTED** as to plaintiff's:

a. First Amendment claims;

b. Eighth Amendment claim insofar as it alleged inadequate prison conditions;

c. Eighth Amendment claim insofar as it alleged inadequate treatment and deliberate indifference to plaintiff's exhibitionism and foot condition;

d. Fourteenth Amendment claims;

e. ADA claim;

f. RA claim; and

g. 11th Amendment claim;

2. Further **RECOMMENDED** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No. 7) be **DENIED** as to plaintiff's:

> a. Eighth Amendment deliberate indifference claim, regarding the condition of depression;

3. Further **RECOMMENDED,** that Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt. No. 67) be dismissed as no arguments were made in support of this motion.

**\*24 ORDERED,** that copies of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**SO ORDERED.**

Dated: September 25, 2014.

**All Citations**

Slip Copy, 2015 WL 417084

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Barrow also alleges that his rights were violated under the Patients' Bill of Rights. Second Am. Compl. ¶ 33. However, a violation of state law does not implicate a federal right for purposes of a section 1983 action. *Hanrahan v. Menon,* No. 07–CV–610, 2010 WL 6427650, at *13 (N.D.N.Y. Dec.15, 2010) (citations omitted) (finding claim of a violation under the Patients' Bill of Rights is not cognizable in a section 1983 action).

3    To the extent that it can be inferred that Barrow asserts a violation of the physician-patient privilege, such a claim cannot be sustained. Because Barrow commenced this case as a section 1983 action, federal law applies. As federal law does not recognize the physician-patient privilege, this claim would also fail. *Barnes v. Glennon,* 9:05–CV–0153, 2006 WL 2811821, at *4–*5 (N.D.N.Y. Sept.28, 2006).

4    Barrow does not specify which defendants have personal knowledge of each alleged constitutional violations. It appears that Barrow intends to argue that each defendant had personal knowledge of each alleged constitutional violation (*see* Second Am. Compl. at 15 ("All defendants mentioned in these papers ... has [sic] caused Plaintiff ... to be deprived of the 14th and 8th amendment rights secured by the U.S.A. [C]onstitution. Also, the A.D.A. [t]itle II and section 504 of the Rehabilitation Act")). Where Barrow does not identify which defendants he brings each cause of action against, unless otherwise indicated, this report assumes that Barrow is alleging personal involvement of each constitutional violation upon each defendant.

5    All unpublished decisions are attached to this Report and Recommendation.

6    Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision has affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

7    Indeed, Barrow concedes that he has had incidents of exposure while incarcerated. Dkt. No. 50, at 18.

8    The United States Supreme Court has held that "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle [v. Gamble]." Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

9    Barrow did not include a claim regarding any of his parole concerns in the instant complaint. Even if he had, such claims should be dismissed. The Supreme Court has held that

while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's authority scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.

*Robles v. Dennison,* 745 F.Supp.2d 244, 263 (W.D.N.Y.2010) (citing *Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Board of Pardons v. Allen,* 482 U.S. 369, 371, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. *Barna v. Travis,* 239 F.3d 169, 170–71 (2d Cir.2001) (citing *Greenholtz,* 442 U.S. at 11–13). Because Barrow cannot allege that he has a liberty interest in his parole, to the extent that he has attempted, he has failed to state a due process claim.

10    Insofar as Barrow complains that his failure to attend programming negatively impacted his parole date, as noted (*supra* n. 8), even if this statement were sufficient to raise a denial of a liberty interest claim, such claim must fail, as there is no due process interest in parole. *See Barna,* 239 F.3d at 170–71.

11    To avoid repetition or confusion, to the extent Barrow may raise privacy claims under both the Eighth and Fourteenth Amendment, they will both be discussed in this section of the Report.

12    Even assuming Barrow alleged sufficient facts to state a claim under the ADA or RA, the individual defendants cannot be held liable for a violation of the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009).

---

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2682103
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Vincent BOUKNIGHT, Plaintiff,
v.
YEE–CHEEN DOUNG, M.D., and
Toni McLarvin, M.D., Defendants.

No. 09 Civ. 5817(SAS).
|
July 8, 2011.

**Attorneys and Law Firms**

Vincent Bouknight, Dannemora, NY, pro se.

Virginia J. Nimick, Esq., Heidell, Pittoni Murphy & Bach LLP, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

 **\*1** Vincent Bouknight, incarcerated and proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eight Amendment right to be free from cruel and unusual punishment. Bouknight alleges that Drs. Doung and McLaurin[1] demonstrated deliberate indifference to his serious medical needs by: (1) "intentionally disallow[ing]" a surgical procedure that had been "scheduled and approved by his treating physician" before his incarceration; (2) "failing to provide adequate medical care to him following his altercation with staff which resulted in a fracture to his left ulna;" and (3) denying his request for a "front-cuff order," which would have prohibited prison officers from applying handcuffs behind his back, thereby avoiding the "severe pain" of having his injured forearm cuffed behind him.[2] Defendants move to dismiss all claims "for failure to state a cause of action or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56."[3] Because the motion presents evidence outside the pleadings, it is, in fact, a motion for summary judgment.[4] For the reasons set forth below, Defendants' motion for summary judgment is granted.

**II. BACKGROUND**

**A. The Alleged Denial of the Scheduled Surgical Procedure**

In June 2005, Bouknight sustained a gunshot wound to his left forearm.[5] He visited Dr. Debra Parisi in August 2005, complaining of significant pain.[6] After Dr. Parisi "discussed the risk, benefits, and alternatives to operative management" with Bouknight he elected to proceed with surgery on his forearm.[7] The surgery was completed on September 29, 2005, at Beth Israel Medical Center ("Beth Israel") with "no complications."[8] On January 31, 2006, Dr. Parisi signed a prescription form for Bouknight indicating that he would "require more surgery ... to improve his motion & function."[9]

Bouknight had six follow-up post-surgical appointments with Dr. Parisi to monitor the outcome of his surgery.[10] He had been "noncompliant with his therapy because of difficulties with his medical insurance" and "never regained pronation and supination of the forearm."[11] On June 5, 2006 (the sixth visit), x-rays revealed that Bouknight had developed "a synostosis between the proximal radius and proximal ulna."[12] Dr. Parisi scheduled another surgery to "take down the proximal synostosis and try to regain his pronation and supination."[13] The surgery was scheduled for July 21, 2006.[14]

Bouknight was arrested and incarcerated in Rikers Island Jail Complex ("Rikers") on June 30, 2006, before the scheduled surgery.[15] Bouknight visited the Rikers orthopedic clinic on several occasions in 2006.[16] On July 10, 2006, the attending physician, non-party Dr. Marie Francois, wrote "[Bouknight] wishes to have [Dr. Parisi] operate on him again. Surgical request (orthopedics) submitted to the senior M.D. attention."[17] Bouknight alleges that on "July 21, 200[6, he] was transported to Beth Israel for the scheduled surgery, but was returned to [Rikers], immediately before the start of surgery on orders of the Defendants."[18]

 **\*2** The first documented interaction between Bouknight and Defendants occurred on October 31, 2006, at Bellevue Hospital ("Bellevue").[19] The medical records of that date reveal that Defendants intended to "[discuss with] team re: possible operation to increase [pronation and supination

of] wrist. [Patient] understands that surgery may not treat [range of motion] entirely, will likely not treat pain, and that stiffness may recur." [20] Bouknight returned to Bellevue on November 28, 2006, where the attending physician (non-party Dr. Nirmal Tejwani,) "discussed patient's exam and [x-ray] with orthopedic team. There is no orthopedic intervention that will help this patient at this time. Patient angry and I would recommend a second opinion at another facility." [21] Bouknight next saw Defendants on April 24, 2007, and continued to complain of pain in his forearm. Defendants noted Bouknight's complaints of pain and lack of pronation and supination, but again determined that he was a "nonoperative candidate." [22] Bouknight alleges that this determination was a "denial of adequate medical treatment" sufficiently egregious to violate his constitutional rights. [23]

## B. The Alleged Failure to Provide Adequate Medical Care Following an Altercation

Records from Rikers indicate that Bouknight complained of pain following an altercation on December 21, 2007, after which he twice visited the Rikers clinic for evaluation. Neither of these visits involved Defendants. [24] Bouknight alleges that he was denied appropriate medical care after the altercation, which he supports by submitting a "Request for Radiological Examination." [25] It reads: "[patient] states that he had an altercation and plate and screws 'broke.' Please evaluate." [26] The top portion of the form, filled out by an unnamed official, recommended that Bouknight's left elbow, ulna, and radius be x-rayed. [27]

The form was then turned over to a roentgenologist, [28] who recorded that an x-ray exam of Bouknight's left forearm showed a "well healed fracture ... of radius immobilized with 12cm metallic plate & screws which appear intact. Numerous retained small metallic fragments in soft tissues proximal forearm anteriorly & in proximal radial shaft at site of healed fracture." [29] The roentgenologist recommended a follow-up visit. [30] The follow-up consultation occurred on November 4, 2008. [31] Although the attending physician's notes regarding this consultation are largely illegible, it appears that she found Bouknight had sustained a "relatively new" fracture to his left ulna that may have been caused by the "altercation." [32] There is no evidence linking Defendants to any aspect of Bouknight's "altercation."

## C. The Alleged Denial of a "Front–Cuff Order"

Bouknight alleges that Defendants "intentionally and/or negligently did not grant this simple [front-cuff] order .... As a result of Defendants' intentional and/or negligent actions (or lack thereof), plaintiff suffered hours of severe pain and mental anguish[.]" [33] Medical records from Rikers indicate that attending physicians recommended front-cuffing Bouknight on August 13, October 15, and October 25 of 2007. [34] It is unclear whether these recommendations constituted "orders" that correctional offers were bound to follow, or simply doctors' opinions on the proper course of care.

**\*3** A front-cuff order was granted to Bouknight by Great Meadow Correctional Facility on June 9, 2009, but Bouknight appears to allege that this order was vacated the day after it was received. [35] Another official front-cuff order, granted by Southport Correctional Facility on July 30, 2009, was scheduled to last for 180 days. [36] There is no evidence linking Defendants to any decision to grant, deny, vacate, or ignore a front-cuff order.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [37] " 'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.' " [38] "[T]he burden of demonstrating that no material fact exists lies with the moving party ..." [39] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence ... on an essential element of the nonmovant's claim." [40]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [41] The non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [42] and " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [43] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [44]

## IV. APPLICABLE LAW

### A. Section 1983

Section 1983 states, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [45] "The purpose of [section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." [46] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [47] Furthermore, imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation. [48]

**\*4** The applicability of section 1983 to private parties is limited to those circumstances in which the parties may be considered to be acting "under color of state law." [49]

> The actions of nominally private entities are attributable to the state when those actions meet one of three tests: 1. The "compulsion test:" the entity acts pursuant to the coercive power of the state or is controlled by the state, 2. The "public function test:" the entity has been delegated a public function by the [s]tate, or, 3. The "joint action test" or "close nexus test:" the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the [s]tate, or the entity's functions are entwined with state policies. [50]

### B. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs

Because Bouknight was a pre-trial detainee during the time of Defendants' alleged violations, his claims are governed by the Fourteenth Amendment. [51] In substance, there is no difference in the standards governing pretrial detainees and prisoners. [52]

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. [53] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [54] Prison officials have a "duty ... to ensure that inmates receive adequate medical care." [55] But "the prison official's duty is only to provide reasonable care ... '[P]rison officials who act reasonably [in response to an inmate health risk] cannot be found liable under the Cruel and Unusual Punishment Clause[.]' " [56]

The Cruel and Unusual Punishment Clause embodies both an objective and a subjective prong. [57] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." [58] "Because the Eighth Amendment is not a vehicle for medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." [59] The deliberate indifference standard is therefore high, and generally will not be met by mere complaints of negligence or allegations of medical malpractice. [60]

## V. DISCUSSION

### A. Count One—Denial of Surgery

The undisputed facts do not support Bouknight's allegations that he was denied a necessary surgical procedure by Defendants. Bouknight was first evaluated by Defendants in October, 2006. [61] But the alleged denial of surgery occurred on July 21, 2006. [62] Bouknight has not submitted any

evidence indicating that Defendants met him prior to October, 2006, or had any role in the decision to withhold surgery. No reasonable jury could find that Defendants committed the act complained of in the SAC. Defendants were not personally involved in the decision to withhold surgery in July, 2006.

**\*5** Even construing the SAC liberally to include subsequent denials which did involve Defendants, the undisputed facts demonstrate that Bouknight subsequently visited several doctors at Bellevue, each of whom determined that he was not a candidate for a second operation. [63] Bouknight offers no evidence that Defendants' decision to deny surgery was anything other than a considered medical judgment. While Bouknight clearly disagrees with this judgment, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." [64]

If Defendants' medical decision was poorly reasoned or wrong, Bouknight may have a claim for medical malpractice. But malpractice does not constitute a cause of action under the Eighth Amendment. The deliberate indifference prong sets a high bar—to be liable, a defendant must have acted with a culpable " 'state of mind that is the equivalent of criminal recklessness.' " [65] There is nothing to substantiate the allegation that Defendants were deliberately indifferent when they saw Bouknight at Bellevue or that their decisions was based on financial considerations. Bouknight's allegations are conclusory and unsubstantiated. Summary judgment is therefore granted to Defendants on Bouknight's first count.

**B. Count Two–Denial of Adequate Care Following Alteration**

Bouknight alleges that Defendants "intentionally denied proper radiography diagnostics, failed to diagnose and assess proper treatment, failed to stabilize his arm in a split [sic] or cast, and refuse any of plaintiff's requests for follow-up care, subjecting the plaintiff to unnecessary and wanton infliction of pain." [66]

Voluminous records from Bellevue, Rikers, and other correctional facilities have been submitted by both parties. There is no evidence that either Defendant was personally involved with Bouknight's care after the "altercation." Again, a defendant cannot be liable for constitutional torts if he was not "personal[ly] involve[d]." [67] Defendants' motion for summary judgment is therefore granted on Count Two. [68]

**C. Count Three–Denial of a "Front–Cuff Order"**

Bouknight has alleged that Defendants denied him a front-cuff order "intentionally and/or negligently," which caused him "severe pain and mental anguish." [69] When a defendant denies a front-cuff order for no justifiable reason, a cause of action may lie under the Eighth Amendment. [70] However, Bouknight has offered no evidence that Drs. Doung and McLaurin played any role whatsoever in denying a front-cuff order.

A jury could not reasonably find that Defendants were personally involved with any decision to deny a front-cuff order. None of the exhibits Bouknight has submitted indicate that Defendants had the authority to grant such an order. There is no evidence (apart from Bouknight's unsubstantiated allegations) showing that either Defendant had negligently or intentionally refused to grant the order. The only evidence respecting cuff orders shows that non-party doctors and prison officials recommended that Bouknight be granted a front-cuff order on five separate occasions. [71] This evidence does not raise any material issue of fact regarding Defendants' personal involvement. Accordingly, the motion for summary judgment is granted with respect to Count Three.

**VI. CONCLUSION**

**\*6** For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this motion (docket # 24) and this case.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2682103

---

Footnotes

1      Sued incorrectly herein as "Dr. McLarvin." *See, e.g.,* Bellevue Hospital Medical Records ("Bellevue Records"), Ex. B to 2/11/11 Declaration of Virginia J. Nimick, Defendants' Counsel, in support of Defendants' Motion to Dismiss ("Nimick Decl.") at 24 (referring to this Defendant as "Toni McLaurin.")

2    Second Amended Complaint ("SAC") ¶¶ 25–32.

3    Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) ("Def.Mem.") at 1.

4    *See* Fed.R.Civ.P. 12(d).

5    *See* Beth Israel Medical Records, Ex. C to SAC, at 2.

6    *Id.*

7    *Id.*

8    *Id.* at 5. *See also* Notes of Dr. Debra Parisi ("Parisi Notes"), Ex. D to SAC, at 1. Bouknight asserts that the surgery was on October 6, 2005. *See* SAC ¶ 12. This one-week difference is immaterial for purposes of this motion.

9    Parisi Notes at 18.

10    *Id.* at 1–7.

11    *Id.* at 8. "Pronation" and "supination" refer to one's ability to rotate the forearm and wrist to face palms upward or downward. *See* http://an atomy.med.umich.edu/surface/upper_limb/pronate.html.

12    *Id.* "Synostosis" is a "union between adjacent bones ... formed by osseous material, such as ossified connecting cartilage." *See* http:/ /www.nlm.nih.gov/cgi/mesh/201 1/MB_cgi?mode= & term=Synostosis & field=entry.

13    Parisi Notes at 8.

14    *See* Plaintiff's Memorandum of Law Opposing Motion For Summary Judgment ("Pl.Mem.") ¶ 4.

15    *See id.* Although Bouknight alleges he was incarcerated on June 5, 2006 (*see* SAC ¶ 16) the documents he now submits show the date of incarceration as June 30, 2006. *See* Pl. Mem. ¶ 4.

16    *See* Rikers Medical Records ("Rikers Records"), Ex. C to Nimick Decl. at 2, 45–47, 73–75, 89, 97–98, 116, 120.

17    *Id.* at 97.

18    SAC ¶ 17. Bouknight lists the year as 2005, but it is apparent that he meant 2006. However, Bouknight offers no proof in support of this allegation.

19    Bellevue Records at 24. It is not clear whether Defendants are affiliated with Bellevue or Rikers, or where they maintained their medical offices.

20    *Id.*

21    *Id.* at 23.

22    *Id.* at 22.

23    Pl. Mem. ¶ 2.

24    Rikers Records at 160–162.

25    Request for Radiological Examination, Ex. E to SAC. The form, dated October 10, 2008, has "Downstate Corr. Fac." handwritten across the top, indicating that Bouknight may have been transferred from Rikers to Downstate.

26    *Id.*

27    *See id.*

28    A roentgenologist specializes in radiology and the administration of xrays. *See* http://www.merriam-webster.com/dictionary/roentgenologist.

29    Request for Radiological Examination.

30    *Id.*

31    *See* Request and Report of Consultation, Ex. I to Pl. Mem.

32    *Id.*

33    SAC ¶¶ 31–32.

34    *See* Rikers Records at 189, 231, 259.

35    Front–Cuff Orders, Ex. F to SAC.

36    *See id.* There is no documentary evidence to indicate precisely when Bouknight was transferred from Rikers to either Great Meadow or Southport.

37    Fed.R.Civ.P. 56(c).

38    *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008)).

39    *Miner v. Clinton County, N.Y.,* 541 F.3d 464, 471 (2d Cir.2008).

40    *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008).

41    *See id.*

42 *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

43 *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

44 *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc., All* U.S. 242, 248–49 (1986)).

45 *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)). *Accord Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 (2002) (" '[O]ne cannot go into court and claim a 'violation of § 1983'-for § 1983 by itself does not protect anyone against anything.' ") (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617 (1979)).

46 *Wyatt v. Cole,* 504 U.S. 158, 161 (1992).

47 *See Palmieri v. Lynch,* 932 F.3d 73, 78 (2d Cir.2004).

48 In section 1983 suits, "a plaintiff must plead that each Governmentofficial defendant, through the official's own individual actions, has violated the Constitution." *Iqbalv. Ashcroft,* 129 S.Ct. 1937, 1948 (2009). *Accord Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' ") (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

49 Bouknight has not pled, and Defendants have not raised, any facts which indicate that Defendants did or did not act under color of state law. While the nature of the relationship between Defendants and the State is unknown, Defendants did not raise this issue in their motion. It is therefore assumed that Defendants acted under color of State law for purposes of this motion.

50 *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 34 (2d Cir.2010) (quoting *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008)) (some quotation marks omitted). *Accord Flagg v. Yonkers Sav. and Loan Ass'n,* 396 F.3d 178, 187 (2d Cir.2005); *Bhatia v. Yale Sch. of Med.,* 347 Fed. Appx. 663, 664–65 (2d Cir.2009); *Mitchell v. Home,* 311 F.Supp.2d 361, 369 (S.D.N.Y.2005).

51 *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000). In the case of a pre-trial detainee, " 'the cruel and unusual punishment proscription of the Eight Amendment to the Constitution does not apply,' because 'as a pre-trial detainee, [the plaintiff is] not being punished.' Instead, a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the ... Due Process Clause of the Fourteenth Amendment if held in state custody." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (quoting *Cuoco,* 222 F.3d at 106 (alteration in original)).

52 *See Robinson v. California,* 370 U.S. 660, 666 (1962). "[T]he standard for analyzing a pre-trial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard." *Thomas v. Nassau County Corr. Ctr.,* 288 F.Supp.2d 333, 337 (E .D.N.Y.2003).

53 *See* U.S. Const. amend. VIII.

54 *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ..." (quotation marks and citations omitted)).

55 *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer,* 511 U.S. 825, 832, 844 (1994)).

56 *Id.* at 279–80 (quoting *Farmer,* 511 U.S. at 845) (alteration in original).

57 *See id.* at 279–81.

58 *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

59 *Id.* (citing *Estelle,* 429 U.S. at 105–06).

60 *See Estelle,* 429 U.S. at 106. *See also Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" (citations omitted)).

61 Defendants' Statement of Material Facts submitted pursuant to Local Rule 56.1 ¶ 8. *Accord* Bellevue Records (indicating that Bouknight's first interaction with Defendants was in October, 2006).

62 SAC ¶ 17.

63 *See* Bellevue Records at 23–33.

64 *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

65   *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

66   SAC ¶ 28.

67   *Wright,* 21 F.3d at 501.

68   Even if Defendants had been personally involved with Bouknight's medical care after the altercation, Bouknight has offered no proof of deliberate indifference. He was x-rayed, evaluated, and treated by numerous medical professionals after the "altercation."

69   SAC ¶¶ 31–32.

70   *See Madison v. Mazzuca,* No. 02 Civ. 10299, 2004 WL 3037730, at *8 (S.D.N.Y. Dec. 30, 2004) (finding an alleged denial of a front-cuff order, sufficient to state a claim for an Eighth Amendment violation under section 1983).

71   *See supra* nn. 35–36.

---

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5457681
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

BRIESE LICHTTECHNIK VERTRIEBS
GmbH and Hans–Werner Briese, Plaintiffs,

v.

Brent LANGTON, B2PRO, Key Lighting,
Inc. and Sergio Ortiz, Defendants.

No. 09 Civ. 9790(LTS)(MHD).
|
Nov. 8, 2012.

*MEMORANDUM ORDER*

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiffs Hans–Werner Briese ("Mr.Briese") and Briese Lichttechnik Vertriebs GmbH (the "Briese Company") (collectively, "Plaintiffs") bring this action against Brent Langton ("Mr.Langton"), B2Pro, Key Lighting, Inc. ("Key Lighting") and Sergio Ortiz (collectively, "Defendants") alleging that Defendants have infringed U.S. Patent No. 5,841,146 ("the '146 patent"), which pertains to an umbrella-shaped light reflector for use in photography and videography. The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

Plaintiffs move for summary judgment of willful infringement of Claim 1 of the '146 patent (docket entry no. 232). Defendants oppose the motion. [1] Four other motions are currently pending before the Court. Defendants move to strike portions of the February 27, 2012, Declaration of Plaintiffs' expert, Mark Krichever (docket entry no. 254), and Plaintiffs move to strike the March 15, 2012, Declaration of Sergio Ortiz and its Exhibit A (docket entry no. 260). Defendants also move to strike portions of Mr. Krichever's March 27, 2012, Declaration, portions of the Plaintiffs' Reply in support of their motion for summary judgment and Exhibit B to the Munoz Reply Declaration (docket entry no. 276). Finally, Mr, Ortiz renews his motion to dismiss the Complaint as against him for lack of personal jurisdiction (docket entry no. 246).

The Court has reviewed thoroughly the parties' submissions and arguments. For the following reasons, Defendants' motions to strike portions of Mr. Krichever's Declarations and portions of Plaintiffs' Reply are denied and Plaintiffs' motion to strike Mr. Ortiz's Declaration and its Exhibit A is granted in part. Plaintiffs' motion for summary judgment of willful infringement as to Claim 1 of the '146 patent is denied and Defendants' motion to dismiss for lack of personal jurisdiction over Mr. Ortiz is also denied.

*BACKGROUND*

The following facts are undisputed except as otherwise noted. [2] Mr. Briese filed the '146 patent in the United States on April 15, 1997. The '146 patent consists of Claim One, an independent claim, and multiple dependent claims. Independent Claim 1 reads as follows (numerical references omitted):

An umbrella reflector, comprising:

a bearing body into which a tubular carrying means is inserted so that said tubular carrying means is displaceably held within said bearing body;

a ring of articulated joints arranged on said bearing body and to which umbrella stretchers are hingedly attached, a reflecting umbrella covering fastened to umbrella stretchers;

a sliding means being displaceable on said tubular carrying means

a ring of toggle joints arranged on said sliding means to which expanding stretchers are mounted, the end of expanding stretchers being secured to umbrella stretchers by articulated expanding joints, said expanding stretchers being dimensioned so that when opening the reflectors, said sliding means is displaceable to a point past the plane of said articulated expanding joints, where the resilient restoring forces provide an arrestment holding the reflector in an open position, and

**\*2** an element emitting electromagnetic or acoustic waves which is arranged at the end of said tubular carrying means facing the interior of said umbrella reflector so that by displacing said tubular carrying means within said bearing body said element is moved into different positions in relation to the opened reflector.

('146 patent, col. 4:54–5:14).

Mr. Langton operated a photographic equipment rental business called Briese USA and bought original Briese photographic equipment. On August 27, 1999, Mr. Briese filed suit against another company in which the infringement of the instant ʹ146 patent was asserted. *Hans–Werner Briese v. Profoto A.B. et al.,* No. 99–08727 NM (BQRx) (C.D.Cal.1999) (the "Profoto suit"). Plaintiffs allege that Mr. Langton assisted Mr. Briese, who resides in Germany, with the case. (Pls' 56.1 Stmt ¶¶ 37–38). When the *Profoto* case settled, Plaintiffs allege, Mr. Langton was aware of the details of the settlement agreement, in which Profoto admitted the validity of the ʹ146 patent. (Pls' 56.1 Stmt ¶ 39). Defendants contend that there were questions raised at that time about the patent's validity. (Defs' 56.1 Stmt ¶ 39).

The business relationship between the parties ended in 2007 and Plaintiffs stopped selling their products to Mr. Langton. Mr. Langton then filed a trademark infringement suit against Mr. Briese and the Briese Company, seeking to use the name "Briese" for his products. Mr. Briese counterclaimed, winning a preliminary injunction against Mr. Langton. *Briese USA. Inc. v. Briese Lichttechnik Vertriebs GmbH,* No. 07–2735 GHK (CWx) (CD. Cal 2008). The parties entered into a Mutual Release and Settlement Agreement in January of 2011. (Defs' 56.1 Stmt ¶ 40). Mr. Langton changed the name of his company from Briese USA to B2Pro (a d/b/a of Key Lighting), but Plaintiffs allege that B2Pro infringed and continues to infringe the ʹ146 patent.

Since this suit commenced, Defendants and their counsel have engaged in various forms of pretrial misconduct, resulting in Judge Dolinger's January 14, 2011, Order that the following facts are established and admissible;

   1. B2PRo is the successor corporation to BrieseUSA and BrieseNY.

   2. B2Pro arranged for the design and manufacture of a series of reflector umbrellas after being in possession of the patented Briese reflector umbrellas.

   3. B2Pro has deliberately failed to turn over to plaintiffs, as legally required, all documents reflecting defendants' claimed independent research for and design of their allegedly infringing reflector umbrellas and their component parts.

   4. B2Pro has deliberately failed to turn over to plaintiffs, as legally required, all documents reflecting defendants'

marketing and advertising of their allegedly infringing reflector umbrellas and all documents reflecting revenues from the rental of those allegedly infringing umbrellas.

   5. Defendants appropriated without authorization the company name of the plaintiffs in an attempt to misappropriate the goodwill of the company.

**\*3** (Memorandum & Order of Mag. J. Dolinger, Jan. 14, 2011, making findings of misconduct, docket entry no. 162, at 33–34 ("January 14, 2011, Order")). Judge Dolinger also held that: "plaintiffs will be entitled to an instruction at trial that the failure of the defendants to provide required documents may permit an inference that defendants deliberately infringed the plaintiffs' patents in question and that they earned substantial revenues as a consequence." (*Id.* at 34).

The accused infringing devices are the B2Pro adjustable focus umbrella reflectors in the following sizes: 40 Focus Umbrella Reflectors; 77 Focus Umbrella Reflectors; 90 Focus Umbrella Reflectors; 100 Focus Umbrella Reflectors; 115 Focus Umbrella Reflectors; 125 Focus Umbrella Reflectors; 140 Focus Umbrella Reflectors; 180 Focus Umbrella Reflectors; 220 Focus Umbrella Reflectors and 330 Focus Umbrella Reflectors. (Pls' Stmt. ¶ 5). As part of the instant motion practice, Plaintiffs' expert witness, Mark Krichever, performed a detailed infringement analysis of the alleged infringing umbrella reflectors from the perspective of one skilled in the art at the time of the invention. ("Krichever Deck, Feb. 27, 2012"). Using the Court's claim construction, the constructions agreed to by the parties and adopted by the Court, and the ordinary and customary meaning for the remaining terms of Claim 1, Mr. Krichever concluded that Defendants' umbrella reflectors literally contained each and every element of Claim 1 of the ʹ146 patent. (Krichever Deck, Feb. 27, 2012, ¶¶ 37–38). To perform his analysis, Mr. Krichever used photographs bates stamped BH008923–8933 and BH008958–9036 and reviewed B2Pro's descriptions of the allegedly infringing umbrella reflectors on B2Pro's website, "www.B2Pro.com." (PL Mot. for Sum. Judgment at 13–14).

---

### DISCUSSION [3]

Where, as here "a decision on the motion[s] to strike may affect [Plaintiffs'] ability to prevail on summary judgment, it is appropriate to consider [the motions to strike] prior to [the Plaintiffs' motion for] summary judgment." *Rund v.*

*JPMorgan Chase Group Long Term Disability Plan,* 10 Civ. 5284, 2012 WL 1108003, at *1 (S.D.N.Y. Mar. 30, 2012).

*Defendants' Motion to Strike Mark Krichever's First Declaration*

Defendants move to strike paragraphs 19 and 26–37 of the February 27, 2012, Krichever Declaration under Federal Rules of Civil Procedure 16(f) and 30(b)(6) and Federal Rule of Evidence 702. Defendants argue principally that Mr. Krichever's qualifications are insufficient, that the factual support for his Declaration is inadequate because he examined photographs of the accused device rather than the device itself, and that Mr. Krichever's statement, that Defendants' allegedly infringing conduct manifested in "making, using and renting" the accused devices, is inconsistent with Plaintiffs' previously-disclosed Patent Infringement Contentions, which characterized the infringing conduct as "intentional copying, rental, sale and offer for sale of the infringing devices ...."[4] (Krichever's Deck, Feb. 27, 2012, ¶ 19). Defendants further contend that the inability of Plaintiffs' Rule 30(b)(6) deposition witnesses to supply information in response to questions regarding the factual basis of, *inter alia,* Plaintiffs' contentions that Defendants sold or rented the accused devices precludes Plaintiffs from seeking to prove such activity. None of these arguments is availing.

**\*4** Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. In patent cases, expert testimony is "useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of

the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips v.. AWH Corp.,* 415 F.3d 1303, 1318 (Fed Cir.2005). According to his Declaration, Mr. Krichever has a Master's degree in Opto–Mechanical Engineering and has more than 40 years of experience working as an optomechanical engineer. Defendants' contention that Mr. Krichever is unqualified to opine centers on the lack of evidence that he has ever handled physically an umbrella reflector. Mr. Krichever's academic and experiential engineering background is, however, sufficient to qualify him as an expert in the engineering issues that are in dispute in this litigation.

Moreover, an expert is not required to personally inspect the accused device to render valid opinions. Federal Rule of Evidence 703 (which governs the basis of opinion testimony by experts) provides that "[an] expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed." Fed.R.Evid. 703 (emphasis added). "[T]he Federal Rules of Evidence establish that an expert need not have obtained the basis for his opinion from personal perception." *Monsanto Co. v. David,* 516 F.3d 1009, 1015 (Fed.Cir.2008). Mr. Krichever's Declaration proffers that he read and examined a substantial amount of pertinent material (including the ʹ146 patent, the file history, deposition transcripts, and the B2Pro website), and his opinions are supported by his cited evidence.

Mr Krichever's reference to "making, using and renting" the accused devices is not inconsistent with the Plaintiffs' Infringement Contentions, which state that Defendants infringed the patent by the "intentional copying, rental, sale and offer for sale of the infringing devices." (Krichever's Decl., Feb. 27, 2012, ¶ 19). Clearly, the alleged copies of the umbrella reflectors were "made" at some point and it can be no surprise to Defendants, who offer their devices to the public on a website with pictures and descriptions of how the devices operate, that Plaintiffs are complaining of "use," which is a way to characterize the rental and/or sales of the accused devices. Mr. Krichever's reference to a 125 model accused device is supported by the B2Pro website screen shots that Plaintiff has offered. The question of whether or not B2Pro actually rents or sells this 125 focus umbrella reflector constitutes a disputed issue of fact.

**\*5** Finally, Defendants' contention that Judge Dolinger's remark, in the January 24, 2011, Order, that Plaintiffs

are bound by the 30(b) (6) witnesses' disclaimers of personal knowledge in response to "specific factual questions," precludes Plaintiffs from seeking to prove that Defendants sold or rented the accused devices is unfounded. (Memorandum & Order of Mag. J. Dolinger, January 24, 2011, partially granting Defendants' motion to compel, docket entry no. 167 ("January 24, 2011, Order")). Defendants have selectively quoted only a portion of the January 24, 2011, Order dealing with this issue. Reading the whole of the Order demonstrates that, rather than granting Defendants' request to preclude parts of Plaintiffs' case based upon allegedly non-responsive answers, Judge Dolinger denied Defendants' requests for sanctions, finding that, "to the extent that [the 30(b)(6) witnesses] were asked properly phrased and permissible questions about factual details, they were able to provide responsive testimony." (January 24, 2011, Order, at 17). Judge Dolinger found that the only questions that the 30(b) (6) witnesses were unable to answer were questions that were overly general, vague or improperly calling for legal conclusions, and that the "failure of defendants' counsel to focus on specific purely factual details does not demonstrate that the witnesses failed to fulfill their required roles under Rule 30(b)(6)." (*Id.* at 17). Accordingly, the motion to strike portions of the February 27, 2012, Declaration of Mr. Krichever is denied.

*Plaintiffs' Motion to Strike Sergio Ortiz's Declaration*
Plaintiffs move to strike the March 15, 2012, Declaration of Sergio Ortiz and its Exhibit A, seeking costs and expenses, including reasonable attorneys' fees pursuant to Federal Rules of Civil Procedure 37(c)(1) and 56(c)(4) and Judge Dolinger's January 14, 2011, Order. Based on his personal experience and background with the B2Pro umbrella reflectors, Mr. Ortiz testifies that three elements of Claim 1 of the '146 patent do not appear in the B2Pro umbrella reflectors. Plaintiffs contend that Mr. Ortiz is offering expert testimony, which was not properly disclosed, and that Defendants are using Mr. Ortiz's Declaration to " 'sandbag" them.

Federal Rule of Evidence 701 allows a lay witness to testify to opinions which are:

> (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702,

Fed.R.Evid. 701. Witness testimony is excluded pursuant to Rule 701 when the witness's testimony is "based on the witness's scientific, technical, or specialized knowledge rather than observation." *New York v. Solvent Chemical Co., Inc.,* 453 Fed. App'x 42, 47 (2d Cir.2011). In patent cases, the testimony relating to the interpretation and application of patent claims by persons of ordinary skill in the art generally involves "scientific, technical or specialized knowledge," as is the case here, and thus, requires expert testimony. *See e.g. Markman v. Westview Instruments, Inc.,* 52 F,3d 967, 979 (Fed Cir.1995) (describing how courts should "ascertain the meaning of claims" by considering the claims themselves, "the specification, [ ] the prosecution history" and "[e]xpert testimony, including evidence of how those skilled in the art would interpret the claims").

*\*6* With over fifteen years of experience working with, developing and repairing lighting equipment, including umbrella reflectors from Briese and B2pro, Mr. Ortiz can testify as a lay witness on the structure and operation of the B2Pro umbrella reflectors. However, as a lay witness, Mr. Ortiz cannot parse the terms of the patent claims to opine as to whether the patent reads on the B2Pro umbrella reflectors. Nor, given the post-discovery status of this litigation, can Mr. Ortiz testify as to those matters as an expert. Mr. Ortiz was never disclosed as an expert as required by Federal Rule of Civil Procedure 26. Mr. Ortiz's infringement opinion (Ortiz Dec!., Mar. 15, 2012, ¶ 2) is belated expert rebuttal opinion and is therefore stricken, as is Mr. Ortiz's testimony mapping the claim language of the patent to the structures in the accused B2Pro devices (Ortiz Deck. Mar. 15, 2012, ¶¶ 3 and 5) (*e.g.,* interpreting the terms "sliding means," "displaceable on" and "displaceably held within").

In Judge Dolinger's January 14, 2011, Order, he precluded Defendants "from utilizing, either on summary judgment or at trial, any documents not produced to plaintiffs during the specified discovery period." (January 14, 2011, Order at 33). Exhibit A to Mr. Ortiz's Declaration was not produced during discovery and therefore, is barred by the January 14, 2011, Order. The Court assumes for the purposes of the instant motion practice that the measurement and dimensions proffered by Mr. Ortiz correspond to the umbrella reflector parts that were previously provided to Plaintiffs for inspection. If Plaintiffs contend that the measurements and dimensions do not correspond to the umbrella parts that were produced for inspection, the application to strike the representations as to dimensions may be renewed in connection with trial.

Accordingly, Plaintiffs' motion to strike Mr. Ortiz's Declaration to the extent that it offers any infringement opinion or claim construction is granted. Defendants' motion to strike Exhibit A is also granted. Mr. Ortiz's Declaration will only be considered in connection with the instant motion practice for its purported description of the physical structure and operation of the B2Pro umbrella reflectors. The Court denies the Plaintiffs' request for an award of costs and expenses in connection with this motion.

*Motion to Strike Portions of the Second Declaration of Mark Krichever and Plaintiffs' Reply*

Defendants also move to strike paragraphs 3–7 of the March 27, 2012, Second Declaration of Mark Krichever, pages 3–9 of Plaintiffs' Reply, filed March 27, 2012, and Exhibit B to the Munoz Reply Declaration filed by Plaintiffs in support of their motion for summary judgment, on the grounds that the Plaintiffs' Reply papers are procedurally improper, raise new arguments and proffer new evidence and were late-filed.

"[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.,* 215 F.3d 219, 226–27 (2d Cir.2000) (finding among other things, that the reply submission was the first opportunity plaintiffs had to rebut the defendant's argument) (internal quotations and citations omitted). Plaintiffs' Reply and the Munoz Reply Declaration were provided in direct response to Defendants' arguments and Mr. Ortiz's Declaration. Plaintiffs raise no new legal arguments in their Reply. The Court therefore denies the Defendants' motion to strike pages 3–9 of the Plaintiffs' Reply brief and Exhibit B to the Munoz Reply Declaration.

**\*7** Nor does Mr. Krichever's March 27, 2012, Declaration introduce any new-arguments. It only responds to arguments raised in Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and the Declaration of Mr. Ortiz. Mr. Krichever's interpretation of the claim terms in the March 27, 2012, Declaration is consistent with the intrinsic record and with his first declaration. Accordingly, the motion to strike Mr. Krichever's March 27, 2012, Declaration is denied.

*Plaintiffs' Motion for Summary Judgment of Willful Infringement of Claim 1 of '146 Patent*

As in any other type of action, summary judgment is appropriate in patent cases where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). *See Union Carbide Corp. v. Am. Can Co.,* 724 F.2d 1567, 1571 (Fed.Cir.1984). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party initially carries the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once that showing has been made, the non-moving party may not rely solely on "[c]onclusory allegations, conjecture and speculation," but must demonstrate that there is a genuine issue for trial. *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotations omitted). All ambiguities and factual inferences should be drawn in favor of the non-moving party "if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

When a plaintiff claims that there has been a literal infringement of a patented product, the court must determine "as a matter of law, the correct claim scope, and then [compare] the properly-construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." *Johnson Worldwide Associates, Inc. v. Zebco Corp.,* 175 F.3d 985, 988 (Fed Cir.1999). A literal patent infringement case is "amenable to summary judgment" when "the parties do not dispute any relevant facts regarding the accused product but disagree over [claim interpretation]." *Athletic Alternatives, Inc. v. Prince Mfg. Inc.,* 73 F.3d 1573,1578 (Fed.Cir.1996). To find that an accused product literally infringes a patent claim, " 'every limitation of the patent claim [must] be found in the accused device.' " *Wenger Mfg. Inc. v. Coating Mach. Sys., Inc.,* 239 F .3d 1225, 1231 (Fed Cir.2001) (internal quotations and citations omitted).

For substantially the reasons set forth in Mr. Krichever's Reply Declaration, there appear to be no genuine material factual disputes regarding any aspect of the structure of the B2Pro umbrella reflector other than the arrestment mechanism. Mr. Ortiz's Declaration, does, however, frame a genuine factual dispute regarding the arrestment mechanism, precluding the resolution of the infringement issue on this motion for summary judgement. Claim 1 of the '146 patent requires that the "resilient restoring forces provide an arrestment holding the reflector in an open position." According to Mr. Ortiz, mechanical contact between two

aluminum tubes on the B2Pro umbrella reflectors, rather than the "resilient restoring forces," provides the arrestment holding the reflector open. (Ortiz's Decl., Mar. 15, 2012, ¶ 4). The question of whether the arrestment element of Claim 1 reads on B2Pro's accused devices is a disputed issue of fact that must go to the jury. This is the only aspect of the descriptions of the B2Pro umbrella reflector provided by Mr. Ortiz in his Declaration that raises any material factual dispute. Literal infringement requires that every element of the claimed invention be found in the accused device. *Wenger Mfg. Inc.,* 239 F.3d at 1231.

**\*8** Because a genuine dispute of material fact precludes resolution of the infringement issue, summary judgment must also be denied as to the issue of whether any infringement was willful.

*Mr. Ortiz's Motion to Dismiss for Lack of Personal Jurisdiction*

The final motion pending before this Court is Mr. Ortiz's renewal of his motion to dismiss pursuant to the Court's November 9, 2010, Order ("November 9, 2010, Order"), which denied Mr. Ortiz's pre-discovery Rule 12(b)(2) motion without prejudice for renewal after discovery. Mr. Ortiz moves, under Federal Rule of Civil Procedure 12(b)(2), for an Order dismissing the Complaint against him for lack of personal jurisdiction.

After the parties have conducted discovery, plaintiff's burden to establish personal jurisdiction is met by "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990). If the material facts are not contested, the Court determines whether Plaintiff's factual averments are sufficient to make out a *prima facie* case for the exercise of jurisdiction. *Id.* Personal jurisdiction may be exercised over any defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Federal Rule of Civil Procedure 4(k)(l)(a) (West 2012). If a plaintiff can establish a factual predicate for jurisdiction under the laws of the forum state, the court must then consider whether an exercise of jurisdiction under these laws is consistent with federal due process requirements. *Best Van Lines. Inc. v. Walker,* 490 F.3d 239, 242 and 247 (2d Cir.2007).

Plaintiffs assert that this Court has jurisdiction over Mr. Ortiz pursuant to sections 302(a)(1) and 302(a)(3) of New York's

Civil Practice Law and Rules ("CPLR"). Under New York's long-arm statute, CPLR § 302(a)(1), a court may exercise specific jurisdiction over a non-domiciliary where: (1) the non-domiciliary defendant transacts business within New York; and (2) the claim against the non-domiciliary defendant arises directly out of this activity. *Best Van Lines,* 490 F.3d at 246. A non-domiciliary "transacts business" under CPLR § 302(a)(1), when he "purposefully avails [himself] of the privilege of conducting activities within [New York] thus invoking the benefits and protections of its laws." *Cutco Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986) (internal citations and quotations omitted). A cause of action is said to "arise out of a defendant's business transaction in New York under § 302(a)(1) when there is an "articulable nexus" or a "substantial relationship" between transactions within New York and the claim asserted. *Kronisch v. United States,* 150 F.3d 113, 130 (2d Cir.1998) (internal citations omitted). In evaluating contacts, courts look to the "existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York," *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.,* 131 F. Supp. 2d 544, 548 (S.D.N.Y.2001).

**\*9** Here, Defendants' own factual proffers suffice to provide the requisite *prima facie* basis for the exercise of personal jurisdiction over Mr. Ortiz. Defendants represent that Mr. Ortiz is an officer of Key Lighting, which does business as B2Pro. Mr. Ortiz has testified that he is president and sole owner of B2Pro, which was formerly known as Briese USA (and, as Briese USA, was a partnership co-owned by Mr. Ortiz with Mr. Langton). (Docket entry no. 64, Ex. 3 at 124, 142). B2Pro has offices and engages in the business of renting photographic equipment (including the accused reflecting umbrellas) in New York as well as in Los Angeles. (Ortiz Dep. Tr. 43:18–21, 80:21–23). Mr. Ortiz has also admitted that he oversees the company's creation and rental of umbrella reflectors and other equipment and has been involved in servicing customers in New York. (Docket entry no. 64, Ex. 3 at 45:18–24, 48:5–16, 51:13–23, 53:6–11, 121:13–14, 132:23–133:1). Mr. Ortiz also maintains files relating to the business in the New York B2Pro office. (Ortiz Dep. Tr. 113:13–114:24,217:3–12)

These activities demonstrate that Mr. Ortiz is involved in the transaction of the umbrella reflector rental and servicing business in New York. In that all of B2Pro's focus umbrella reflector offerings are accused infringing devices, the claims in this action clearly arise out of the New York-

related business activity. The Court therefore has personal jurisdiction over Mr. Ortiz pursuant to CPLR § 302(a)(1).

Plaintiffs also contend that Mr. Ortiz is subject to personal jurisdiction in New York because his alleged out-of-state tortious acts caused harm in New York State under CPLR § 302(a)(3). To establish jurisdiction under CPLR § 302(a)(3), the plaintiff must show that the cause of action "arises out of a tort committed outside of New York but the tort causes harm within New York, the defendant expected or should reasonably have expected the act to have consequences in the state and the defendant derives substantial revenue from interstate or international commerce." *Citibank v. City Nat'l,* 97 F.Supp.2d 549, 568 (S.D.N.Y.2000) (*citing* C.P .L.R. § 302(a)(3)). A corporate officer may be subject to personal jurisdiction in New York if it is established that "the transaction at issue performed by the corporation ... [was] with the knowledge and consent of the officer and the officer [ ] exercised control over the corporation in the transaction. *Kinetic Instruments v. Lares,* 802 F.Supp. 976, 984 (S.D.N.Y.1992). Individual defendants should have known that they could be liable for their corporation's actions when they "plainly participated in and approved of the infringement of the plaintiff's patent." *Fromson v. Citiplate,* 886 F.2d 1300, 1304 (Fed.Cir.1989).

It is undisputed that B2Pro arranged for the design and manufacture of the umbrella reflectors after being in possession of the patented Briese devices. The company then rented the allegedly infringing devices; these transactions were within the knowledge and consent of Mr. Ortiz, who also exercised control over the transactions. As Mr. Ortiz said, "I don't have to justify to anyone in our company. I'm the final word. If I decide how it's to be made, what it's going to cost, I don't have to check with anybody. I just do it." (Ortiz Dep. Tr. 164:22–25.) Furthermore, as an owner of Key Lighting, d/b/a B2Pro, Mr. Ortiz derives substantial revenue from interstate commerce. For these reasons, and for substantially the reasons discussed in connection with CPLR § 302(a) (1), the Court is authorized to exercise jurisdiction over Mr. Ortiz pursuant to section 302(a)(3) of the CPLR.

**\*10** The final step in a jurisdictional challenge is to determine whether due process is violated by the exercise of jurisdiction over the defendant. Due process requires that a defendant "not present within the territory of the forum" have "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotations and citations omitted). Once a defendant's contacts with a forum state rise to this minimum level, to defeat jurisdiction, the defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462,477(1985).

The Court has again considered thoroughly the factors relevant to the due process analysis, as outlined in the Court's November 9, 2010, Order, and concludes that it does not violate due process to exercise jurisdiction over Mr. Ortiz. (*See* November 9, 2010, Order at 8.) Mr. Ortiz has purposefully availed himself of the privilege of doing business in New York, by running a business that is present and transacts business in the state. Mr. Ortiz is involved in the selling or renting of the allegedly infringing products in New York. Therefore, the cause of action here, patent infringement, arises out of activity directed to New York and it does not offend "notions of fair play" that Mr. Ortiz would be susceptible to being hauled into court in New York.

*CONCLUSION*

For the foregoing reasons, Defendants' motions to strike portions of Mr.

Krichever's Declarations, the Plaintiffs' Reply and Exhibit B to the Munoz Declaration are denied for the reasons indicated herein. Plaintiffs' motion to strike Mr. Ortiz's Declaration and its Exhibit A is granted in part. Plaintiffs' request for an award of costs and expenses in connection with the motion is denied. Plaintiffs' motion for summary judgment of willful infringement is denied and Mr. Ortiz's motion to dismiss the Complaint for lack of personal jurisdiction is denied. This Memorandum Order resolves docket entry numbers 232, 246, 254, 260, and 276.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5457681

Footnotes

1    At times in the opposition papers, Defendants also seem to be making a cross-motion for summary judgment. To the extent this was the Defendants' intention, the cross-motion is unsubstantiated and is denied.

2    Facts recited as undisputed are identified as such in the parties' statements of facts pursuant to Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory, contrary factual proffer. Citations to the parties' respective S.D.N.Y, Local Civil Rule 56.1 statements ("Defs' 56.1 Stmt.") and responses thereto ("Pls' 56.1 Stmt") incorporate by reference citations to the underlying evidentiary submissions.

3    When "deciding issues in [a] patent case, district court applies law of circuit in which it sits to nonpatent issues and law of Federal Circuit to issues of substantive patent law." *In re Omeprazole Patent Litigation,* 490 F.Supp.2d 381 (S.D.N.Y.2007).

4    The Patent Infringement Contentions to which both parties refer, dated April 30, 2010, have not been filed on ECF. The parties are directed to file these Infringement Contentions and any responses on ECF promptly upon receipt of this Order.

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Candelaria v. Greifinger, Not Reported in F.Supp. (1998)

1998 WL 312375

1998 WL 312375
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Juan CANDELARIA, Plaintiff,

v.

Robert B. GREIFINGER; Bethlynn Terry;
Anthony J. Annucci; Susan J. Butler; Dr.
Lester Wright; Thomas Lavalley; Daniel A.
Senkowski; Philip Coombe, Jr.; Mark R. Chassin,
M.D.,M.P.P., M.P.H.; Public Health Council
of the State of New York; Salvatore Canonico,
Joseph Ostrowsky; Richard L. Herzfeld; David
Neier; Quentin Moore; Kings County District
Attorney; New York City Police Department;
Supreme Court of the State of New York—
County of Kings Criminal Term; George Pataki;
Brown and Williamson Tobacco Corporation;
Republic Tobacco Company, Defendants.

No. 96–CV–0017 (RSP/DS).
|
June 8, 1998.

**Attorneys and Law Firms**

Juan Candelaria, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Department of Law, the Capitol, Albany, New York, for State Defendants, Howard L. Zwickel, Asst. Attorney General, of counsel.

MEMORANDUM–DECISION AND ORDER

POOLER, J.

 **\*1** This matter comes to me following a report-recommendation by Magistrate Judge Daniel Scanlon, duly filed on the 24th day of April, 1998. Ten days after service thereof, the Clerk of the Court has sent me the entire file, including any and all objections filed by the parties. No party filed objections.

In this action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes, Candelaria challenges the conditions of his confinement at Clinton Correctional Facility ("Clinton"). Candelaria moved for injunctive relief requiring Clinton to transport physically disabled inmates in a wheelchair-accessible vehicle. Dkt. No. 15. On April 9, 1997, I concluded that Candelaria's motion could not be addressed on the record before me and remanded the issue to the magistrate judge for further consideration. Dkt. No. 99. Candelaria also renewed his motion for appointment of counsel, dkt. nos. 115, 116, and 121, and requested an extension of time in which to provide the United States Marshal Service with information necessary to effect service of process on certain of the defendants, dkt. no. 121.

The magistrate judge recommended I deny as moot Candelaria's motion for injunctive relief, on the grounds that Candelaria had been transferred from Clinton to Elmira Correctional Facility. Dkt. No. 123. In addition, the magistrate judge denied Candelaria's motion for appointment of counsel, granted his motion for an extension of time in which to provide information relevant to service, and recommended that, in the event Candelaria fails to provide the Court with completed USM–285 forms for each of the unserved defendants within forty-five (45) days of the date of the magistrate judge's order, the action be dismissed as to those defendants for whom Candelaria had not submitted the forms. *Id.*

After careful review of the record, including the report-recommendation, to which the parties submitted no objections, I conclude that the magistrate judge's findings were not clearly erroneous. It is therefore

ORDERED that the report-recommendation is approved, and it is further

ORDERED that Candelaria's motion for injunctive relief concerning the transportation of disabled inmates is DENIED as moot, and it is further

ORDERED that if Candelaria fails to provide, within forty-five (45) days of the date of this order, completed USM–285 forms for each of the unserved defendants, this action will be dismissed without further order of the Court as to those defendants for whom Candelaria has not submitted the forms, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

Candelaria v. Greifinger, Not Reported in F.Supp. (1998)

1998 WL 312375

IT IS SO ORDERED.

ORDER and REPORT–RECOMMENDATION

[SCANLON](), Magistrate J.

Plaintiff Juan Candelaria filed this civil rights action in January 1996 to challenge his conviction and the conditions of his confinement at the Clinton Correctional Facility ("Clinton"). Candelaria alleges causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes. This matter is before the Court for further consideration of that portion of plaintiff's motion for injunctive relief which relates to the adequacy of Clinton's method of transporting physically disabled inmates, in light of the parties' submissions filed pursuant to this Court's Order filed July 9, 1997. *See* Dkt. No. 107. Also before the Court are renewed motions from Candelaria for the appointment of counsel (Dkt. Nos. 115, 116 and 121), and a request for a further extension of time in which to provide the U.S. Marshal Service with certain information necessary to effect service of process on the remaining defendants. *See* Dkt. No. 121.[1] These matters will be addressed separately below.

## I. Injunctive Relief

**\*2** Candelaria is paralyzed from the waist down and is confined to a wheelchair. By his motion for injunctive relief, Candelaria sought an order of this Court requiring Clinton to transport physically disabled inmates such as himself in a wheelchair-accessible van. According to plaintiff, Clinton's use of a prison station wagon which was neither equipped nor designed to accommodate passengers with physical impairments was both unsafe and in violation of his civil and constitutional rights. *See* Dkt. No. 68 at ¶ 18.

District Judge Rosemary S. Pooler determined that Candelaria's claim regarding Clinton's method of transporting physically disabled inmates could not be addressed on the record then before the Court and remanded that issue to this Court for review upon further factual development. *See* Dkt. No. 99. By Order filed July 9, 1997, this Court directed the state defendants to submit affidavits, together with supporting documentary evidence, if any, on the adequacy of Clinton's method of transporting such inmates. *See* Dkt. No. 107. Plaintiff was afforded an opportunity to respond to such submission and the Court reserved decision on whether an

evidentiary hearing would be required prior to the resolution of plaintiff's motion for injunctive relief. *Id.* at 4.

Pursuant to the Court's Order, the state defendants filed the affidavits of John Mitchell, the Nurse Administrator at Clinton, and Mark Vann, a Correctional Lieutenant at Clinton. *See* Dkt. No. 114. By these affidavits, the state defendants continue to assert that physically disabled inmates (including Candelaria) have been transported without incident while sitting on a seat in one of the vans used for this purpose. *See id.* Candelaria filed responding papers in which he asserts that inmates are sometimes required to sit on the floor of the van and that, moreover, disabled persons such as himself are not always able to sit safely on a van seat. *See* Dkt. No. 117.

Since the entry of the Court's Order, Candelaria has been transferred to the Elmira Correctional Facility ("Elmira"), where he has been housed since December 2, 1997. *See* Dkt. No. 121.[2]

It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted) (finding request for injunctive relief moot where inmate transferred from subject facilities). Accordingly, the Court recommends that plaintiff's motion for injunctive relief be denied without prejudice to renew in the event that he is transported from Elmira to outside medical visits in a vehicle which is not equipped for the transport of wheelchair-bound inmates.[3]

## II. Appointment of Counsel

Turning to Candelaria's requests for the appointment of counsel, a review of the file in this matter, including plaintiff's most recent submissions requesting appointment of counsel (*see* Dkt. Nos. 115, 116 and 121), in conjunction with the factors a court is to consider when ruling on such motions, *see Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997), indicates no change of circumstances that would warrant appointment of counsel *pro bono* for the plaintiff at the present time. In this regard, Candelaria's apparent poor health does not appear as a matter of record in this action to have prevented him from effectively litigating this action. To the contrary, plaintiff has actively pursued his lawsuit against the defendants and has filed numerous motions during the course of this litigation.

**Candelaria v. Greifinger, Not Reported in F.Supp. (1998)**

1998 WL 312375

**\*3** Accordingly, plaintiff's requests for appointment of counsel are denied for the reasons stated in this Court's prior order concerning this issue. *See* Dkt. No. 107.

*III. Service of Process*

By its July Order, this Court granted Candelaria's requests for an extension of time in which to effect service of process on four individuals and seven entities named as defendants in this action. *See* Dkt. No. 107 at 18–20. Upon the completion of a new USM–285 form for each unserved defendant containing whatever information Candelaria possessed or was able to obtain in a reasonable period of time, the U.S. Marshals Service (the "Service") was directed to attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure. *See* Dkt. No. 107. [4]

Candelaria now seeks a further extension of time to permit him to provide the Service with the completed USM–285 forms. *See* Dkt. No. 121. According to Candelaria, his three transfers, including a lengthy hospitalization, prevented him from timely completing that paperwork. [5]

Plaintiff is hereby granted a further extension of forty-five (45) days from the filing date of this Order in which to provide the Service with the completed USM–285 forms. Said forms shall contain any and all information presently known to plaintiff concerning (i) the whereabouts of the individual defendants, and (ii) the name(s) of the individual(s) upon whom service can be effected on behalf of the seven entities. Upon receipt of same, the Service shall attempt to effect service of process on the these defendants in accordance with the Federal Rules of Civil Procedure and the July Order. [6] Candelaria is advised that his failure to timely provide the Service with the completed USM–285 forms will result in the dismissal of his action as against those defendants for whom plaintiff has not completed them.

WHEREFORE, it is hereby

RECOMMENDED, that Candelaria's motion for a preliminary injunction (Dkt. No. 19) be denied as moot insofar as it challenges the method of transporting physically disabled inmates at the Clinton Correctional Facility, and it is further

ORDERED, that Candelaria's requests for the appointment of counsel (Dkt. Nos. 115, 116 and 121) are denied, and it is further

ORDERED, that Candelaria's request for an extension of time in which to provide the Service with completed USM–285 forms for each of the unserved defendants in this action is granted. Candelaria shall provide such forms, containing all of the information presently known to him relative to effecting service of process on those defendants within forty-five (45) days of the filing date of this Order, and it is further

RECOMMENDED, that if plaintiff fails to timely provide completed USM–285 forms as discussed herein, this action be dismissed as against those defendants for whom plaintiff has not submitted them, and it is further

ORDERED, that the Service shall attempt to serve each of the remaining defendants in accordance with the Federal Rules of Civil Procedure and the terms of the July Order promptly upon receipt of the completed USM–285 forms from Candelaria, and it is further

**\*4** ORDERED, that the Clerk serve a copy of this Order on the parties hereto, and on the Service, by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW, *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 312375

Footnotes

1    The Court notes that Candelaria submitted with one of his requests for appointment of counsel a document entitled "Consolidated Next of Kin–Powers of Attorney–and–Last Will and Testament." *See* Dkt. No. 116.

**Candelaria v. Greifinger, Not Reported in F.Supp. (1998)**

1998 WL 312375

2  Candelaria was transferred to Green Haven Correctional Facility on July 27, 1997, and was thereafter hospitalized from August 25, 1997 until December 2, 1997, when he was discharged to Elmira. *See* Dkt. No. 121.

3  In recommending that plaintiff's motion for injunctive relief be denied as moot, the Court makes no findings with regard to the adequacy of the method of transport utilized at Clinton or the need for an evidentiary hearing to determine same.

4  The following defendants have not yet been served with the summons and complaint in this action: Mark E. Chassin, M.D.; Salvatore Canonico; Joseph Ostrowsky; Quentin Moore; Brown & Williamson Tobacco Corporation; Republic Tobacco, Company; Public Health Council of the State of New York; New York City Police Department; Supreme Court of the State of New York; County of Kings, Criminal Division; and Kings County District Attorney. *See* Dkt. No. 107.

5  Candelaria also contends that he is now confined to the infirmary at Elmira Correctional Facility, where he is not permitted "to possess a large quantity of legal papers." *Id.* at 1.

6  The Service is obligated to effect service of process in accordance with the Federal Rules of Civil Procedure and, if necessary, the Service must make multiple attempts at service. *See Armstrong v. Sears,* 33 F.3d 182, 188 (2d Cir.1994) (where defendant refused to acknowledge Service's request for waiver under Rule 4(d), Service must effect personal service under Rule 4(e)). *Accord, Hurlburt v. Zaunbrecher,* 169 F.R.D. 258, 259 (N.D.N.Y.1996) (Smith, M.J.).

---

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

### A. *Standard for Summary Judgment*

Pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c); see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. *Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22,

1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wideranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being

released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[1]

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1064330
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph Paul GUARNERI, Plaintiff,

v.

LT. James HAZZARD, Corporal J. Crook, Deputy
Paul March; Deputy Grippin, Deputy Howland,
Deputy Mace, Deputy John Doe, the Schoharie
County Jail Medical Department, Dr. Weitz, Jane
Doe Nurse Practitioner, Commissioner Frederick
C. Lamy, and Francis T. Sullivan, Defendants.

No. 9:06–CV–985 (NAM/DRH).
|
March 22, 2010.

West KeySummary

**1**    **Prisons**
👉 Particular Conditions and Treatments

   **Sentencing and Punishment**
👉 Medical Care and Treatment

State prisoner failed to show that his knee
injury was a serious medical need since he
never exhibited any limitations in his range
of motion or complained of an inability to
ambulate, and thus, his Eighth Amendment
rights were not violated. The prisoner alleged
that he had a torn ACL, which was supported
by the medical evidence. However, he played
basketball, even after being advised to avoid
outdoor recreation. He alleged that he suffered
from severe pain, but exhibited a normal gait
and no swelling or difficulty walking. He alleged
that he was in severe pain prior to being treated
in the emergency room, but after he received
an injection of pain medication he did not feel
pain. Within an hour or two of his return, he
was involved in a physical altercation and kicked
multiple sealed doors off the hinges. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Joseph Paul Guarneri, Schoharie, NY, pro se.

O'Connor, O'Connor, Bresee & First, P.C., Justin O'C.
Corcoran, Esq., of Counsel, Albany, NY, for Defendant
Weitz.

Lemire, Johnson Law Firm, Gregg T. Johnson, Esq., Scott
Quesnel, Esq., of Counsel, Malta, NY, for Defendants Lt.
James Hazzard, Cpl. J. Cronk, Deputy Paul Marsh, Jr.,
Deputy Grippin, Deputy Howland County of Schoharie and
Deputy Mace.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** In this *pro se* civil rights action under 42 U.S.C. §
1983, plaintiff claims that defendants violated his First,
Eighth and Fourteenth Amendment rights while plaintiff was
incarcerated at the Schoharie County Jail. In the second
amended complaint, plaintiff asserts that defendants violated:
(1) the Eighth Amendment for failing to provide plaintiff
with adequate medical care; (2) the First Amendment and
Religious Freedom Restoration Act ("RFRA") for denying
plaintiff the right to practice his chosen religion; (3)
the Fourteenth Amendment for denying plaintiff Equal
Protection on account of his religious beliefs; and (4)
the First Amendment for denying plaintiff access to
the courts. Defendants move for summary judgment and
dismissal of plaintiff's second amended complaint pursuant to
Fed.R.Civ.P. 56.

**FACTUAL BACKGROUND**

The facts in this case, unless otherwise noted, are
undisputed. [1] The Schoharie County Sheriff's Department
("SCSD") operates the Schoharie County Jail Facility
("SCJ") in Schoharie County, New York. At the relevant
time period, James Hazzard ("Lt.Hazzard") was employed
as a lieutenant in the SCSD. In 2006, Lt. Hazzard was
the Chief Administrative Officer for the SCJ and was
responsible for reviewing inmate grievances. Allen Nelson
("Nelson") was employed by the SCSD as a Corrections
Officer and acted as the SCJ Inmate Grievance Coordinator

with responsibilities that included receiving, investigation and making determinations on inmate grievances. [2] Paul Marsh ("Marsh") was employed as a Corrections Officer at SCJ. However, Officer Marsh was injured on November 5, 2005 and, as of December 2008, had not returned to work. James Grippin ("Grippin") was employed as a Corrections Officer at SCJ from February 2003 through August 2006. Donald Mace ("Mace") was employed as a Corrections Officer at SCJ and was employed in that capacity for 19 years. Dr. Weitz ("Weitz") is board certified in internal medicine and rheumatology and licensed to practice medicine in the State of New York. Dr. Weitz began working at SCJ in January 2004. Defendant Weitz has submitted a twenty page affidavit which details his contacts with plaintiff and comments on all of plaintiff's visits to sick call. [3] Defendant Weitz's affidavit chronologically details all of the dates and states whether plaintiff was seen by other medical personnel or treated by defendant Weitz.

Plaintiff has been arrested over 70 times in the past 20 years and has spent most of his adult life in and out of correctional facilities on various charges and convictions. Since 2000, plaintiff has been housed at SCJ on 16 separate occasions. [4] Plaintiff claims that he suffers from herniated discs in his neck and lower back, torn ligaments in his knee, post-traumatic stress disorder ("PTSD"), bi-polar disorder and depression.

**Plaintiff's Incarceration from 2004 until 2005**
Plaintiff was incarcerated at SCJ from January 2004 until January 2005. On January 29, 2004, plaintiff was evaluated by a social worker at SCJ. Plaintiff denied suicidal and homicidal ideation and was found not to be an 'imminent risk" to himself or others. On February 27, 2004, a nurse practitioner examined plaintiff and prescribed Flexeril for his back pain. [5] At plaintiff's request, the nurse agreed to discuss plaintiff's mental health complaints with Dr. Weitz. On March 2, 2004, Dr.Weitz evaluated plaintiff's mental health condition and consulted with Kelly Farnum, N.P., at Schoharie County Mental Health Clinic. [6] Dr. Weitz and Nurse Farnum discussed plaintiff's medical condition and agreed that Dr. Weitz would prescribe Prozac and Depakote. [7] On March 23, 2004, plaintiff was seen Nurse Farnum upon Dr. Weitz's request. Nurse Farnum noted that plaintiff was cooperative, his thoughts were organized and goal directed and plaintiff denied any suicidal or homicidal tendencies. Nurse Farnum noted that plaintiff's impulse was "intact during interview" but that his insight and judgment

were "poor" and his intelligence was, "below average". Nurse Farnum suggested that plaintiff continue with his current medication.

**\*2** In April 2004, the medical staff at SCJ noted that plaintiff requested a transfer to "Mercy" or another "psychiatric hospital". The staff denied this request concluding that plaintiff had "adequate care" and that he was "manipulating for psychiatric hospitalization". In May 2004, plaintiff demanded to be seen by a psychiatrist. The medical staff discussed plaintiff's request with Dr. Weitz and an appointment was made for plaintiff to see Dr. Warren Becker at Schoharie County Mental Health Clinic.

On May 18, 2004, plaintiff was treated by a nurse practitioner after complaining that he hurt his right knee playing basketball. The nurse noted that plaintiff's range of motion was intact but his patella was tender. The nurse diagnosed plaintiff with a right knee strain and prescribed Bextra. [8]

On June 15, 2004, Nurse Practitioner Nancy McDonald at SCJ noted that plaintiff was refusing to take his medication including Bextra, Wellbutrin, Flexeril, Depakote and Amoxicillin. [9] Plaintiff reported that he did not take his medications because they "masked the problems".

On June 25, 2004, plaintiff was taken to Bassett Hospital with a prescription from Dr. Weitz for x-rays of his cervical spine, thoracic spine and lumbar spine. The x-rays revealed mild degenerative changes in the lumbar spine. Plaintiff was advised to avoid playing basketball and other outdoor recreation.

On July 28, 2004, plaintiff was examined by Dr. Warren Becker, a psychiatrist at Schoharie County Mental Health Clinic. [10] Dr. Becker found that plaintiff did not display any psychiatric disorder that required medication but noted that the medication would make him "feel calmer". Dr. Becker found plaintiff to be polite and cooperative and did not conclude that he was suffering from PTSD.

On August 24, 2004, plaintiff requested a knee brace so that he could play basketball. Plaintiff was seen by a nurse practitioner on August 30, 2004 and complained that he "went to jump up and when he came down, the right knee buckled". Plaintiff was diagnosed with a right knee strain. The nurse practitioner told plaintiff to avoid basketball and ordered a knee brace. On September 27, 2004, plaintiff requested a different knee brace claiming that the neoprene

knee brace he was wearing did not allow for the proper lateral movement of his knee. Nurse McDonald advised plaintiff that his brace was sufficient but stated she would discuss the issue with Dr. Weitz. Dr. Weitz stated that plaintiff needed an orthopedic evaluation to determine his need for a brace. Plaintiff was advised that an appointment would be made for a consultation.

On November 4, 2004, plaintiff was examined by Dr. Shep Friedman, an orthopedist at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament ("ACL") tear. Dr. Friedman suggested exercise and possible surgery. Dr. Friedman indicated that a brace was medically necessary and that he would speak with someone at the jail to discuss a more supportive brace that would meet jail guidelines. The medical staff told plaintiff that if the facility paid for the brace, it would become facility property when he was transferred. Sgt. Newman and Sgt. Santoro gave Nurse McDonald permission to purchase the brace. [11]

**\*3** In December 2004, plaintiff refused to wear a neoprene knee brace. In January 2005, Dr. Friedman re-examined plaintiff and found a normal gait and normal range of motion with some tenderness in the right knee. Dr. Friedman diagnosed plaintiff with a chronic ACL tear and noted that the jail would not permit plaintiff to use a brace with metal stays outside of his cell. Dr. Friedman suggested surgical intervention or conservative measures including physical therapy.

**Plaintiff's Incarceration in 2006**
Plaintiff was incarcerated at SCJ in June 2006 and remained there until August 24, 2006 for a parole violation. [12] During the three months that he was incarcerated at SCJ in 2006, plaintiff filed 102 separate inmate requests and approximately 12 medical requests.

In June 2006, upon plaintiff's arrival at SCJ, Sgt. Newman noted that plaintiff had an "old black knee brace in his personal property. Issued a new blue knee brace-must be returned upon release".

**Plaintiff's Medical Treatment–2006**
On June 9, 2006, plaintiff completed a medical request form complaining of dizziness and insomnia. The same day, plaintiff was prescribed Prozac. On June 10, 2006, plaintiff completed another medical request complaining of pain in his

right leg. Plaintiff was seen by a member of the medical staff and prescribed 800 mg of Motrin.

On June 15, 2006, Dr. Weitz examined plaintiff and noted a history of low back pain and degenerative disc disease of his lower spine. Upon examination, Dr. Weitz found that plaintiff could walk without limping, had no motor sensory loss and no symptoms with straight leg raises. Dr. Weitz diagnosed plaintiff with low back pain and prescribed Flexeril. On the same day, plaintiff completed a medical request asking for medication called "trigosamine", a consultation with a neurosurgeon, a back brace and back surgery. Plaintiff also refused to see Dr. Weitz. Plaintiff was seen by Melissa Becker, a nurse practitioner, who noted that plaintiff's request was for an herbal remedy that was not FDA regulated. Nurse Becker noted, "I am not ordering unnecessary testing. I am trained medically to make judgment decisions."

On June 16, 2006, plaintiff submitted a grievance claiming that he was denied a back brace and adequate x-rays for herniated discs. On June 21, 2006, after an investigation, Officer Nelson concluded that plaintiff was unwilling to follow the course of action recommended by the medical staff and refused to take prescribed medication and Motrin. Therefore, Officer Nelson responded to the grievance stating, "I have no choice but to deny this grievance". Plaintiff appealed the decision to Lt. Hazzard who found that, "[y]ou again are refusing any course of action by medical. They have a plan set up which they discuss with you and you refuse to abide by it. Grievance denied". Plaintiff appealed Lt. Hazzard's decision to the Citizens Policy and Complaint Review Council ("CPCRC") and on August 10, 2006, CPCRC issued a decision denying plaintiff's grievance.

**\*4** On June 18, 2006, plaintiff complained of severe pain in his lower back. Plaintiff was treated on June 19, 2006 and advised to continue with his medications. On July 19, 2006, plaintiff requested a hinged knee brace. On July 20, 2006, plaintiff's medications were increased.

On July 21, 2006, at approximately 2:00 a.m., plaintiff allegedly sustained a knee injury when his knee, "gave out" while he was in the medical holding cell. [13] Officer Nelson claims that he went to plaintiff's cell at approximately 3:00 a.m. and that plaintiff demanded to be taken to the emergency room immediately and refused to wear his knee brace. Officer Nelson claims that at approximately 3:12 a.m., he spoke with Dr. Weitz by telephone who directed Officer Nelson to put the brace on plaintiff's knee for the rest of the evening. Dr. Weitz

further advised Officer Nelson that the medical staff would examine plaintiff the next morning at the facility. Plaintiff claims that he did not put his brace on because his knee "swelled up".

Later the same day, plaintiff was seen by Nurse Becker who noted that plaintiff's knee was tender to the touch with minimal swelling. Nurse Becker convinced plaintiff to use the brace but plaintiff insisted that he be taken to the emergency room to be fitted for a metal brace. [14] The nurse recommended that plaintiff be evaluated and "scanned".

On July 21, 2006, at approximately 1:45 p.m., plaintiff was seen in the Bassett Hospital Emergency Room. Plaintiff claims he was in "severe" pain. The doctors in the emergency room prescribed Tylenol, wrapped the knee in an ace bandage and advised plaintiff to rest. The doctors also suggested that plaintiff follow with Dr. Friedman. Plaintiff claims he was able to walk out of the hospital because he was "injected" with pain medication. Plaintiff testified that within an hour or two, he was "feeling no pain". On July 21, 2006, upon plaintiff's return from the hospital, plaintiff was involved in an incident with the SCJ correctional staff. Plaintiff admitted to engaging in a verbal exchange with the staff and also admitted that he kicked one of the Corrections Officers. [15]

On July 24, 2006, plaintiff was examined by Dr. Friedman at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament tear with some arthritic change and limited range of motion. Dr. Friedman noted that plaintiff was fitted for a "Genu ACL brace" which plaintiff was "comfortable with".

From July 24, 2006 through August 24, 2006, plaintiff was permitted to wear the hinged knee brace. On August 24, 2006, Officer Mace escorted plaintiff to the Elmira Correctional Facility ("ECF") and upon arrival, advised ECF staff that the brace needed to be returned to SCJ. The ECF staff removed the brace from plaintiff, outside of Officer Mace's presence. Officer Mace returned the brace to the SCJ.

**Plaintiff's Request for a Catholic Priest**

On June 9, 2006, plaintiff submitted an Inmate Request seeking "religious assistance" from a Catholic priest. Plaintiff received a response from Cpl. Rodriguez–Stanley which stated, "I contacted our jail Chaplain Rev. Ferenczy, and he will try to reach the local Catholic priest to see when he could come out and see you". According to Lt. Hazzard,

the SCJ staff, including the facility Chaplain, Reverend Paul Ferenczy, made efforts to obtain the services of a Catholic priest. Plaintiff testified that he previously met with Rev. Ferenczy. On June 26, 2006, plaintiff filed a grievance claiming he was being denied his, "First Amendment of not having his Catholic religion for 'no' reason at all". Plaintiff claimed that SCJ was deliberately violating the "Religious Freedom Restoration Act". Plaintiff sought to have "Catholic servicers [sic]". Lt. Hazzard explained to plaintiff that ongoing efforts were being made to obtain the services of a Catholic priest. According to Lt. Hazzard, plaintiff accepted that explanation. On June 29, 2006, plaintiff's request for rosary beads was granted. In August 2006, Lt. Hazzard denied plaintiff's grievance noting that, "[e]very attempt was made to get [ ] Catholic priest into facility, our own Chaplain had been trying to assist us. Inmate was sent back to state on August 24, 2007". [16]

**Plaintiff's Access to Courts**

 *5 Plaintiff testified that while incarcerated at SCJ, he filed four lawsuits. Moreover, his requests for addresses, supplies and a notary were routinely granted. On June 13, 2006, plaintiff submitted an Inmate Request seeking, "[l]egal reference material called Chapter on Parole and on Article 78 from the Jailhouse Lawyer Manual New Edition". On June 15, 2006, plaintiff filed a second Inmate Request with respect to the materials. On June 16, 2006, plaintiff was advised that the Jailhouse Lawyer Manual, "is not required library material set forth in minimum standards as outline by Commission of Corrections". On June 16, 2006, plaintiff filed two grievances with regard to this issue. Plaintiff sought to have all forms and chapters referenced in his prior request provided immediately and sought copies from the Jailhouse Lawyer Manual on Article 78 and parole and all legal forms from that book, "when requested in the future". Officer Nelson claims that Cpl. Wood investigated the issues and prepared a report. After reviewing the report, Officer Nelson concluded that SCJ was not required to maintain the requested information. On June 21, 2006, Officer Nelson issued a decision stating that, "[a]ll legal reference materials required by NYSCOC minimum standards are available for your review in the facility library and case law copies are available, as you well know, by request. Grievance Denied". Lt. Hazzard reviewed Officer Nelson's decisions and upheld the denial. In July 2006, plaintiff made at least three requests for extended library time and all requests were granted. Plaintiff appealed the determination to the CPCRC and on August 10, 2006, the CPCRC denied plaintiff's grievance.

**Prior Litigation**

On May 11, 2005, plaintiff filed an Amended Complaint in an action entitled *Joseph Paul Guarneri v. John Bates, Jr., Lt. Hazzard, Mr. Santoro, Mr. Newman, Roland Hirot, Mr. Gordon, Paul Marsh, Jr., Schoharie County Jail Medical Department, Dr. Weitz, Nancy McDonald, State Commission of Correction, Frederick C. Lamy, Frank T. Sullivan and Eliot Spitzer,* 05–CV–444 (GLS/DRH) (Dkt. No. 5) ("*Guarneri I*" ). [17] That action involved plaintiff's medical treatment while he was incarcerated at SCJ from January 2004 until January 2005. Plaintiff alleged that the defendants violated his right to medical care under the Eighth Amendment. Specifically, plaintiff alleged that during the course of his arrest on January 5, 2004, he sustained from a rotator cuff tear in his shoulder that caused him severe pain. Plaintiff claimed that the defendants were deliberately indifferent to his medical needs with regard to the shoulder injury. Further, plaintiff alleged that he suffered from knee injuries and that the defendants were deliberately indifferent to his needs as they refused to allow plaintiff to wear his hinged knee brace outside his cell.

On May 31, 2007, the defendants filed motions for summary judgment seeking dismissal of plaintiff's complaint. *See Guarneri v. Bates,* 05–CV–444, (Dkt. No. 72). The matter was referred to U.S. Magistrate Judge David R. Homer for a Report and Recommendation. In his report, Magistrate Judge Homer provided a factual "Background" that included a discussion of plaintiff's medical treatment from August 2004 through January 2005. Magistrate Judge Homer found that plaintiff's shoulder injury may constitute a serious medical need, however, plaintiff failed to establish that the defendants were deliberately indifferent. (Dkt. No. 86). Moreover, Magistrate Judge Homer found that plaintiff failed to offer evidence that his knee injury was serious or that the defendants were deliberately indifferent. Accordingly Magistrate Judge Homer recommended that the Court grant the defendants' motions for summary judgment and dismissal of all claims. (Dkt. No. 86).

**\*6** On March 10, 2008, District Judge Gary L. Sharpe issued a Memorandum–Decision and Order accepting and adopting Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 88).

## SECOND AMENDED COMPLAINT AND PROCEDURAL HISTORY

On August 14, 2006, plaintiff filed a complaint in this action. [18] On February 7, 2007, plaintiff filed a Second Amended Complaint. Specifically, plaintiff alleges two causes of action under the First Amendment: (1) denial of meaningful access to courts; and (2) denial of religious freedom. Plaintiff also asserts causes of action with regard to his religious freedom pursuant to the RFRA and the Fourteenth Amendment. Plaintiff also alleges that defendants violated the Eighth Amendment claiming that: (1) defendants did not allow him to keep his hinged knee brace upon arrival at ECF; (2) defendants delayed in providing adequate emergency treatment in July 2006; (3) plaintiff received inadequate emergency care in 2000 and 2003 for herniated discs; and (4) defendants denied plaintiff proper medical care by refusing to provide a back brace.

On June 13, 2007, defendant Weitz filed a motion pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6) seeking dismissal of plaintiff's complaint arguing that: (1) he was not personally involved in the deprivation of plaintiff's knee brace and in plaintiff's medical care; (2) the complaint failed to state a cause of action; (3) the complaint was barred by res judicata and collateral estoppel; and (4) the claims relating to plaintiff's back were barred by the statute of limitations. (Dkt. No. 19). The motion was referred to Magistrate Judge Homer for a Report and Recommendation. On February 6, 2008, Magistrate Judge Homer concluded that plaintiff failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at ECF and recommended granting Weitz's motion for summary judgment based upon lack of personal involvement with the confiscation of the knee brace. However, Magistrate Judge Homer also found that plaintiff sufficiently alleged that Dr. Weitz was personally involved in his medical care for mental health issues and back and neck injuries sustained in 2003.

Magistrate Judge Homer also found that plaintiff sufficiently alleged an Eighth Amendment violation with respect to his knee injury, mental health and 2003 back injury and recommended denial of Weitz's motion on that ground. [19] However, plaintiff's claims relating to medical indifference occurring in 2000 were "clearly outside the three-year [statute of limitations] period". With regard to Weitz's res judicata argument, Magistrate Judge Homer concluded that there had not been a final determination in the pending federal case (09–

CV–444) against Dr. Weitz and therefore, that aspect of the motion should be denied without prejudice. On February 27, 2008, this Court adopted Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 55).

**\*7** Presently before the Court are two motions for summary judgment. Defendant Weitz moves for summary judgment and dismissal of plaintiff's complaint arguing that: (1) plaintiff's claims are precluded under the doctrine of res judicata and collateral estoppel; (2) plaintiff cannot establish that defendant was deliberately indifferent to any serious medical condition relating to plaintiff's knee, back or mental health treatment; (3) plaintiff cannot demonstrate defendant's personal involvement in medical decisions concerning plaintiff's emergency medical treatment in 2003 for herniated discs; (4) plaintiff's claim of mistreatment of a back injury in 2003 is precluded by the statute of limitations; and (5) Dr. Weitz is entitled to qualified immunity. (Dkt. No. 70). Defendants Hazzard, Marsh, Grippin, Mace, Howland, Cronk and the County of Schoharie move for summary judgment arguing: (1) plaintiff did not suffer from a serious medical need with respect to his knee, back and mental health and even assuming plaintiff suffered from serious medical need(s), defendants were not deliberately indifferent to plaintiff's condition(s); (2) plaintiff was not denied the ability to freely exercise his religious beliefs; (3) plaintiff was not denied equal protection on account of his religious beliefs; (4) plaintiff was not denied meaningful access to the courts; (6) defendants were not personally involved in the alleged constitutional deprivations; and (7) defendants are entitled to qualified immunity. (Dkt. No. 71). Plaintiff opposes the motions. (Dkt. No. 77).

### DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts ("Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that those facts are supported by the evidence in the record. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) (holding that the court may not rely solely on the movant's statement of undisputed facts contained in its Rule 56.1 statement and must be satisfied that the movant's assertions are supported by the evidence in the record). Although a plaintiff is *pro se,* bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment. *See Higgins v. Davis,* 2001 WL 262930, at \*2 (S.D.N.Y.2001).

**\*8** "Defendants can meet their burden of establishing their entitlement to motion for summary judgment by relying on plaintiff's medical records to establish the absence of any evidence supporting deliberate indifference to his mental health needs." *Mills v. Luplow,* 2009 WL 2579195, at \*8 (W.D.N.Y.2009). Though conventional wisdom might dictate the submission of affidavits from the primary actors ... [the] defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's claims, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims." *Id.*

### II. Collateral Estoppel/Res Judicata

Defendant Weitz seeks dismissal of plaintiff's claims based upon res judicata arguing that plaintiff should be precluded from "splitting" his claims into separate actions when he had, "a full and fair opportunity to litigate his claims in the previous lawsuit". [20]

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits in an action "precludes the parties or their privies from relitigating issues that were or could have been raised in that action". *Computer Assoc. Int'l v. Altai, Inc.,* 126 F.3d 365, 369 (2d Cir.1997). "It must first

be determined that the second suit involves the same 'claim' or 'nucleus of operative fact' as the first suit". *Interoceanica v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997) (citation omitted). New York law follows a transactional approach which bars the relitigation of not only matters that were litigated between parties in a preceding action, but also any matters that could have been litigated in that action. *Ramsey v. Busch,* 19 F.Supp.2d 73, 83 (W.D.N.Y.1998). To ascertain whether the two actions arise from the same claim, courts look to whether the underlying facts are "related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations". *Interoceanica,* 107 F.3d at 90 (citations omitted). A plaintiff cannot avoid claim preclusion by " 'splitting' his claim into various suits based on different legal theories (with different evidence 'necessary' to each suit)". *Waldman v. Vill. of Kiryas Joel,* 207 F.3d 105, 110 (2d Cir.2000) (citing *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 39 (2d Cir.1992)).

"As a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play." *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997) (citing *S.E. C. v. First Jersey Secs.,* 101 F.3d 1450, 1464 (2d Cir.1996)); *see also Waldman,* 207 F.3d at 113 (res judicata will not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was itself based on earlier acts). "Claims arising after the prior action need not, and often perhaps could not, have been brought in that action and are not barred by res judicata unless they represent a continuance of the same 'course of conduct' ". *Stewart v. Transport Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 443 (S.D.N.Y.2008) (citing *Green v. Illinois Dep't of Transp.,* 609 F.Supp. 1021, 1026 (N.D.Ill.1985)) (the court declined to read the doctrine of res judicata to require the plaintiff to amend his first complaint to allege a claim that arose after the suit had been filed). A party may file a supplemental pleading but it is not required to do so and may file a new suit if he chooses. *Garcia v. Scoppetta,* 289 F.Supp.2d 343, 350 (E.D.N.Y.2003). In *Maharaj,* the Second Circuit held:

> **\*9** If, after the first suit is underway, a defendant engages in actionable conduct, plaintiff may-but is not required to-file a supplemental pleading setting forth defendant's subsequent conduct. Plaintiff's failure to supplement the pleadings of his

already commenced lawsuit will not result in a res judicata bar when he alleges defendant's later conduct as a cause of action in a second suit.

*Maharaj,* 128 F.3d at 97.

Res judicata, if applied too rigidly, could work considerable injustice. *Reilly v. Reid,* 45 N.Y.2d 24, 28, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978) (holding that claim preclusion is tempered by recognition that two or more different and distinct claims or causes of action may often arise out of a course of dealing between the same parties) (citations omitted). "A party's choice to litigate two such claims or causes of action separately does not bar his assertion of the second claim or cause of action." *Id.* at 29, 407 N.Y.S.2d 645, 379 N.E.2d 172 (citation omitted).

In May 2005, plaintiff filed his complaint in *Guarneri I* alleging constitutional violations relating to medical care for his shoulder and knee injuries.[21] On August 14, 2006, while *Guarneri I* was pending, plaintiff filed a complaint in the instant action alleging constitutional violations relating to medical care for his knee, back, neck and mental health issues. Defendant argues that plaintiff is attempting to "split" his claims and that he "could have raised the claims at issue here in the previous action". Defendant contends that "most of the complaints and treatment relating to [plaintiff's] back and mental health complaints occurred in 2004, the same period of time at issue in his previous lawsuit".

It is undisputed that a final judgment on the merits was entered in *Guarneri I.* However, in *Guarneri I,* plaintiff did not allege any violations with respect to his back, neck or mental health issues. Applying the "transactional" approach for res judicata purposes, the Court finds that the claims and factual circumstances in the present action pertain to a different time period and are not sufficiently related in time, space and origin. In both actions, plaintiff alleged constitutional violations relating to medical treatment for his knee. However, plaintiff was examined by Dr. Weitz in June 2006 and the "give way" incident occurred in July 2006. Thus, these "legally significant" acts occurred after the complaint was filed in *Guarneri I* and are not precluded under res judicata. Defendants argue that when plaintiff testified at his deposition in *Guarneri I,* the medical treatment about which plaintiff complained in the instant action had already occurred. While the record supports that assertion, the appropriate analysis involves the date of the filing of the

first complaint, not the date of the deposition. Based upon the record before the Court in *Guarneri I* and the record in the present action, the factual scenarios and evidence relevant to *Guarneri I* and the present action are sufficiently different such that a judgment in the present action will not destroy or impair the rights or interests established in *Guarneri I.* See *Ramsey v. Coughlin,* 94 F.3d 71, 83 (2d Cir.1996). Accordingly, Weitz's motion for summary judgment and dismissal of plaintiff's claims based upon res judicata is denied.

**III. Eighth Amendment**

 **\*10** Defendants claim that they are entitled to summary judgment and dismissal of plaintiff's § 1983 claims because plaintiff cannot demonstrate that any defendant was deliberately indifferent to any serious medical need.

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." [22] *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). A medical condition is considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). If unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)). "Because there is no distinct litmus test, a serious medical condition is determined by factors such as '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment; (2)

whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain.' " *Whitcomb v. Todd,* 2008 WL 4104455, at \*10 (N.D.N.Y.2008) (citing *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Sonds,* 151 F.Supp.2d at 310 (citing *Estelle,* 429 U.S. at 105–106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Sonds,* 151 F.Supp.2d at 310 (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

 **\*11** Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Jones v. Lindblad,* 2009 WL 804155, at \*6 (W.D.N.Y.2009) (citing *Estelle,* 429 U.S. at 104). Culpable intent requires the inmate to establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* (citing *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996)). Delays must be purposeful or intended or the plaintiff must establish that the deprivation of not having treatment in the stated period was sufficiently serious. *Woods v. Goord,* 1998 WL 740782, at \*12 (S.D.N.Y.1998).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that a plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id; see also Whitcomb,* 2009 WL 4104455, at \*10 (noting that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a § 1983

claim). Even if medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Dean,* 804 F.2d at 215.

## A. Knee Injury

Defendants argue that plaintiff did not suffer from a serious knee injury and further, that plaintiff received prompt medical attention after the "give way" episode in his cell. Plaintiff claims that the "give way" episode occurred at 2:00 a.m. and that he did not receive medical treatment until five hours later. Plaintiff alleges that defendants deliberately and intentionally denied plaintiff emergency medical care after the episode.

### 1. Serious Medical Need

A plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *Lowman v. Perlman,* 2008 WL 4104554, at *5 (N.D.N.Y.2008) (citing *Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y.2006)). Generally, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection". *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered in a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D.N.Y.2006)) (holding that a "medial meniscal tear, with joint effusion" which did not render the plaintiff immobile was not a serious medical need; *see also Williamson,* 2006 WL 1977438, at *9–16 (knee injuries such as a torn meniscus, arthritis, degenerative joint disease and ligament tears are not serious injuries under the Eighth Amendment).

 *12  In this matter, plaintiff alleges that he suffers from severe pain and torn ligaments in his knee. Plaintiff's claim that he suffers from an ACL tear is supported by Dr. Friedman's diagnosis. However, in *Guarneri I,* Magistrate Judge Homer concluded that, "the allegations of pain and chronic ACL tear do not constitute a serious medical need in these circumstances". The record in *Guarneri I* included medical records from 2004 through 2005. In the instant action, plaintiff has not produced any additional evidence demonstrating that he suffers from a serious medical condition with respect to his knee. Plaintiff never exhibited any limitations in his range of motion and never complained of an inability to ambulate. Indeed, plaintiff continued to played basketball even after he was advised, on more than one occasion, by medical staff to avoid outdoor recreation. *See Price v. Engert,* 589 F.Supp.2d 240, 245–46 (W.D.N.Y.2008)

(citing *Chatin v. Artuz,* 28 F.App'x. 9, 10 (2d Cir.2001)) (two weeks after receiving alleged injuries, the plaintiff was able to play basketball, suggesting that he was not in serious pain and that his injuries did not interfere with his daily activities; *see also Lowman,* 2008 WL 4104554, at *5 (the fact that the plaintiff was able to walk and play basketball suggested that the plaintiff did not suffer from a serious medical need). Plaintiff's claim that he suffered from "severe pain" as a result of his knee injury is contradicted by the medical records wherein plaintiff exhibited a "normal gait" and "no swelling or difficulty walking".

On July 21, 2006, the "give-way" episode occurred in plaintiff's cell. Plaintiff was evaluated by a nurse practitioner who noted that plaintiff ambulated without a limp and found minimal swelling in the knee with tenderness upon palpation. Plaintiff testified that he was in severe pain prior to being treated in the emergency room but that after he received an injection of pain medication, he was "feeling no pain". Indeed, within an hour or two of his return to SCJ, plaintiff had a physical altercation with Correction Officers and kicked "multiple sealed doors off the hinges". Thus, even assuming plaintiff suffered extreme pain after the "give way" episode, such a short period of pain is de minimis and does not constitute a serious medical condition under the Eighth Amendment. The medical evidence pertaining to plaintiff's knee injury/complaints fails to establish that plaintiff suffered from a serious or urgent medical condition. Plaintiff failed to provide any medical evidence, either with affidavits or medical records, that defendants' failure to provide treatment caused serious harm.

### 2. Deliberate Indifference

Even assuming plaintiff had a "serious medical need", plaintiff cannot establish that defendants were deliberately indifferent. This court has carefully outlined the extensive attention that plaintiff received for his complaints. From January 2004 until August 2006, plaintiff was examined and/or treated by the medical staff at SCJ or outside medical personnel approximately thirty times. In addition, after plaintiff made a request for a knee brace, Dr. Weitz arranged for an orthopedic consultation with Dr. Friedman. During the relevant time period, plaintiff had three appointments with Dr. Friedman-including an appointment three days after the "give way" episode. Plaintiff's complaints were never ignored, and in most instances, plaintiff only waited a few days to see medical personnel.

**\*13** Plaintiff's complaints of deliberate indifference are also contradicted by the fact that he received several prescription medications including Bextra, Flexeril and Motrin for knee pain. According to the record, plaintiff was non-compliant and refused to take the medications claiming that they "masked his symptoms". Plaintiff's history of refusing to comply with the directions of the medical staff and physicians undermines his claims of deliberate indifference. *See Wright v. Genovese,* 2010 WL 890962, at \*15 (N.D.N.Y.2010) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)). In addition to medication, during his incarceration in 2004, the medical staff also offered plaintiff support for his knee including a neoprene brace. Plaintiff refused to wear the brace. Upon his arrival at SCJ in June 2006, plaintiff presented with an "old knee brace" and was provided with a new knee brace on the same day.

Plaintiff claims that his requests for physical therapy and injections were intentionally denied. Based upon the record, the medical staff deemed the requests "not medically necessary" as plaintiff did not exhibit objective signs of a serious injury. The fact that plaintiff disagreed with the course of treatment does not rise to a level of deliberate indifference and provides no basis for relief under § 1983.

Even crediting plaintiff's claim that he waited five hours for medical care after the "give way" episode, the timing of these events does not establish a disregard of a risk to plaintiff or "deliberate indifference" to his medical needs. *Shankle v. Andreone,* 2009 WL 3111761, at \*6 (E.D.N.Y.2009) (citations omitted). Although the record contains conflicting accounts with regard to how quickly the medical staff responded to plaintiff's needs, by his own admission, plaintiff was treated within five hours of the incident. Courts have held that delays longer than five hours were insufficient to implicate the Eighth Amendments. *See Rodriguez v. Mercado,* 2002 WL 1997885, at \*9 (S.D.N.Y.2002) (the plaintiff was seen within eight or nine hours of the incident); *see also Davidson v. Harris,* 960 F.Supp. 644, 648 (W.D.N.Y.1997) (holding that even assuming the plaintiff's factual allegations were true and that he was forced to wait six to eight hours before receiving oxygen and pain medication, the plaintiff has failed to demonstrate that the alleged deprivation was "a condition of urgency, one that may produce death, degeneration or extreme pain", and therefore, failed to state a cause of action of deliberate indifference to serious medical needs).

Plaintiff's conclusory assertions that he received improper medical attention, absent other documentation, fails to constitute evidence sufficient to raise issues of fact to defeat summary judgment. *See Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1997) (granting summary judgment where "plaintiff's affidavit and deposition ... [did] not contain facts involving manifestations of ... deliberate indifference ..."). Indeed, plaintiff's complaints are contradicted by the record which establishes that plaintiff received more than adequate medical care for his knee complaints.

**\*14** Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claims that defendants violated his Eighth Amendment rights with regard to his knee injury is granted.

**B. Knee Brace** [23]
Defendants argue that they did not interfere with plaintiff's medical treatment when they confiscated the knee brace provided to plaintiff by SCJ.

Where a "prisoner is receiving appropriate on-going treatment for his condition" and brings a claim for denial of adequate medical care for an "interruption in treatment," the Second Circuit has stated that the "serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith,* 316 F.3d at 186. Plaintiff must submit some evidence that a defendant interfered with his prescribed course of treatment and caused plaintiff to suffer pain. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 270 (W.D.N.Y.1998) (holding that the plaintiff submitted evidence that the defendant's repeatedly took his cane from him on a number of occasions thereby creating an issue of fact as to whether the defendant acted with wantonness); *see also Williamson,* 2006 WL 1977438, at \*18 (finding that the defendants refusal to renew the plaintiff's permit for crutches did not threaten to produce death, degeneration or extreme pain). A single, isolated occurrence, might not support an Eighth Amendment claim. *Id.*

This portion of plaintiff's claim belies his argument that defendants were deliberately indifferent to his knee condition. Plaintiff concedes that defendants provided him with a hinged knee brace after the "give way" episode in July 2006 and further, that he was permitted to wear the brace until his transfer to ECF in late August 2006. Under these circumstances, the record does not support a finding of

deliberate indifference. Plaintiff has not provided evidence of any additional adverse effects or injuries stemming from the time he was forced to return the brace to SCJ to the present. There is no evidence that the deprivation of the hinged knee brace created or had the potential to create serious harm to plaintiff. Moreover, plaintiff has failed to establish that defendants "maliciously took away" his brace. *Cf. Hemmings v. Gorczyk,* 134 F.3d 104, 107 (2d Cir.1998). According to Mace's affidavit, he confiscated the knee brace upon plaintiff's transfer at the request of Lt. Hazzard. Plaintiff has failed to establish that Mace acted out of anything other than a reasonable belief that the brace was "SCJ property". Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's complaint with regard to the confiscation of the knee brace is granted.

## C. Back Injury

Defendants allege that plaintiff's activities and refusal to take medication or adhere to the recommended course of treatment by his physicians demonstrates that he did not suffer for a serious medical need with regard to his back. Defendants also claim that they were not deliberately indifferent to his medical needs as plaintiff was prescribed pain medication and muscle relaxants. Plaintiff alleges that defendants: (1) should have provided him with a back brace: (2) refused to provide emergency medical care for plaintiff's back injuries in 2000 and 2003 [24]; and (3) defendants refused to allow him to obtain treatment with a neurosurgeon [25].

**\*15** The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Williams v. Smith,* 2009 WL 2431948, at \*8 (S.D.N.Y.2009) (although the plaintiff may have difficulty meeting the seriousness issue at trial, all inferences must be drawn in his favor at the summary judgment stage). As this Court stated in the prior Memorandum–Decision and Order:

Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* 2002 WL 31075804, at \*14 (S.D.N.Y.2002) (citations omitted); *see also Farraday v. Lantz,* 2005 WL 3465846, at \*5 (D.Conn.2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need).

(*See* Dkt. No. 55).

Back pain does not constitute a serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications." *Jackson v. Fairchild,* 2007 U.S. Dist. LEXIS 17497, at \*5–9, 2007 WL 778133 (N.D.N.Y.2007).

Based upon the record, there is an issue of fact with respect to whether plaintiff suffered from a serious back injury. Dr. Weitz noted that plaintiff complained of back pain "since his arrival to jail". Plaintiff continued to complain of back pain throughout 2004 and underwent x-rays in June 2004 which revealed mild degenerative changes in the lower spine. Conversely, the record indicates that plaintiff was prescribed Tylenol, Bextra and Flexeril for his pain but that he was not compliant with his medication and disobeyed doctor's orders by playing basketball.

Even assuming plaintiff suffered from a serious medical need, plaintiff has not submitted competent evidence demonstrating that defendants were deliberately indifferent and disregarded his health or safety. As noted previously, plaintiff's request for medical treatment were routinely granted and in most cases, within 2 days of such requests. Plaintiff was evaluated by an orthopedic specialist, was prescribed several medications for his back pain and underwent x-rays of his back at an outside facility at Dr. Weitz's request. Accordingly, plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Plaintiff alleges that defendants ignored his requests for a back brace and refused to allow him to consult with a neurosurgeon based upon non-medical concerns. Upon a review of the record, it is clear that plaintiff's requests were denied due to plaintiff's refusal to adhere to the medical staff's prescribed course of action and his unwillingness to accept medication for his complaints of pain. The record establishes that defendants were responsive to plaintiff's request but did not provide plaintiff with the specific treatment he requested. Plaintiff was provided with muscle relaxants and other prescription medication. Plaintiff clearly disagreed with defendants course of treatment. However a disagreement, without further evidence, is insufficient to sustain a cause of action for violations of plaintiff's Eighth Amendment right. Plaintiff was treated by a number of different medical professionals who are afforded wide discretion in their

treatment of prisoners. *See Aquino v. Kooi,* 2007 WL 201169, at *4 (N.D.N.Y.2007).

**\*16** Finally, plaintiff claims that defendants' deliberately refused to provide "emergency care" in 2003 after a slip and fall in the shower area and assault by another inmate at the SCJ. [26] As a result of the incident(s), plaintiff claims that he sustained herniated discs in his neck and lower back. Plaintiff has not provided any competent, admissible evidence to support that allegation. Indeed, the record does not contain any evidence or medical records relating to any of plaintiff's medical treatment in 2003 either within or outside of SCJ. The record is also devoid of any medical requests for treatment or any other complaints by plaintiff of pain in his neck.

Dr. Weitz argues that he is entitled summary judgment and dismissal of plaintiff's claims relating to the denial of "emergency care" 2003 because he did not begin treating plaintiff until January 2004. The record establishes that Dr. Weitz did not treat plaintiff until January 2004 and plaintiff does not dispute this contention. Accordingly, summary judgment and dismissal of this cause of action as against Dr. Weitz is appropriate on this basis as well. [27]

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claim that defendants were deliberately indifferent to his medical needs for back and neck injuries is granted.

### D. Mental Health

Defendants argue that plaintiff did not suffer from a serious mental health condition. Further, defendants claim that plaintiff cannot establish that they were deliberately indifferent to his medical needs as defendant responded to plaintiff's requests for mental health treatment and plaintiff never filed any grievance with respect to the issue. Plaintiff claims that he suffers from mental illness and that the, "psychiatric care he received can be such a substantial deviation from accepted standard as to constitute deliberate indifference". Plaintiff claims he was denied supportive therapy and follow up interviews with mental health providers.

The denial of mental health care may constitute a violation of the Eighth Amendment if plaintiff alleges "pain, discomfort or risk to health". *Mills,* 2009 WL 2606240, at *16 (citation omitted). Support for the claim of mental illness may be presented in the form of "medical evidence, such as a

physician's diagnosis." *Selah v. N.Y.S. Docs Com'r,* 2006 WL 2051402, at *5 (S.D.N.Y.2006) (citing *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir.1995)). Plaintiff must provide evidence that a condition is of urgency. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 218 (N.D.N.Y.2001) (holding that even if the plaintiff's mental health care was "far from optimum", he was provided significant psychotropic medication, bi-weekly individual therapy sessions, and monthly medical reviews while incarcerated). Disagreements with the treatment offered or allegations that he should have received more time with a psychiatrist do not constitute deliberate indifference. *Id.* Moreover, plaintiff cannot establish a "serious medical need" when he is offered but refuses medication that may alleviate his mental anguish. *Sims v. Daley,* 1997 WL 33608, at *5 (S.D.N.Y.1997).

**\*17** In this case, plaintiff alleges that he suffers from post-traumatic stress disorder, severe depression, anti-social disorder and bipolar disorder. Plaintiff presents conclusory allegations and fails to submit medical records or an affidavit from any physician or mental health provider to support his assertions. In fact, plaintiff's allegations are wholly inconsistent with the record. Dr. Becker opined that plaintiff did not suffer from PTSD. Moreover, according to the record, the mental health staff at SCJ and Schoharie Mental Health Clinic continually noted that plaintiff was not a risk to others, not a suicide risk and did not display homicidal ideation.

Even assuming plaintiff could establish that his mental health condition was serious, plaintiff cannot establish that defendants were deliberately indifferent to his condition. When plaintiff began complaining of mental health issues, Dr. Weitz contacted Schoharie Mental Health Clinic and consulted with Kelly Farnum and arranged for an evaluation by Dr. Becker. The record demonstrates that each time plaintiff requested a mental health evaluation, he was seen and treated within days of the request. *See Mills* 2009 WL 2606240, at *17 (holding that the record demonstrated that the plaintiff received adequate care for his mental health condition while incarcerated as the plaintiff was seen by the prison's mental health staff each time he requested). In 2004, Dr. Weitz and Dr. Becker prescribed Depakote, Welbutrin and Prozac. Moreover, within a few days of arriving at SCJ in June 2006, plaintiff received a prescription for Prozac from SCJ's medical staff. Based upon the record, plaintiff cannot establish that defendants were deliberately indifferent to his mental health needs and therefore, defendants' motions for summary judgment and dismissal of plaintiff's Eighth

Amendment claims with respect to his mental health is granted.

## IV. Plaintiff's Request for a Catholic Priest [28]

Plaintiff has alleged causes of action under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. [29] Plaintiff claims that defendants "tried to pass off Rev. Ferenczy as a Catholic Priest" and thus, committed fraud. Defendants claim that plaintiff was not inhibited from practicing any sincerely held religious belief.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc–1), imposes duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009) (citation omitted). Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion. *Redd v. Wright,* 2010 WL 774304, at *3 (2d Cir.2010). "The state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id.*

**\*18** Under the First Amendment, "a generally applicable policy will not violate a plaintiff's right to free exercise of religion if the policy is 'reasonably related to legitimate penological interests' ". *Id.* (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). To succeed on a claim under the First Amendment, the plaintiff must prove that defendants conduct substantially burdened his sincerely held religious beliefs. *Pugh v. Goord,* 571 F.Supp .2d 477, 497 (S.D.N.Y.2008). The defendant must then establish that legitimate penological interests justify the impinging conduct. *Id* .

In order to be considered a "substantial burden", the plaintiff must demonstrate that the government's action pressured him to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Muhammed v. City of New York Dep't of Corrections,* 904 F.Supp. 161, 188 (S.D.N.Y.2005) (citations omitted). The burden must be more than an inconvenience, it must be substantially interfere with a tenet or belief that is central to the religious doctrine. *Id.* (citations omitted); *see also Jones v. Shabazz,* 2009 WL 3682569, at *2 (5th Cir.2009) (holding that a government action or regulation only creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly

modify his religious behavior and significantly violate his religious beliefs). If the plaintiff demonstrates a substantial burden, the onus shifts to the government to prove that an action or policy is the least restrictive means of furthering a compelling state interest. *See Pugh,* 571 F.Supp.2d at 503. A court must consider whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant. *Kikumura v. Hurley,* 242 F.3d 950, 962 (10th Cir.2001). Prison security and penological institutional safety goals are unquestionably compelling state interests. *Muhammed,* 904 F.Supp. at 189. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience ... of prison [ ] administrators in establishing necessary regulations ... to maintain security and discipline ..." *Jova,* 582 F.3d at 415 (citing *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)).

While an inmate has a constitutional right to practice his religion, the prison staff "is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice". *Davidson v. Davis,* 1995 WL 60732, at *5–6 (S.D.N.Y.1995) (citing 42 U.S.C. § 2000bb–1(b)); *see also Reimers v. Oregon,* 863 F.2d 630, 632 (9th Cir.1988) (an inmate does not have the right under the Free Exercise Clause to have the particular clergyman of his choice provided to him). The Constitution does not require that a religious advisor be provided for every sect in a penitentiary. *Weir v. Nix,* 114 F.3d 817, 820–821 (8th Cir.1997) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)) (prison officials need not provide exactly the same religious facilities or personnel to prisoners of every faith). A plaintiff cannot demonstrate that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for coordinating visits with spiritual advisors. *See Pogue v. Woodford,* 2009 WL 2777768, at *8 (E.D.Cal.2009) ("[i]f the rule were to the contrary, prisons would have to fund any other religion facilitating request without which an inmate could claim a substantial burden") (citations omitted). Only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner. *Id.* (citing *SapaNajin v. Gunter,* 857 F.2d 463, 464 (8th Cir.1988)).

**\*19** In the case at hand, defendants do not dispute that plaintiff had sincerely-held religious beliefs. Accordingly,

the Court analyzes whether defendants' conduct created a substantial burden upon those beliefs. Plaintiff makes the conclusory allegation that defendants attempted to perpetrate a fraud by "passing Rev. Ferenczy off as a Catholic". However, plaintiff has provided no factual basis for these assertions. Plaintiff testified that SCJ provided him with a Bible and rosary beads, upon request. Further, plaintiff admits that he had access to the facility Chaplain, Rev. Ferenczy and testified that he actually met with the Reverend on at least one occasion. As part of the motion herein, Sgt. Newman provided a copy of the SCJ's Inmate Rules and Regulations which were in effect during plaintiff's incarceration. The Rules provided, *inter alia,* "[y]ou may request religious assistance. Every effort will be made to assist you with your request, starting with the Facility Chaplain". The Rules and Regulations clearly stated that the facility would make "every effort" to honor requests for religious assistance. Moreover, according to the Regulations, SCJ allowed outside clergy to visit. Defendants have provided evidence that the SCJ staff attempted to locate a Catholic priest to meet with plaintiff. Plaintiff has not submitted any evidence demonstrating that defendants' failure to provide a Catholic priest pressured him to commit an act forbidden by his faith. Plaintiff has not demonstrated that he was "prevented" from meeting with a spiritual advisor of his choice. Rather, plaintiff argues, without legal or factual support that defendants are obligated to provide him with such an advisor. Plaintiff's argument lacks merit. Defendants' failure to comply with plaintiff's request does not amount to either a constitutional or statutory violation. Based upon the record, plaintiff 's free exercise of religion was not substantially burdened by defendants' failure to provide him with a Catholic priest.

Even if plaintiff could establish that his rights were substantially burdened, plaintiff's claim would nonetheless fail because defendants actions were the least restrictive means in furtherance of a compelling interest. Construing plaintiff's complaints in a favorable light, plaintiff seemingly argues that he was denied visits with personal spiritual advisors. Plaintiff claims that SCJ personnel told him that Henry Eckerd, a Jehovah's Witness, would not come to see him. Plaintiff also claims that he asked to be allowed to see his godfather, a Catholic priest, but that he wasn't allowed to have visitors. Plaintiff cannot prevail on this claim for two reasons. First, according to the SCJ Inmate Rules and Regulations, "[m]eetings with attorneys, counselors and clergy are not charged as visits". Plaintiff has not submitted evidence proving that he contacted his godfather and that defendants explicitly refused to allow visitation. Further,

during his deposition, plaintiff admitted that he did not call Mr. Eckerd because he did not want to "run up his phone bill". Second, even assuming plaintiff was denied visits with clergy, based upon the record, defendants' had a compelling interest in revoking plaintiff's visitation privileges. Defendants do not dispute that plaintiff's visitation privileges were revoked. Throughout his deposition, plaintiff admitted that he was prone to violence indicating that he had kicked corrections officers during altercations and that he became, "physical with the staff to see medical". Plaintiff admitted that he, "assault[ed] the staff" to get them to take him to the medical unit. Plaintiff stated that this occurred on two or three occasions. There is no unqualified constitutional right to visitation, which may be regulated in keeping with legitimate penological objectives. *Smith v. Beatty,* 1996 WL 166270, at *1 (7th Cir.1996) (citing *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Even assuming plaintiff could establish that he was denied the right to visit with clergy, based upon the record, plaintiff's violent outbursts and behavior resulted in the decision to restrict plaintiff's visitation privileges. Clearly, this was the least restrictive means of furthering a compelling governmental interest. Moreover, plaintiff admitted that even before his visitation privileges were revoked, he was not visited by a Catholic priest.

**\*20** Based upon the record, plaintiff was not deprived of the right to exercise the religion of his choice. Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's First Amendment claims and RLUIPA claims relating to religion is granted.

## VI. Fourteenth Amendment–Equal Protection [30]

Plaintiff alleges that, "Lt. Hazzard deliberately and intentionally tried to force a different religion on plaintiff" and denied plaintiff the right to Equal Protection under the Fourteenth Amendment. Defendants contend that there is no evidence that plaintiff was treated differently on account of his religious beliefs.

"The equal protection clause directs state actors to treat similarly situated people alike." *Salahuddin v. Perez,* 2006 WL 266574, at *9 (S.D.N.Y.2006) (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)). To prove an equal protection violation, plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). "[T]he Equal

Protection Clause does not require that "every religious sect or group within a prison must have identical facilities or personnel". *Allen v. Toombs,* 827 F.2d 563, 569 (9th Cir.1987) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). Rather, it entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.' " *Shakur v. Schriro,* 514 F.3d 878, 891 (9th Cir.2008) (quoting *Cruz,* 405 U.S. at 322).

Plaintiff has failed to produce any evidence that defendants intentionally or purposefully discriminated against him on the basis of his faith. Plaintiff has not provided any evidence of bias, discriminatory remarks or evidence of comparable situations where fellow inmates were treated differently. Plaintiff's conclusory assertions that defendants committed "fraud" by attempting to "pass off" Rev. Ferenczy as Catholic are unsupported by facts or the record. Based upon the record, the Court finds that plaintiff has been provided with "reasonable opportunities" to practice his faith and therefore, has not been denied equal protection. *See Card v. Dugger,* 709 F.Supp. 1098, 1109 (M.D.Fla.1988).

## VII. Access to Courts [31]

Defendants argue that plaintiff was not denied meaningful access to the courts. Specifically, defendants contend that SCJ maintains a law library that complies with New York State's Minimum Standards and Regulations for Management of County Jails and Penitentiaries and provides all required texts. Plaintiff claims that defendants impeded his ability to do legal research and that the SCJ law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system. Further, plaintiff argues that his time in the library was "intentionally and unreasonably limited".

**\*21** Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828; *Bourdon,* 386 F.3d at 92. However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library

or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351–54, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The government does not have to afford inmates unlimited access to a library. *Bounds,* 430 U.S. at 828; *see also Shell v. Brun,* 585 F.Supp.2d 465, 468 (W.D.N.Y.2008) (holding that a prison law library may not be to an inmate's liking but that does not make it constitutionally inadequate). The plaintiff must prove that the "alleged shortcomings in the library [ ] hindered his efforts to pursue a legal claim". *Davis v. Buffardi,* 2005 WL 1174088, at \*1–2 (N.D.N.Y.2005) (citing *Lewis,* 518 U.S. at 351; *see also Santiago v. James,* 1998 WL 474089, at \*4– 5 (S.D.N.Y.1998) (holding that the plaintiff failed to offer specific facts regarding the type of materials requested, who allegedly denied him the materials or when/frequency of these alleged occurrences).

In order to survive a motion for summary judgment, the plaintiff must present evidence showing that: (1) the defendants acted deliberately and maliciously; and (2) that he has suffered actual injury. *Lewis,* 518 U.S. at 351–54. Where it is alleged that access to a law library or necessary materials has been denied, plaintiff must establish that the deprivation proximately causes some prejudice or denial of a legal claim. *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204–05 (W.D.N.Y.1998) (citing *Lewis,* 518 U.S. at 351).

If the plaintiff cannot articulate any actual injury as a result of purported efforts by the defendants to prevent him from litigating his case, his access claim can not survive scrutiny. *Odom v. Kerns,* 2002 WL 31059341, at \*4 (S.D.N.Y.2008). "The underlying action that the plaintiff alleges being denied access to must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope". *Key v. Fischer,* 2007 WL 2522352, at \*4–5 (S.D.N.Y.2007) (citing *Christopher v. Harbury,* 536 U.S. 403, 416, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)) (holding that the complaint should state the underlying claim in accordance with Fed.R.Civ.P. 8(a)). A plaintiff must offer specific references to the injury and must demonstrate that he sustained dismissal of or prejudice to a lawsuit because of the lack of law books. *Gill v. Pact Org.,* 1997 WL 539948, at \*4–6 (S.D.N.Y.1997). When the plaintiff fails to provide the court with the case number of the habeas petition that was allegedly dismissed due to the defendants' alleged actions, he has failed to demonstrate how he was actually injured or prejudiced by the alleged denial of access to the courts. *Bolton v. King,* 2008 WL 2952769, at \*5 (S.D.Miss.2008); *see also Smith v. Henderson,* 2007

WL 142765, at *4 (S.D.Ga.2007) (holding that the plaintiff failed to establish a genuine issue of fact regarding whether he suffered an actual injury as the plaintiff was not specific about his previous case).

**\*22** Based upon the record, plaintiff has failed to show that a reasonable factfinder could conclude that his access to the courts was caused by defendants' deliberate misconduct. Conversely, the record demonstrates that plaintiff was routinely given extended library time and that his requests for addresses, pens, notebooks and a notary were all approved. Plaintiff admittedly has filed a multitude of lawsuits and testified that he filed four lawsuits while incarcerated at SCJ including an Article 78 petition filed on April 7, 2004. *See Hopper v. John Doe Myers Recreational Coach Northwest Detention Center,* 2006 WL 3337388, at \*5 (W.D.Wash.2006) (holding that the numerous civil suits, pleadings, and motions the plaintiff was able to successfully bring and vigorously prosecute in District Court, showed that he had sufficient access to the courts while detained).

Even assuming that defendants intentionally denied plaintiff access to the library and legal materials, plaintiff has not submitted evidence that he sustained any actual injury. Specifically, plaintiff testified that he was denied access to Article 78 documents and that he was prevented from filing a writ of habeas corpus. However, when plaintiff was asked about missing deadlines for filing papers due to the inadequacy of the library, plaintiff could not recall the deadline dates. Plaintiff could only state that his "divorce, my visitation and [ ] a couple Article 78s against the defendants" were dismissed based upon the fact that the complaints were insufficiently drafted. Plaintiff failed to provide any details about his Article 78 submissions or habeas petition other than the fact that he made such a petition. *See Waters,* 2009 WL 750217, at \*5; *see also Swift v. Tweddell,* 2008 WL 4615053, at \*9 (W.D.N.Y.2008) (holding that the plaintiff failed to identify any judicial proceeding that he attempted to pursue that was hindered by the alleged deficiencies of the law library). Plaintiff has failed to offer any evidence establishing that the alleged deficiencies in the SCJ law library impeded his efforts to bring a viable legal claim. Plaintiff has not produced copies of petitions or lawsuits that were allegedly dismissed nor has plaintiff provided case numbers for these alleged submissions. Plaintiff has failed to submit evidence that the dismissal of any cause of action was proximately caused by his alleged denial of access to the courts. Based upon the lack of evidence, plaintiff has not established that

his underlying Article 78 filing(s) or habeas petition(s) were nonfrivolous.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's cause of action alleging that his First Amendment right to access to the courts was violated is granted.

**VIII. Personal Involvement**

Defendants Cronk, Marsh, Grippin, Howland and Mace move for summary judgment arguing that they were not personally involved in the alleged constitutional violations.

**\*23** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U. S .C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 973 (2d Cir.1995).

"In order to defeat the portion of [the] defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon [the] plaintiff to present evidence to support an inference that the defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care." *Mendoza v. McGinnis,* 2008 WL 4239760, at \*8 (N.D.N.Y.2008) (citations omitted). Personal involvement is generally a question of fact and

summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citing Fed .R.Civ.P. 56(c) and cases)).

In the complaint, plaintiff referred only once to Cpl. Cronk claiming that he deliberately denied plaintiff appropriate mental health care by not allowing plaintiff speak to mental health counselors when having mental health episodes. Plaintiff failed to offer any evidence with regard to Cpl. Cronk's alleged involvement in his mental health care or such "episodes". Indeed, plaintiff testified that Cpl. Cronk was "one step of supervision before a sergeant" and that he improperly reacted to plaintiff's mental health crisis. The fact that Cpl. Cronk may have had some supervisory authority is insufficient to create liability under § 1983. Plaintiff has failed to submit any proof demonstrating that Cpl. Cronk was personally involved in any of his alleged constitutional violations. Accordingly, the Court grants Cronk's motion for summary judgment and dismissal of plaintiff's complaint for lack of personal involvement, in addition to the reasons that the Court has previously discussed.

**\*24** With respect to the remaining defendants, plaintiff has provided sufficient evidence to raise a triable issue of fact with regard to defendants involvement in the alleged constitutional violations. Plaintiff testified that Deputy Howland and Deputy Grippin refused to communicate his medical needs to the medical staff. Defendant Howland failed to submit an affidavit setting forth facts that would be admissible into evidence. *See Davis v. Goode,* 995 F.Supp. 82, 91 (E.D.N.Y.1998) (holding that the defendants failed to carry their burden of presenting affidavits or other evidence to support their claim that no material issues of fact exist as to the personal involvement of these individual defendants). Thus, Howland has failed to sustain his burden on a motion for summary judgment on this issue.

Defendants Grippin and Mace provided affidavits admitting that they were employed at SCJ at the relevant time. Although Grippin and Mace deny any wrongdoing in the matter, there are triable issues of fact regarding Grippin and Mace's personal involvement in plaintiff's alleged constitutional violations.

Finally, plaintiff alleges that Deputy Paul Marsh denied him adequate emergency medical care after an incident that occurred at SCJ in 2003. On the motion, Marsh provided

an affidavit and stated that he was injured on the job on November 7, 2005 and did not return to work. Deputy Marsh does not deny that he was working at SCJ prior to November 2005. Therefore, plaintiff has sufficiently alleged personal involvement as against Deputy Marsh. Thus, the Court denies Marsh's motion for summary judgment on this basis.

## IX. Qualified Immunity

Public officials enjoy qualified immunity from liability under § 1983 "so long as their conduct does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Second Circuit has held that "[a] right is clearly established if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003)).

In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

**\*25** Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation, defendants are entitled to summary judgment on this ground. *Dorcely v. Wyandanch Union Free Sch. Dist.,* 665 F.Supp.2d 178, 219 (E.D.N.Y.2009) (citing The *Cathedral Church of the Intercessor v. The Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005)) ("[w]ithout an underlying constitutional violation, qualified immunity cannot attach").

## CONCLUSION

To summarize, the Court denies defendant Weitz's motion for summary judgment on the basis of res judicata. Weitz's motion for summary judgment and dismissal of plaintiff's Eighth Amendment claims relating to plaintiff's knee, back and mental health is granted as plaintiff has failed to establish that Weitz was deliberately indifferent to any serious medical need. Moreover, Weitz's motion for summary judgment and dismissal of plaintiff's claim that Weitz deliberately and wilfully denied "emergency care" for plaintiff's back injury in 2003 is granted based upon Weitz's lack of involvement. Accordingly, plaintiff's complaint as against defendant Weitz is dismissed in its entirety and Weitz is awarded summary judgment.

Defendant Cronk's motion for summary judgment and dismissal of plaintiff's Eighth Amendment, First Amendment and Fourteenth Amendment claims based upon lack of personal involvement is granted. [32]

Defendants Hazzard, Marsh, Grippin, Howland, and Mace motions for summary judgment and dismissal of plaintiff's Eighth Amendment causes of action are granted as plaintiff has failed to establish that defendants were deliberately indifferent to any serious medical need. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment right to free exercise of religion are granted as plaintiff has failed to establish that defendants prevented him from engaging in religious activities without any reasonably related penological interest. Defendants motions for summary judgment and dismissal of plaintiff's Fourteenth Amendment Equal Protection cause of action is granted as plaintiff has failed to submit evidence that defendants intentionally discriminated against plaintiff on the basis of his faith.

Defendants motions for summary judgment and dismissal of plaintiff's First Amendment access to courts cause of action is granted as plaintiff has failed to demonstrate that defendants intentionally deprived him of access to courts and further, that he sustained an actual injury as a result of such denial.

In the alternative, all defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, based upon qualified immunity.

**Accordingly, it is hereby**
**ORDERED,** that defendant Weitz's motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 70) is **GRANTED,** and it is further;

**ORDERED,** that defendants Hazzard, Marsh, Grippin, Howland, Mace and County of Schoharie's motions for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 71) are **GRANTED,** and it is further;

**\*26 ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties by regular or electronic mail, and it is further;

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED,** as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1064330

Footnotes

1    The facts set forth in this section are taken from: (1) the Second Amended Complaint; (2) the Answer; (3) Defendants' Statements of Material Facts; (4) the exhibits and evidence submitted by Defendants in support of their Motions for Summary Judgment; (5) plaintiff's deposition transcript; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment. Plaintiff does not dispute the accuracy of the facts. In opposition to the motion, plaintiff provided copies of several grievances filed in 2008. The Court has reviewed those submissions and determines that they are not relevant to the issues at hand and therefore, will not be considered within the context of these motions.

2    Officer Nelson is not a defendant in this action but provided an affidavit in support of defendants' motion.

3    Defendant Weitz summarizes plaintiff's medical treatment from January 2004 until July 2006. The relevant portions of plaintiff's medical records are sealed medical records on file with the court. As plaintiff has not objected to the admissibility of these records, the Court accepts the medical records as evidence and the statements contained therein as true. *See* Jackson v. Onondaga County, 1998 WL 713453, at *5 (N.D.N.Y.1998).

4   Plaintiff was incarcerated at SCJ from 2000–2005. However, for the purposes of the within motion, only he relevant dates of his confinement and medical treatment are summarized herein.

5   Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 725 (31st ed.2007).

6   Kelly Farnum treated plaintiff prior to his incarceration.

7   Prozac is used in the treatment of depression and obsessive-compulsive disorder. *Id.* at 730, 1562. Depakote is used in the treatment of manic episodes associated with bipolar disorder. *Id.* at 497, 565.

8   Bextra is an anti-inflammatory used for symptomatic treatment of osteoarthritis or rheumatoid arthritis. *Dorland's* at 215, 2048.

9   Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

10  Plaintiff made a request for his own psychiatrist and that request was denied. Plaintiff did not file a grievance with respect to that denial.

11  On December 14, 2004, the brace arrived at SCJ but did not comply with the facility's standards.

12  Defendants allege that plaintiff was admitted on June 7, 2006. Plaintiff claims he was admitted on June 5,

13  Plaintiff refers to this incident as the "give way" episode.

14  Plaintiff claims that he was not examined by any member of SCJ medical staff prior to being seen at the emergency room. Officer Nelson claims that when he advised plaintiff that he would be examined in the morning, plaintiff requested, completed and submitted a Pre–Grievance form. Sgt. Newman claims that he denied the grievance on July 24, 2006 because plaintiff was taken to the hospital on July 21, 2006 and July 24, 2006. Sgt. Newman asserts that plaintiff accepted the decision and that plaintiff took no further action with respect to that grievance.

15  On August 10, 2006, Sgt. Newman presided over a disciplinary hearing and issued an Inmate Hearing Disposition sanctioning plaintiff to 40 days punitive segregation. Plaintiff was transferred out of SCJ on August 24, 2006 and did not complete his sentence.

16  According to the record, plaintiff was transferred to ECF in August 2006.

17  Plaintiff's original complaint was filed on April 15, 2005. On May 3, 2005, Judge Sharpe issued a Decision and Conditional Order of Dismissal directing plaintiff, *inter alia,* "to set forth a short and plain statement of the alleged wrongdoing or misconduct committed by each defendant, the date of the conduct complained of and the nexus between that conduct and plaintiff's constitutional and statutory rights in order that the Court can properly assess the sufficiency of plaintiff's claims." *See Guarneri v. Bates,* 05–CV–444 (Dkt. No. 3).

18  On August 14, 2006, plaintiff filed a complaint in this action. (Dkt. No. 1). Plaintiff was named as a "co-plaintiff" with another inmate, Ryan McNamee. On November 9, 2006, this Court issued a Decision and Order severing plaintiff's action from the action of Ryan McNamee and directing plaintiff to file an amended complaint that, "sets forth only his claims for relief and the facts in support of his claims". (Dkt. No. 9).

19  In the Conclusion portion of the recommendation, Magistrate Judge Homer did not address defendant's motion with respect to plaintiff's Eighth Amendment claim with regard to his knee injury. However, in the text of the Report and Recommendation, Judge Homer discussed plaintiff's knee injury. Judge Homer noted:

> [C]onstruing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.
>
> Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32. Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.
>
> (Dkt. No. 54).

20  Plaintiff does not respond to this argument.

21  Plaintiff has made no claims with regard to his shoulder in this action.

22  Plaintiff claims that he was a pretrial detainee and enjoyed greater privileges than a convicted prisoner. However, plaintiff offers no support for this allegation. "As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences." *McQueen v. County of Albany,* 2010 WL 338081,

at *10 (N.D.N.Y.2010) (citing *Benjamin v. Fraser,* 343 F.3d 35, 49–50 (2d Cir.2003)). However, the Second Circuit has held that, "[c]laims for deliberate indifference to a serious medical condition of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

23    This Court previously granted Weitz's motion to dismiss plaintiff's claim with regard to the confiscation of the knee brace due to lack of personal involvement. (Dkt.Nos.54, 55).

24    This Court previously determined that any allegations from 2000 were barred by the applicable statute of imitations.

25    The allegations with regard to the neurosurgeon are not contained in the Second Amended Complaint. Rather, plaintiff raised the issue for the first time in his opposition to defendants' motions.

26    From a review of the complaint, the Court is unable to determine which event occurred in 2000 and which occurred in 2003. The Court has already determined that plaintiff's claims with respect to any injury in 2000 are precluded by the statute of limitations.

27    The Court has determined that Weitz was not personally involved in plaintiff's complaints of inadequate emergency care in 2003. Thus, the Court declines to engage in an analysis of Weitz remaining argument that any cause of action arising from the 2003 injury is barred by the statute of limitations.

28    This cause of action has not been asserted against Weitz.

29    Plaintiff asserted a cause of action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"). The RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Hamilton v. Smith,* 2009 WL 3199531, at *1 (N.D.N.Y.2009) (citation omitted). Therefore, the Court construes plaintiff's RFRA claim as a RLUIPA cause of action.

30    This cause of action has not been asserted against Weitz.

31    This cause of action has not been asserted against Weitz.

32    In the alternative, Cronk's motion for summary judgment is also granted for the reasons discussed in the context of defendants Hazzard, Marsh, Grippin, Howland and Mace's motions for summary judgment.

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,
v.
Richard HATCHER, and City
of New York, Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

**Attorneys and Law Firms**

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

***OPINION AND ORDER***

RAMOS, District Judge.

 **\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

**I. Background**

**A. Undisputed Facts**
Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced. (*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2). On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (*Id.* at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga–Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (*Id.*) Both prescriptions were to last for fourteen days. (*Id.,* Ex. C.)

 **\*2** On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with

depressed mood. (*Id.* at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (*Id.* at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily. (*Id.,* Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (*Id.*) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002.[6] (*Id.*)

**B. Facts in Dispute**
In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

**1. Defendant's Version of Facts**
Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (*Id.*) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (*Id.,* Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (*Id.,* Ex. J.) On the same day, Hatcher[7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (*Id.*) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he

denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (*Id.*) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (*Id.*)

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id* .) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

**2. Plaintiff's Version of Facts** [8]
Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication.[9] (*Id.* 17:16–18, 22:2–13.)

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication [10]-including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days

there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

### 3. The Criminal Prosecution of Plaintiff

**\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years' imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC") at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First Department affirmed the denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13.) In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, the Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

### II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the

Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint.[11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs.61, 63 .)

### III. Applicable Legal Standards

#### A. Summary Judgment

**\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward

with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

### B. Local Rule 56.1 and *Pro Se* Litigants

**\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed.R.Civ.P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local Rule 56.1(b), (d); *see also* Fed.R.Civ.P. 56(c) (requiring

reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[p]ro se litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding/y numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other

material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,* 39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

## IV. Discussion

### A. Plaintiff's Claim Against Hatcher

#### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008). First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

#### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the

prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when—as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition") (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the treatment that is otherwise unchallenged, [12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

**\*9** Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there. [13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm. [14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"-but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to

inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

**\*10** The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity— a condition tending to cause acute pain if left untreated— precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at \*2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191– 92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) aff'd, 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra*

Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at 280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

**\*11** While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10– 15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

### B. Plaintiff's Claim Against the City ("*Monell* Claim")

The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a

municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell." Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. See *Coppedge V. United States,* 369 U.S. 438. 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 71770

---

Footnotes

1  Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

2  Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

3  Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

4  Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

5  The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

6  Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

7  Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly referred to Hatcher as "Dr. Fletcher." (*E.g.* Hamm Dep. 17:16.)

8  As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

9  Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after learning of the five-day delay in receiving treatment. (*Id.*) The Court discusses these inconsistencies below. *See infra* n. 13.

10  Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

11  In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

12  To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

13    As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

     The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678 F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

14    Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2761339
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Ernest S. HARRIS, Plaintiff,

v.

Robert A. HOREL, et al., Defendants.

No. C 06–7761 SBA (PR).
|
Docket Nos. 34, 45, 49, 53.
|
Aug. 31, 2009.

**Attorneys and Law Firms**

Earnest S. Harris, Crescent City, CA, pro se.

Emily L. Brinkman, CA Attorney General, San Francisco, CA, for Defendants.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

SAUNDRA BROWN ARMSTRONG, District Judge.

### *INTRODUCTION*

**\*1** Plaintiff Ernest Harris is a state prisoner who is proceeding pro se in this civil rights action brought under 42 U.S.C. § 1983, in which he alleges that officers and employees of Pelican Bay State Prison ("PBSP") violated his constitutional rights. Defendants have filed have a motion for summary judgment. For the reasons set forth below, the Court finds that Plaintiff has not shown that there are genuine issues as to any material fact as to his claims against Defendants. Accordingly, the Court GRANTS the motion for summary judgment as to all claims against all Defendants. [1]

### *BACKGROUND*

The following facts appear to be undisputed, unless otherwise noted. This action arises from the punishments Plaintiff received from April 2005 to December 2006 for violating the rules of the Indecent Exposure Pilot Program ("IEPP") at PBSP. According to Defendants, in 2004 PBSP gave notice to inmates that in 2005 it would implement the IEPP "to address the management of indecent exposure incidents at Pelican Bay." (Pls.' Mot. for Summ. J. ("MSJ") ¶ 5.) Plaintiff disputes that proper notice was given. The disciplinary sanctions that PBSP can impose under the IEPP include the deprivation of canteen and yard privileges, property, and guest visitations. (*Id.* ¶ 6.) IEPP's security precautions include a yellow covering attached to the front of a cell to alert staff that an inmate has a propensity to commit acts of indecent exposure or sexual disorderly conduct, and the wearing of a "behavior modification suit," or "Exposure Control Jumpsuit" ("ECJ") that prevents an inmate from exposing himself. (*Id.* ¶ 7.) Only inmates who have a history of exposing themselves while outside their cell are required to wear the suit, and the inmate is not required to wear it while in his cell. (*Id.*)

Plaintiff, who is housed in the Security Housing Unit ("SHU") at PBSP, was found to have committed two acts of indecent exposure in 1999, three in 2004, two in 2005, and one in 2006. (*Id.* ¶ 26.) As punishment for the 1999 violation, Plaintiff received ninety days of lost credit for the first violation. For the 2004 violations, Plaintiff was given 180 days of lost credit, was denied canteen privileges, was required to wear the ECJ, and the yellow placard was placed on the front of his cell. For the 2005 violations, Plaintiff lost a total of 180 days of credit. In 2006, Plaintiff lost canteen, mail, and personal property privileges for 180 days. (*Id.*)

Plaintiff alleges that his Eighth Amendment rights against cruel and unusual punishment rights were violated when Defendants (1) failed to provide adequate notice that the IEPP would be imposed; (2) suspended canteen and personal property privileges; (3) restriction of various privileges without time limits on the length of the restriction; threatened his safety; and (5) required him to wear the ECJ.

### *DISCUSSION*

**I.** *Standards of Review*

**A.** *Summary Judgment*

**\*2** Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattret,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen,* 91 F.3d 1275, 1279 (9th Cir.1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323.

## II. *Analysis*

### A. Alleged Lack of Notice

Plaintiff claims that Defendants failed to provide adequate notice that PBSP would implement the IEPP procedures.

Due process requires fair notice of prohibited conduct before a sanction can be imposed. *See Newell v. Sauser,* 79 F.3d 115, 117 (9th Cir.1996). This principle applies within the prison setting. *See id.* at 117–18 (prison regulation prohibiting possession of "anything not authorized for retention or receipt by the prisoner" did not give inmate-law librarian notice that he could not possess draft legal documents to assist other inmates pursuing litigation. Accordingly, a prisoner may not be disciplined without having committed a violation of known policy or procedure.

Based on a review of the record, the Court concludes that Plaintiff has not shown evidence that precludes summary judgment. Assuming, *arguendo,* that Plaintiff's factual allegations are true, Plaintiff has not shown that his due process rights were violated. Specifically, Plaintiff knew of and was subject to identical punishments before the imposition of IEPP as he was after the imposition of the program. In 2004, for example, before the implementation of the IEPP, Plaintiff, as punishment for acts of indecent exposure, lost day credits and canteen privileges, was required to wear the ECJ, and his cell was marked with the yellow covering. Because Plaintiff had notice of these punishments under the system preceding IEPP, he has not shown that the alleged lack of notice of the implementation of IEPP violated his right to due process. More specifically, if Plaintiff had no notice that a new program was being implemented, he would assume that the old program was in place, a program that prescribed the same punishments as the new system. On this record, the Court concludes that Petitioner has failed to set forth specific facts that show that there is a genuine issue for trial. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### B. Deprivation of Canteen and Personal Property Privileges

**\*3** Plaintiff claims that the deprivation of his canteen and personal property privileges was cruel and unusual punishment, and therefore a violation of his Eighth Amendment rights. In particular, Plaintiff alleges that the deprivation of hygiene products (such as shampoo, lotion, deodorant), items such as a television and reading material, and paper violated the Eighth Amendment.

The Eighth Amendment imposes duties on prison officials, who must provide all prisoners with the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety. *See Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *see Farmer,* 511 U.S. at 834 (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, *id.* (citing *Wilson,* 501 U.S. at 297).

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective first component

of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it may be withheld. *See Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir.2000).

Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim. *See id.* at 732–733; *see, e.g., Hearns v. Terhune,* 413 F.3d 1036, 1041–42 (9th Cir.2005) (allegations of serious health hazards in disciplinary segregation yard for a period of nine months, including toilets that did not work, sinks that were rusted and stagnant pools of water infested with insects, and a lack of cold water even though the temperature in the prison yard exceeded 100 degrees, enough to state a claim of unconstitutional prison conditions); *Anderson v. County of Kern,* 45 F.3d 1310, 1314 (9th Cir.1995) ("[A] lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment.").

The requisite state of mind to establish an Eighth Amendment violation in prison-conditions cases, the necessary state of mind is one of "deliberate indifference." *See, e.g., Farmer,* 511 U.S. at 834 (inmate safety); *Helling v. McKinney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (inmate health); *Wilson,* 501 U.S. at 302–03 (general conditions of confinement); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (inmate health).

Neither negligence nor gross negligence will constitute deliberate indifference. *See Farmer,* 511 U.S. at 835–36 & n. 4. A prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate health or safety. *Id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.*

**\*4** Applying the Eighth Amendment legal principles to the instant matter, the Court concludes that Petitioner has not shown evidence that precludes summary judgment. Petitioner simply has not shown that the alleged deprivations of canteen access and personal property are sufficiently serious under *Farmer.* Plaintiff has not alleged, nor shown, that Defendants failed to provide the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety,

or that the denial of canteen access or of personal property constituted such a deprivation. Nor has Plaintiff shown that the canteen contained items he needed to enjoy life's necessities, or that a piece of personal property denied him was necessary to his health or safety. In sum, Plaintiff's being denied access to such canteen products as writing paper or hygiene items is not a deprivation that implicates his Eighth Amendment rights. *See, e.g., Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir.1996) (holding that there is no constitutional right to such canteen items as birthday cards).

Furthermore, Plaintiff's assertion that he did not have access to paper is contradicted by the fact that he was able to file complaints against PBSP while he was in prison. Nor has Plaintiff has shown that being deprived of his personal property items of a television and reading material was a denial of life's basic necessities.

Also, Plaintiff has not met second *Farmer* element, viz., he has not shown that Defendants knew of and disregarded a risk to his health or safety by denying canteen access or by denying him his personal property. Again, Petitioner has not identified any item in the canteen or a piece of personal property the denial of which Defendants knew created a risk to Plaintiff's health or safety.

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### C. Allegedly Limitless Restrictions

Plaintiff claims that the punishments imposed under IEPP—having to wear the suit, for example—are without limitation, and therefore constitute cruel and unusual punishment.

Based on a review of the record, the Court concludes that Plaintiff has not shown evidence that precludes summary judgment. Defendants have submitted evidence that the restrictions "have specific time limitations." (MSJ at 16.) According to Defendants, a first offense can result in a loss of privileges of up to ninety days, while a second offense can result in a 180–day loss of privileges. The suit is worn only by inmates who have a history of indecent exposure, and only when the inmate is outside of his cell. "The suit restriction remains in place for 90 days for a first offense and then six months for subsequent offenses with continued review" by prison authorities. (MSJ at 17–18.) Plaintiff has not presented countering evidence, nor does it appear that he disputes Defendants' assertions.

As for yard restrictions, Plaintiff has not shown evidence that he had less yard time than before the punishments were imposed, but rather that he is required to wear the suit when he is outside of his cell.

 **5** Furthermore, Plaintiff would have received notice of any allegations made against him, as well as notice of hearing before any punishment were imposed. At these hearings, Plaintiff could challenge the charges, and, if found guilty, could appeal them.

Based on this record, the Court concludes that Plaintiff has failed to make the requisite showing to defeat a motion for summary judgment. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

## D. Alleged Threat to Plaintiff's Safety

Plaintiff claims that making his cell with the yellow covering alerts other prisoners as to his status, thereby making him the object of attacks by other prisoners. Plaintiff also claims that the lack of natural light, which is caused by the yellow covering, has caused him severe depression and has caused him to contemplate suicide.

As to his first claim, Plaintiff has alleged that some inmates will not speak to him, and that assaults on other prisons under similar restrictions as Plaintiff have occurred. However, Plaintiff has not alleged or presented evidence that he has been attacked by other prisoners, or even that he has been threatened by other inmates because he has been identified as having a history of committing acts of indecent exposure. Plaintiff, then, has not set forth specific facts showing that there is a genuine issue for trial. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

As to his second claim, Plaintiff has not shown that Defendants were deliberately indifferent to Plaintiff's mental health. Rather, the record shows that Defendants were aware of mental health risks and had a program through which Plaintiff's mental health concerns could be addressed. Specifically, Defendants have presented evidence undisputed by Plaintiff that PBSP repeatedly examines inmates subject to IEPP and those who are housed in SHU to determine their mental health. Specifically, inmates under IEPP are monitored for any psychological issues which would require treatment for exhibitionism or paraphilia. Before an inmate is placed in SHU, he is examined by a psychologist to ensure that the inmate does not have a mental health problem that

would "exclude their placement in SHU." (MSJ at 20.) Also, inmates can at any time request to see a psychologist for treatment or an assessment. (*Id.*) On this record, Plaintiff has not shown that Defendants were deliberately indifferent to his serious psychological needs. Plaintiff, then, has not set forth specific facts that show a genuine issue for trial. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to these claims.

## E. The Behavioral Modification Suit

Plaintiff claims that having to wear the suit is a violation of his Eighth Amendment rights because the ECJ is dirty, does not get washed, stinks, and "is like a padded suit with straps in the back like a straightjacket." (Compl. at 3.)

 **6** Applying the above legal principles to the instant matter, the Court concludes that Plaintiff has not presented evidence that precludes summary judgment. Specifically, Plaintiff's allegations that he has to wear a dirty and restrictive suit for the hour or so that he is allowed out of his cell, do not, without more, rise to the level of an Eighth Amendment violation. Temporary placement in unsanitary and malodorous conditions does not rise constitute a constitutional violation. *See Anderson,* 45 F.3d at 1314–15 (temporary placement in safety cell that was dirty and smelled bad did not constitute infliction of pain). Accordingly, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment (Docket No. 34) is GRANTED as to all claims. Plaintiff shall take nothing by way of his complaint.

Plaintiff's motion for reconsideration of the Court's dismissal of his First Amendment claim (Docket No. 45) is DENIED.

Defendants' motion to stay discovery (Docket No. 49) is DENIED AS MOOT.

Plaintiff's motion for discovery (Docket No. 53) is DENIED AS MOOT.

This order terminates Docket Nos. 34, 45, 49 & 53.

The Clerk of the Court shall enter judgment in favor of Defendants, terminate all pending motions, and close the file.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2761339

Footnotes

1    Defendants assert that they are immune from suit as to all claims under the doctrine of qualified immunity. (MSJ at 21.) Because the Court has determined that Plaintiff has not shown evidence that precludes summary judgment, the Court need not address the question of qualified immunity.

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🟨 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Reid v. Nassau County Sheriff's Dept., E.D.N.Y.,
August 20, 2014

2011 WL 1346818
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frederick HENDERSON, Plaintiff,
v.
Dr. Diane SOMMER, M.D., Barbara
Sullivan, Jeffery Drumheller, and
United States of America, Defendants.

Nos. 08 Civ. 3440(RMB), 09 Civ. 611(RMB).
|
April 1, 2011.

### DECISION & ORDER

RICHARD M. BERMAN, District Judge.

### I. Background

**\*1** On or about April 8, 2008, Frederick Henderson
("Plaintiff" or "Henderson") commenced an action pursuant
to *Bivens v. Six Unknown Named Agents of the Federal
Bureau of Narcotics,* 403 U.S. 388 (1971), against Diane
Sommer, M.D. ("Dr.Sommer"), Clinical Director of the
Health Services Unit at the Federal Correctional Institution
in Otisville, New York ("FCI Otisville"); Barbara Sullivan
("Sullivan"), Health Services Administrator at FCI Otisville;
and Jeffrey Drumheller ("Drumheller"), Associate Warden
at FCI Otisville (collectively, "Individual Defendants"). (*See*
Compl. in No. 08 Civ. 3440, dated Jan. 10, 2008 ("*Bivens*
Complaint").) Plaintiff alleges that the Individual Defendants
violated Plaintiff's Eighth Amendment rights by, among other
things, "delay[ing] and deny[ing] Plaintiff] ... emergent and
medically necessary treatment for ... a torn meniscus of the
right knee" following Plaintiff's slip and fall on a wet floor at
FCI Otisville on May 2, 2007. (*Bivens* Compl. ¶¶ 1, 25, 50.)
Plaintiff also alleges that Sullivan and Drumheller violated
Plaintiff's First Amendment rights by engaging in this
"deliberately indifferent conduct" in retaliation for "previous
grievances filed against both defendants" by Plaintiff. (*Bivens*
Compl. ¶¶ 22–23, 27, 54–56.)

On or about January 22, 2009, Plaintiff commenced a second
(related) action pursuant to the Federal Tort Claims Act, 28
U.S.C. § 1346(b)(1) ("FTCA"), alleging that the United States
caused Plaintiff's May 2, 2007 slip and fall "by negligent
act and omission," *i.e.,* by unreasonably delaying delivery
of Plaintiff's "physician approved orthotic shoes" and by
"leaving an[ ] extreme [ly] wet [floor] without placing 'Wet
Floor' warnings signs." (Compl. in 09 Civ. 611, dated Nov.
27, 2008 ("FTCA Complaint"), ¶¶ 36–37.) [1]

By Order dated February 25, 2009, the Court consolidated
the *Bivens* and FTCA actions on consent of the parties. (*See*
Admin. Order, dated Feb. 25, 2009.)

On December 21, 2010, the Individual Defendants and
the United States (collectively, "Defendants") moved for
summary judgment as to both complaints pursuant to Rule 56
of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.").
(*See* Not. of Mot., dated Dec. 21, 2010; Mem. of Law in Supp.
of Combined Mot., dated Dec. 21, 2010 ("Defs.Mem."), at
1.) [2] Defendants argue, among other things, that (1) Plaintiff's
Eighth Amendment claim must fail because "there are no
material, disputed facts demonstrating that [the Individual
Defendants] were deliberately indifferent to [Plaintiff's]
medical needs"; (2) Plaintiff's First Amendment claim must
fail because Plaintiff cannot show that "the[ ] purported
'retaliatory conduct' chilled his First Amendment rights";
and (3) Plaintiff's FTCA claim must fail because "there is
no evidence" that the United States "acted unreasonably in
providing [P]laintiff with ... replacement orthotic shoes," or
that it "created or had notice of the allegedly dangerous
condition that caused the slip and fall." (Defs. Mem. at 1–2.)

**\*2** On February 7, 2011, Plaintiff filed an opposition,
arguing, among other things, that (1) the Individual
Defendants "had the authority to delay, and they deliberately
delayed, Henderson's treatment simply because they did not
want the inconvenience of having him as a patient"; (2) "they
exercised their power to delay ... as a form of retaliation for
[Plaintiff's] numerous complaints about medical treatment";
and (3) the United States "failed to adequately control
those charged with providing janitorial services so as not to
leave [the] premise[s] in a dangerous condition where it is
foreseeable that an injury could have occurred." (Mem. of
Law in Opp'n to Def. Mem., dated Feb. 7, 2011 ("Pl.Opp'n"),
at 2, 7.)

On February 18, 2011, Defendants filed a reply. (Reply Mem. in Further Supp. of Combined Mot., dated Feb. 18, 2011 ("Defs.Reply").) The parties waived oral argument.

The following facts are not in dispute:

(i) on or about February 16, 2007, Dr. Sommer prescribed replacement orthotic shoes with a three-quarter-inch lift as "medically necessary" to treat Plaintiff's "severe leg length discrepancy";

(ii) on May 2, 2007, at approximately 9:30 a.m., Plaintiff, who uses a cane, left the FCI Otisville law library, walked up a staircase to the restroom, returned 5 to 7 minutes later, and, "after the steps," slipped and fell;

(iii) between May 2, 2007, and August 8, 2007, Plaintiff was examined no less than 7 times by medical personnel at FCI Otisville, and received pain relievers, ace bandages, and X-rays of his right hip and right knee;

(iv) on August 11, 2007, Plaintiff was examined by an orthopedist who recommended arthroscopic surgery to repair "meniscal damage" to Plaintiff's right knee;

(v) on or about August 21, 2007, Plaintiff received the replacement orthotic shoes which had been prescribed before the slip and fall;

(vi) on September 14, 2007, the Committee approved surgery for Plaintiff and submitted a request for a third-party health care provider appointment which was scheduled for April 3, 2008;

(vii) on September 18, 2007, Dr. Sommer wrote a prescription for Percocet, which was renewed at Plaintiff's request on October 2, 2007, November 2, 2007, November 26, 2007, December 27, 2007, and January 24, 2008;

(viii) on February 1, 2008, Plaintiff was transferred from FCI Otisville to a New York State prison, along with a Bureau of Prisons Medical Summary, prepared on January 30, 2008 by Dr. Sommer, which stated that Plaintiff "needs ortho [pedic] follow up on knee and possible arthroscop[ic surgery]"; and

(ix) on or about June 3, 2008, Plaintiff underwent arthroscopic knee surgery. (See Decl. of Dr. Sommer, dated Dec. 7, 2010 ("Sommer Decl."), ¶¶ 7–8, 10, 27–28; Pl.'s Medical Records ("Med. R."), attached as Exs. A–E to Sommer Deck, at 5, 6, 11, 19, 21, 24, 34, 36, 48, 62; see Defs.' Rule 56.1 Statement, dated Dec. 21, 2010 ("Defs.56.1"), ¶¶ 1, 5, 6, 8, 14, 15, 19, 24–25, 35–12, 45–47, 50–54, 57–59, 66, 69, 71, 73; Pl.'s Opp'n to Defs. 56.1, dated Feb. 7, 2011 ("Pl.56.1"), ¶¶ 20, 44; Decl. of Adam Johnson, dated Dec. 17, 2010, Ex. A ("Video"); Tr. of Pl.'s Dep., dated Oct. 28, 2010 ("Pl.Dep.Tr."), attached as Ex. A to Decl. of Ellen London, dated Dec. 17, 2010, at 53:20–23, 89:5; Order in No. 08 Civ. 3440[# 7], dated July 17, 2008.)

**\*3 For the reasons set forth below, the Government's motion is granted as to the *Bivens* Complaint and denied as to the FTCA Complaint.**

## II. Legal Standard

"Summary judgment is appropriate only if, construing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains to be resolved by a jury." *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). "[A] genuine issue of material fact exists if the evidence in the record is such that a reasonable jury could return a verdict for the nonmoving party." *Raimond v. United States,* No. 02 Civ. 620, 2004 WL 2108364, at \*1 (W.D.N.Y. Sept. 21, 2004) (internal quotation marks omitted). While courts do not resolve disputed issues of fact but determine whether genuine issues of fact exist to be resolved at trial, mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *See Beechwood Restorative Care Ctr. v. Leeds,* 436 F.3d 147, 155 (2d Cir.2006); *Kronisch,* 150 F.3d at 126.

## III. Analysis

### (1) Eighth Amendment Claim

The Government argues, among other things, that Plaintiff cannot show that "[o]bjectively," his injuries were "sufficiently serious"; or that "[s]ubjectively," the Individual Defendants acted with a "sufficiently culpable state of mind." (Defs. Mem. at 22–24 (internal quotation marks omitted).) Plaintiff responds that "there is no dispute that [Plaintiff] suffered from a multitude of problems with his right knee and hip that resulted in reduced ambulatory activities," and that the Individual Defendants "deliberately delayed [treatment] ... thereby causing [Plaintiff] unnecessary pain and suffering for well over seven months until such time that he was no longer" in federal custody. (Pl. Opp'n at 7.)

"Only deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis

of an Eighth Amendment violation." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). An X-ray of Plaintiff's right hip performed on May 14, 2007 showed "no evidence of fracture" and "good alignment." (Med. R. at 5.) Likewise, an X-ray of Plaintiff's right knee on July 17, 2007 showed "no acute fractures," and a subsequent examination on August 8, 2007 indicated that the knee was "stable, with a full range of motion." (Med. R. at 6, 19.) "Courts in this circuit ... have often considered knee injuries and have consistently found that such injuries ['meniscal damage'] are insufficient to support a ... claim based on deliberate indifference under the Eighth Amendment." *Taylor v. Kurtz,* No. 00 Civ. 700, 2004 WL 2414847, at *4 (W.D.N.Y. Oct. 28, 2004); *see, e.g., Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) ("[A] torn meniscus [is] not sufficiently serious to give rise to a constitutional claim." (internal citation omitted)); *Price v. Engert,* 589 F.Supp.2d 240, 246 (W.D.N.Y.2008); *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 WL 10450, at *4 (S.D.N.Y. Jan. 3, 2002); *see also Culp v. Koenigsmann,* No. 99 Civ. 9557, 2000 WL 995495, at *4 (S.D.N.Y. July 19, 2000).

**\*4** There is also no genuine factual issue to be tried as to the subjective element because "[t]here is no evidence of any kind that [the Individual Defendants] were deliberately indifferent to [P]laintiff's medical condition." *Johnson,* 477 F.Supp.2d at 576; *see Salahuddin,* 467 F.3d at 279; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("[D]eliberate indifference ... involves culpable recklessness, *i.e.,* an act or failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotation marks omitted)). FCI Otisville medical staff consistently and conscientiously provided Plaintiff with medical aid: they "examined and x-rayed [P]laintiff's knee numerous times, regularly prescribed medication and provided ace bandages, obtained a consultation for [P]laintiff to be examined by an orthopedic specialist, ... promptly requested and obtained the Committee's approval of the recommended arthroscopic surgery," "promptly submitted [an appointment request] to a third party-contractor that scheduled his surgery for ... April 3, 2008," and "notified the recipient [state] institution that [P]laintiff needed a follow-up examination with an orthopedic doctor for his knee surgery and also required possible arthroscopic surgery." (Defs. Mem. at 24.) "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

And, "a delay in treatment does not necessarily invoke the Eighth Amendment." *Espinal,* 2002 WL 10450, at *3 (no Eighth Amendment violation despite nearly 3 year delay between first complaint of injury and knee surgery); *see Culp,* 2000 WL 995495, at *7 (no violation for 1 year delay between injury and surgery). Rather, "[t]he Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-generating condition for three days; or delayed major surgery for over two years.' " *Espinal,* 2002 WL 10450, at *3 (quoting *Demata v. N.Y. State Corr. Dep't of Health Servs.,* No. 99–66, 198 F.3d 233, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (unpub'd) (no violation for more than 3 year delay between knee injury and surgery)). In this case, where Plaintiff was treated regularly with pain medication and orthopedic consults prior to surgical intervention; where any "delay" before surgery appears to have resulted from a third party's scheduling constraints and from Plaintiff's transfer to state custody; and where Plaintiff has failed to adduce any evidence that Plaintiff's knee injury required immediate surgery as a "condition of urgency, one that may produce death, degeneration or extreme pain," Plaintiff's Eighth Amendment claim must fail. *Taylor,* 2004 WL 241847, at *4 (quoting *Hathaway,* 37 F.3d at 66); *see Sharp v. Jeanty,* No. 93 Civ. 220, 1993 WL 498095, at *2 (S.D.N.Y. Nov. 30, 1993).

### (2) First Amendment Claim

**\*5** The Government argues that "[P]laintiff has not alleged that his First Amendment rights were 'actually chilled' " by Sullivan and Drumheller. (Defs. Mem. at 20 (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001)).) Plaintiff does not appear to respond to this argument with factual and legal support, concluding only that the Individual Defendants delayed Plaintiff's surgery "as a form of retaliation for his numerous complaints about medical treatment." (Pl. Opp'n at 2.)

"To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks omitted). "[I]n the prison context [the Second Circuit has] ... defined 'adverse action' objectively, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from

exercising constitutional rights.' " *Id.* at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)).

By failing to respond to Defendants' argument for dismissal, Plaintiff has abandoned his First Amendment claim. *See Lipton v. Cnty. of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 515 n. 21 (S.D.N.Y.2003); (Defs. Reply at 10.)

Even if the Court were to examine the merits of this claim, it would likely find that dismissal is warranted because Plaintiff has alleged no specific facts nor presented any evidence showing that Sullivan or Drumheller took some adverse action against Plaintiff or that "there was a 'causal connection' between [Plaintiff's] grievance activity and some unknown adverse conduct." *Nolley v. Cnty. of Erie,* No. 07 Civ. 488, 2008 WL 859165, at *2 (W.D.N.Y. Mar. 31, 2008). Although Plaintiff in conclusory terms asserts that Drumheller and Sullivan delayed and denied treatment "in chronological sequence of previous grievances [sic]" (*Bivens* Compl. ¶ 54), Plaintiff presents no evidence to rebut Drumheller and Sullivan's sworn statements that they "made no clinical decisions regarding any inmate's medical condition or treatment at any time" (Decl. of Sullivan, dated Feb, 3, 2010, ¶ 4; *see* Decl. of Drumheller, dated Feb. 2, 2010, ¶ 4 ("I did not have any authority to make clinical decisions regarding patient care at ... Committee meetings, and I never made decisions about inmate medical care at any time.")); *see also Katel Ltd. Liability Co. v. AT & T Corp.,* 607 F.3d 60, 67 (2d Cir.2010) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory." (internal quotation marks and alterations omitted)). [3]

### (3) FTCA Claim

**\*6** Defendants argue that summary judgment is warranted as to Plaintiff's FTCA claim of negligence because the United States "exercised ordinary care" with regard to Plaintiff's orthotic shoes and because "Plaintiff has offered no evidence that the Government created the allegedly wet condition of the hallway in which he fell." [4] (Defs. Mem. at 16–18 (internal quotation marks omitted).) Plaintiff argues, among other things, that the evidence supports Plaintiff's claim that "the cause of his slip-and-fall injury is negligent inaction." (Pl. Mem. at 4.)

To prevail on a negligence claim under New York law, a plaintiff must show that "(1) defendant owed her a duty of care, (2) defendant breached that duty, and (3) plaintiff was injured as a result of that breach." *Tuthill v. United States,* 270 F.Supp.2d 395, 398 (S.D.N.Y.2003). "To prove breach, the plaintiff must provide evidence demonstrating that a dangerous condition existed [and] that the defendant either created the condition or had constructive knowledge of the condition." *Johnson v. United States,* No. 98 Civ. 7216, 1999 WL 1191646, at *2 (S.D.N.Y. Dec. 15, 1999); *see Hartley v. Walbaum, Inc.,* 893 N.Y.S.2d 272 (App.Div.2010). "[S]ummary judgment is granted begrudgingly in negligence cases, which by their very nature tend to raise factual questions." *Raimond,* 2004 WL 2108364, at *1; *see Hutchinson v. United States,* No. 01 Civ. 1198, 2006 WL 1154822, at *6 (E.D.N.Y. Apr. 28, 2006).

The Court finds that there are questions of material fact which preclude granting summary judgment on Plaintiff's FTCA claim because, viewing the evidence "in the light most favorable to [P]laintiff," *Kronisch,* 150 F.3d at 119, a reasonable jury could find that Defendants breached the duty of care with respect to the wet floor. *See, e.g., Tuthill,* 270 F.Supp.2d at 400–01; *Wright v. United States,* 866 F.Supp. 804, 807 (S.D.N.Y.1994); *Harwe v. Floyd,* No. 09 Civ. 1027, 2011 WL 674024, at *15 (D.Conn. Feb. 17, 2011) (where "there is some possibility, albeit remote, that taking all of the evidence in the light most favorable to [plaintiff], a reasonable jury could find" in her favor). [5]

A reasonable jury could find that Defendants "created the condition" that caused Plaintiff's fall, *Johnson,* 1999 WL 1191646, at *2, by mopping the floor (and failing to display "wet floor" signs) during the 5–7 minute period before Plaintiff's fall. According to Plaintiff, the floor did not "feel wet" when he walked to the restroom at 9:30 a.m. on May 2, 2007. (Pl. Dep. Tr. at 67:23–68:2, 121:18–122:2 (Q: "When you walked to the bathroom ..., did the floor feel wet?" Henderson: "No.... [I]t wasn't slippery and I noticed that it was dry. The traction was okay."); *see* Pl. 56.1 ¶ 20).) Following the fall, Plaintiff "noticed [his] hands were wet," "saw that the floor was wet," and "looked for ... wet floor signs," noticing that "there were none." (Pl. Dep. Tr. at 63:8–25, 66:23–67:11, 122:6–13.) About 40 minutes later, Plaintiff approached Marisol Santiago ("Santiago"), an employee at FCI Otisville, and said to her that "obviously the floor was wet because somebody mopped the floor and there were no

wet floor signs." (Pl. Dep. Tr. at 63:19–064:9; *see* Defs. Reply at 5.)

**\*7** Defendants present a declaration from Patrick Flynn, Santiago's supervisor, who does not testify as to the date in question but states that "[t]he "usual practice is for the inmate orderlies to mop at the beginning" of their 7:30 a.m. to 10:30 a.m. shift, and to put up "wet floor" signs after mopping (Decl. of Patrick Flynn, dated Dec. 17, 2010 ("Flynn Decl."), ¶ 10); and a video showing Plaintiff's 9:30 a.m. slip and fall, the one minute period before it, and the twenty minute period after it. (*See* Decl. of Adam Johnson, dated Dec. 17, 2010, Ex. A ("Video").) Defendants also point out that "within five minutes of [P]laintiff's fall, six individuals walked down the same hallway without slipping or falling"; and that "an Inmate Injury Assessment and Followup form signed by Plaintiff on the day of the [fall] states, 'I slipped on [a] wet spot,' " presumably as opposed to a wet "floor." (Govt. Mem. at 7, 16 n. 4 (citing Video; Med. R. at 48).) But, "[n]egligence questions are properly resolved at trial because, upon a motion for summary judgment, a court may not try issues of fact; it may only determine whether there are factual issues to be tried." *King v. Crossland Sav. Bank,* 111 F.3d 251, 259 (2d Cir.1997) (internal quotation marks omitted); *see Palacios v. Aris, Inc.,* No. 08 Civ. 746, 2010 WL 933754, at *12 (E.D.N.Y. Mar. 11, 2010).

"In sum, because there is a genuine issue of material fact as to whether [D]efendant[s] created the alleged ... condition ... the Court denies [D]efendant[s'] motion for summary judgment as to [P]laintiff's negligence claim." *Myers v. Lennar Corp.,* No. 08 Civ. 2799, 2010 WL 5491112, at *7 (E.D.N.Y. Dec. 30, 2010).

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (and to dismiss) [55, 19] is granted as to Plaintiff's Eighth and First Amendment *Bivens* claims and denied as to Plaintiff's FTCA claim.

The parties are directed to appear before the Court with their principals for a status and settlement conference on Thursday, April 21, 2011 at 10:00 a.m. in Courtroom 21B of the United States Courthouse, 500 Pearl Street, New York, New York. **The parties are directed to engage in good faith settlement negotiations prior to the conference.**

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1346818

---

Footnotes

1   Both the *Bivens* Complaint and the FTCA Complaint were filed *pro se,* but Plaintiff is presently represented by counsel. (*See* Not. of Appearance, dated Oct. 1, 2009.)

2   Defendants also moved, in the alternative, to dismiss the *Bivens* Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (*See* Defs. Mem. at 1.)

3   Defendants contend, in the alternative, that the *Bivens* Complaint should be dismissed for failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). (*See* Defs. Mem. at 18–19); *Martinson v. Menifee,* No. 02 Civ. 9977, 2007 WL 2106516, at *3 (S.D.N.Y. July 18, 2007); *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003). Plaintiff responds that "dismissal of this action for a violation of the PLRA exhaustion requirement would simply mean that [Plaintiff] can refile—given that the claims are still within the applicable statute of limitations." (Pl. Opp'n at 5.) The Court "need not specifically decide whether [Plaintiff's claims have] been exhausted because [such] claims fail on the merits." *Myers v. Johns,* No. 05 Civ. 1448, 2008 WL 5115249, at *11 (N.D.N.Y. Dec. 4, 2008).

4   The FTCA allows "claims against the United States, for money damages, ... for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

5   The Court is drawing no conclusion as to the ultimate merits of Plaintiff's claim.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    5

2010 WL 1948612
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone HOUSTON, a/k/a Tyrone Black, Plaintiff,
v.
Martin HORN, individually and as
commissioner of New York City Department
of Correction, et al., Defendants.

No. 09 Civ. 801(DLC).
|
May 13, 2010.

**Attorneys and Law Firms**

Tyrone Houston, New York, NY, pro se.

Lesley Ann Berson, New York City Law Department, New
York, NY, for defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

 **\*1** Tyrone Houston ("Houston"), proceeding *pro se,*
brings this action pursuant to 28 U.S.C. § 1983 against
Martin Horn ("Horn"), individually and in his capacity as
Commissioner of New York City Department of Corrections
("DOC"), certain DOC corrections officers, medical staff,
and employees, and the City of New York (the "City")
(collectively, the "defendants"). Houston alleges that, while
he was incarcerated on Rikers Island, defendants violated
his constitutional rights by retaliating against him for filing
grievances, failing to attend to his medical needs, and using
excessive force against him. Defendants have moved for
summary judgment pursuant to Fed.R.Civ.P. 56. For the
following reasons, the motion is granted.

*BACKGROUND*

The following facts are undisputed except where indicated.
Houston was held in DOC custody as a pretrial detainee at
Rikers Island and the Manhattan Detention Center ("MDC")
from January 29, 2006 until September 9, 2008. During
his approximately 31 months' incarceration, Houston was
transferred to different housing areas at Rikers Island and the
MDC approximately thirty times.

1. *2006*

When Houston was initially admitted to the custody of DOC
in January 2006, he was assigned to a "General Population"
housing [1] area at the Anna M. Kross Center ("AMKC"), one
of a number of facilities on Rikers Island. [2] Upon admission,
Houston was designated as "Heat Sensitive," which required
him to be placed in air-conditioned housing. DOC staff
also determined that Houston suffered from two chronic
medical conditions—hypertension and glaucoma—for which
he received regular treatment during his incarceration.
Between January 29 and April 7, 2006, Houston was re-
housed within AMKC three times due to his designation for
"Administrative Escort" housing. [3]

While housed at AMKC, Houston contends that he filed two
grievances dated March 6 and March 30, 2006, pursuant
to DOC's Inmate Grievance Resolution Program ("IGRP"). [4] In
the grievances, Houston complained that defendants Deputy
Warden Edwin Bennett ("Bennett") and Security Captain
Michael Williams ("Williams") were unresponsive to his
concerns about "rodents and water buds [sic]" in his cell. [5]

On April 7, 2006, Houston was transferred to the George
Motchan Detention Center ("GMDC") due to reclassification.
Houston was housed at GMDC until July 18, during which
time he was re-housed five times and allegedly subjected
to numerous cell and body searches. [6] Houston contends
that he filed a grievance dated June 19, 2006, in which he
complained that between April 17 and June 19, he was re-
housed four times in retaliation for complaints sent to the
deputy warden. [7]

On May 2, while housed at GMDC, medical staff detected
that Houston had a hernia and referred Houston for surgery.
Houston refused to go to a surgery appointment on May 25
and again on June 5, at which time he requested that he not
be placed on any surgery list.

 **\*2** On July 18, 2006, New York City experienced a severe
electricity "blackout" which left Rikers Island operating on
back-up generators. Houston was transferred from GMDC
to another facility on Rikers Island to maintain him in air-
conditioned housing. As the blackout continued to affect
Rikers Island, on July 20, Houston was transferred to the

air-conditioned MDC in Manhattan. Houston was housed at the MDC until November 29, during which time he was re-housed within the MDC three times. [8] Houston alleges that he was subjected to additional retaliatory body and cell searches while housed at the MDC.

On November 29, Houston was transferred back to GMDC, where he was held until January 22, 2007. During this period, Houston was re-housed within GMDC once, on December 13, 2006, for security reasons. Houston alleges that he was subjected to numerous cell and body searches during this time.

### 2. *2007*

On January 3, 2007, while still housed at GMDC, Houston went to a surgery appointment at Bellevue hospital for his hernia, which resulted in a scheduling of his surgery for February 2007. On January 22, Houston was transferred from GMDC to the Robert N. Davoren Complex ("RNDC") for security reasons. Houston remained at RNDC until May 7, 2008, during which time he was re-housed within RNDC six times and allegedly subjected to more cell and body searches. [9] On February 13, Houston refused to go to Bellevue hospital for his scheduled hernia surgery. Over the following six months, Houston was seen by medical staff without complaint of abdominal pain until August 2007.

On March 12, 2007, Houston sent a letter to defendant Gregory McLaughlin, RNDC Warden ("McLaughlin"), which was forwarded to the RNDC Grievance Office. The letter raised a number of complaints, including that DOC staff were "moving [Houston] from housing unit to housing unit, in retaliation for [his] lawsuits and exercise of [his] right to petition."

Houston filed six additional grievances while housed at RNDC. First, on March 14, Houston filed a grievance in which he alleged that, during the course of a housing transfer, defendants Corrections Officers Vasquez, Ortiz, and Singletary "grabbed [him] and pulled [his] lower back out and denied [him] medical attention." Because Houston's March 14 grievance concerned an alleged assault, the Grievance Coordinator informed Houston that it was "non-grievable" under the IGRP. [10] On March 19, the Grievance Coordinator sent a memorandum to Warden McLaughlin to inform him of the alleged assault.

On March 27, Houston filed a second grievance concerning the alleged assault, which was also rejected by the Grievance Coordinator as "non-grievable" and forwarded to Warden McLaughlin. An "Investigating Supervisor's Report," prepared after an investigation ordered by Warden McLaughlin, concluded that no force had been used against Houston during the March 14 incident. At his deposition, Houston testified that after the March 14 incident, he experienced pain in his lower back and tenderness in his right side, signed up for "sick call," went to the clinic the next day, and was prescribed ibuprofen. [11] Houston again sought and obtained medical treatment on March 27, and was prescribed ibuprofen.

**\*3** On August 16, 2007, Houston told RNDC medical staff that his hernia was bothering him. Houston was referred for surgery, and a surgery appointment was scheduled for November 2007; another appointment was subsequently scheduled for February 2008. Houston missed both appointments. Between August 2007 and August 2008, Houston was seen two to four times per month by medical staff, during which time there is no record of Houston complaining of abdominal pain.

Houston alleges that on September 7 and 8, 2007, he was denied medical treatment for arthritis and lower back pain. On September 7, 8, and 9, 2007, Houston filed three grievances concerning conduct by medical staff at RNDC. Because medical staff members are not DOC employees, the Grievance Coordinator informed Houston that these complaints were non-grievable. [12]

### 3. *2008 and Placement in Close Custody*

On January 15, 2008, Houston filed a sixth grievance at RNDC requesting an accounting of expenditures from his account. This grievance was informally resolved to Houston's satisfaction on January 17 when he was provided with a receipt of the transaction history on his account.

On May 7, 2008, Houston was transferred from RNDC to AMKC for security reasons, where he remained in the same housing area until July 4. While housed at AMKC, Houston filed a grievance on June 11, complaining that he did not receive his special diet meal, and another grievance on June 12, complaining that there were insufficient materials in the law library. Because Houston indicated that he filed previously these grievances with the Board of Correction

and/or a state or federal court, the Grievance Coordinator informed Houston that they were nongrievable.

Houston alleges that at a June 23, 2008 "Inmate Counselor Meeting," defendant Bennett threatened retaliation against him for filing grievances and complaints against AMKC staff. The same day, Houston sent a letter to defendant Horn about Bennett's threat and requested an investigation. There is no evidence that Houston ever received a response.

On July 3, Houston was designated for involuntary "Close Custody/Protective Custody" housing based on purported information received by AMKC staff that his life was in danger. [13] Houston was provided a written DOC form prepared by defendant Williams and approved by defendant Bennett that notified him of this placement. The form states that "[Houston] admitted that he was involved in a stabbing of [four] Latin Kings while he was incarcerated in Elmira State Correctional facility in 2003. Based on the incident the [Latin Kings] placed a hit on [Houston]." The form indicated that Houston was being confined to Close Custody "for his safety and the security of the facility" and notified him of his right to a due process hearing to challenge his placement. On July 4, Houston was transferred to RNDC and housed in Close Custody for five days until July 9, when he was transferred back into General Population housing at RNDC.

 **\*4** On July 14, Houston was re-housed within RNDC as a security precaution. Houston filed a grievance dated July 14 concerning the RNDC medical staff's purported failure to place him in nonHeat-Sensitive housing. [14] On July 16, Houston sent a letter to defendant Horn complaining about, *inter alia,* the purported retaliatory housing transfers, his placement in Close Custody confinement, and the failure to place him in Heat–Sensitive housing.

On July 30, Houston filed another grievance complaining that the RNDC medical staff had failed to treat an injury to his toe in a timely manner. Houston's medical records show that on the date in question, he arrived at the clinic at approximately 7:30 p.m. and was seen by a clinician around midnight. Houston was treated with ibuprofen and instructed to return to the clinic for persisting symptoms. The Grievance Coordinator informed Houston that, because he sought to have the medical staff members who treated him investigated or disciplined, the issue was non-grievable under the IGRP.

Between August 4 and August 7, 2008, Houston was re-housed approximately four times within RNDC due to

problems with the air-conditioning in different housing units. On August 8, Houston filed a grievance concerning this series of housing transfers, alleging that he had been moved out of air-conditioned housing in retaliation for his previous grievances. Houston requested a copy of each grievance that he had filed with a written decision. On August 18, the Grievance Coordinator informed Houston that his retaliation claims could not be verified and that he had been properly housed in Heat Sensitive housing. The Coordinator agreed to provide Houston with copies of the grievances filed at RNDC, most of which had been returned to him as non-grievable. On August 21, Houston signed the form to indicate that he accepted this informal resolution of his grievance.

On August 20, Houston was scheduled for a yet another surgery appointment for his hernia at Bellevue hospital, but again refused to go. On September 9, Houston was discharged from DOC custody.

### 4. *This Litigation*

Houston filed the original complaint in this action on January 28, 2009, and an amended complaint on August 24. In the amended complaint, Houston asserts claims against all defendants for retaliation, deliberate indifference to his medical needs, and excessive use of force in violation of his constitutional rights pursuant to 28 U.S.C. § 1983. On February 17, 2010, after the close of fact discovery, defendants filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56, and served Houston with a "Notice to *Pro Se* Litigant Who Opposes a Motion for Summary Judgment" pursuant to Local Rule 56.1. On March 2, Houston filed his opposition to defendants' motion. In his opposition, Houston argues, *inter alia,* that defendants' motion for summary judgment and supporting affidavits are "frivolous," and requests that the Court sanction defendants' counsel pursuant to Fed.R.Civ.P. 11(c). The motion for summary judgment became fully submitted on March 19.

### DISCUSSION

 **\*5** Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009). The moving party bears the burden of demonstrating the absence of a material factual question,

and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Roe v. City of Waterbury,* 542 F.3d 31, 35–36 (2d Cir.2008). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. *Fed.R.Civ.P.* 56(e); *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Only disputes over material facts—facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *SCR Joint Venture,* 559 F.3d at 137. "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bur. of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation omitted). The rule favoring liberal construction of pro se submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002).

1. *Exhaustion of Administrative Remedies*

Houston alleges that while he was in DOC custody, he was subjected to numerous housing transfers, body and cell searches, and held in Close Custody in retaliation for filing grievances in violation of his First Amendment rights. The Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321–71, as amended, 42 U.S .C. § 1997e *et seq.,* requires a prisoner to exhaust all available administrative remedies before he can bring a civil rights action pursuant to 28 U.S.C. § 1983. *See* 42 U.S.C. § 1997e(a) [15]; *Woodford v. Ngo,* 548 U.S. 81, 93 (2006); *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). "[F]ailure to exhaust is an affirmative defense under the PLRA." *Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009) (citing *Jones v. Bock,* 549 U.S. 199, 216 (2007)).

"Exhaustion is 'mandatory' and 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.' " *Hernandez,* 582 F.3d at 305 (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). "[R]etaliation claims fit within the category of inmate suits about prison life, and therefore must be preceded by the exhaustion of

state administrative remedies available." *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (citation omitted). "Section 1997e(a) requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Hernandez,* 582 F.3d at 305 (quoting *Woodford,* 548 U.S. at 90). Where the prison's procedures permit appeal of an adverse ruling, to exhaust the available procedures a prisoner must file an appeal. In other words, an inmate must use "all steps that the agency holds out." *Woodford,* 548 U.S. at 90 (citation omitted).

**\*6** DOC's IGRP consists of five levels of review for inmate grievances. *See* DOC Directive 3375R–A, § IV(B). After an inmate has submitted his grievance form, the Inmate Grievance Resolution Committee ("IGRC") has five business days in which to resolve the issue informally. If the IGRC is unable to reach a resolution, or if the grievant does not consent to the resolution proposed by the IGRC, then the inmate may request a formal hearing in front of the IGRC to present his complaint and call supporting witnesses. The inmate may also request a formal hearing if he does not receive any response from the IGRC within five business days. The IGRC must then issue a written decision addressing the validity of the inmate's grievance. If the inmate is unsatisfied with the IGRC's decision, he may appeal the decision to the commanding officer of the facility, then to the Central Office Review Committee ("CORC"), and finally to the New York City Board of Correction ("BOC"). An inmate's administrative remedies are not exhausted until he proceeds through all five levels of the IGRP.

Houston failed to exhaust his administrative remedies for his retaliation claim insofar as it relates to the housing transfers and body and cell searches. Housing transfers and body and cell searches are conditions of confinement subject to resolution through the IGRP. The IGRP also specifically permits inmates to submit grievances concerning any retaliation for filing complaints. *See* DOC Directive 2275R–A, § IV(C)(1) ("An inmate may file a grievance that a reprisal occurred through the grievance program.").

Houston filed no grievance concerning the purported retaliatory body and cell searches. He filed at most three grievances concerning housing transfers: (1) the June 19, 2006 grievance concerning four housing transfers within GMDC between April 17 and June 19, 2006; (2) the March 12, 2007 letter to Warden McLaughlin; and (3) the August 8, 2008 grievance concerning four housing transfers within

RNDC between August 4 and August 7, 2008. DOC has no record of the June 19, 2006 grievance and the March 12, 2007 letter was not properly filed as a grievance. Even if Houston properly filed these grievances, however, he did not pursue either grievance through all five levels of the IGRP. For instance, having heard no response from the IGRC within five working days, Houston was required to request a formal hearing. Because Houston has offered no evidence that he requested a formal hearing or that a formal hearing was ever held, Houston did not properly exhaust his administrative remedies with respect to these two grievances.

With respect to the August 8, 2008 grievance, Houston accepted the Grievance Coordinator's informal resolution of this grievance on August 21. If Houston was dissatisfied with the informal resolution of this grievance, as he now claims he was, he could have requested a formal hearing before the IGRC and pursued his remaining administrative remedies under the IGRP. Houston did not. Accordingly, to the extent Houston's § 1983 claim is based on purported retaliatory housing transfers or body and cell searches, his claim is dismissed for failure to exhaust administrative remedies.

**\*7** Houston argues that his failure to exhaust administrative remedies should be excused. Prior to the Supreme Court's decision in *Woodford,* 548 U.S. 81, the Second Circuit explained that failure to exhaust administrative remedies may be excused when:

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Since *Hemphill,* it has become clear that " 'the PLRA exhaustion requirement requires proper exhaustion.' " *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (quoting *Woodford,* 548 U.S. at 93) (emphasis added). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford,* 548 U.S. at 90–

91. Whether the *Hemphill* exceptions survive *Woodford'* s holding requiring "proper exhaustion" remains unclear. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 43 n. 1 (2d Cir.2007) (declining to "decide what effect *Woodford* has on *Hemphill'* s holding"); *Ruggiero v. County of Orange,* 467 F.3d 170, 175–76 (2d Cir.2006) (same).

Even assuming the *Hemphill* exceptions survive *Woodford,* Houston has failed to show that any exception applies in this case. First, Houston contends that the purported retaliatory housing transfers constitute "staff harassment," and are therefore non-grievable under the IGRP. Contrary to Houston's contention, housing transfers can be grieved under IGRP policy, even if the transfers are alleged to be reprisals for filing grievances. In fact, Houston's August 8, 2008 grievance, which concerned four purported retaliatory housing transfers, was informally resolved through the IGRP process to Houston's satisfaction.

Second, Houston alleges that it is an "unwritten policy and custom" of defendants to prevent court access by not permitting full exhaustion of administrative remedies, or by claiming that some issues are "non-grievable" when in fact they are. Houston further alleges that defendants "tampered with prison records, medical records and omitted grievances that were filed in order to prevent court access." Houston has not pointed to any grievance concerning housing transfers or body and cell searches, however, that was returned to him as non-grievable, or for which he was unable to exhaust his administrative remedies due to any interference by defendants. It has been assumed for purposes of this Opinion that Houston properly filed each of the grievances that he describes in his opposition to this motion. As a result, Houston's failure to exhaust administrative remedies with respect to the purported retaliatory housing transfers or body and cell searches cannot be excused.

**\*8** Summary judgment is therefore granted to defendants on Houston's retaliation claim based on the purported retaliatory housing transfers and body and cell searches. Because administrative remedies are no longer available, the claim shall be dismissed with prejudice. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) ("[D]ismissal with prejudice, when remedies are no longer available, is required in the absence of any justification for not pursuing such remedies." (citation omitted)).

Construing Houston's submissions liberally, *Triestman,* 470 F.3d at 474, Houston's § 1983 claim is also premised on

his allegation that he was placed in Close Custody on July 3, 2008 in retaliation for filing grievances against AMKC staff. Unlike housing transfers and body and cell searches, designations for Close Custody housing are not grievable under the IGRP. *See* DOC Directive 3375R–A, § II(C)(1) (stating that classification designations, such as "Close Custody Housing" are non-grievable under the IGRP).[16] In any event, defendants do not argue that Houston failed to exhaust any administrative remedies that may have been available to him with respect to his placement in Close Custody. Because failure to exhaust is an affirmative defense that must be raised by defendants, *Johnson,* 569 F.3d at 45, Houston's retaliation claim based on his placement in Close Custody cannot be dismissed for failure to exhaust administrative remedies.

#### 2. *Retaliation*

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal,* 558 F.3d at 129 (citation omitted). The First Amendment protects prisoners from retaliation for filing grievances. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d at 353 (citing *Dawes v.. Walker,* 239 F.3d 489, 493 (2d Cir.2001)). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord,* 320 F.3d at 353. "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Id.* at 352. "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). The Second Circuit has held that transfers to other facilities or housing units can, under certain circumstances, satisfy the adverse action requirement. *See Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (transfer from one state prison facility to another constituted an adverse

action); *see also Gill,* 389 F.3d at 384 (three weeks in "keeplock" sufficient to state claim for retaliation); *Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (transfer to psychiatric facility sufficient to state claim for retaliation), *abrogated on other grounds by Porter,* 534 U.S. 516.

**\*9** In this case, Houston has not met his burden of showing that his placement in Close Custody for five days "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Houston has failed to introduce *any* evidence concerning the conditions of confinement in Close Custody or how these conditions differed from general population housing. For instance, Houston has not shown that he was denied any privileges while in Close Custody that were previously afforded to him, or that he was subjected to harsher treatment. Houston has thus failed to meet his evidentiary burden of showing that his placement in Close Custody was anything other than *de minimis.* Accordingly, summary judgment is granted to defendants on the retaliation claim.

#### 3. *Deliberate Indifference*

"[A] claim for indifference to the medical needs of ... a pretrial detainee in state custody, [is] properly brought under the Due Process Clause of the Fourteenth Amendment." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). "[T]he standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 70 (citing *Arroyo v. Schaefer,* 548 F.2d 47, 49–50 & n. 3 (2d Cir.1977)). Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U .S. 825, 832, 844 (1994)). Rather, "a prison official violates the Eighth Amendment only when two requirements are met." *Salahuddin,* 467 F.3d at 279 (citation omitted).

The first requirement is objective: the alleged deprivation of adequate medical care must be " 'sufficiently serious.' " *Id.* (quoting *Farmer,* 511 U.S. at 834). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Salahuddin,* 467 F.3d at 279 (citation omitted). Determining whether a deprivation is "sufficiently serious" requires two inquiries. First, a court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* "As the Supreme Court has noted, the prison official's

duty is only to provide reasonable care." *Id.* (citing *Farmer, 511 U.S. at 844–47*). A "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Second, a court must determine "whether the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 280. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* A number of factors may be relevant to the seriousness of a medical condition, including: (1) whether "a reasonable doctor or patient would find it important and worthy of comment;" (2) whether the condition "significantly affects an individual's daily activities;" and (3) whether it causes "chronic and substantial pain." *Id.* (citation omitted). Thus, an alleged deprivation is sufficiently serious where "a condition of urgency, one that may produce death, degeneration, or extreme pain" exists. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*10** The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280; *see also Caiozzo,* 581 F.3d at 71. "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citation omitted). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* This means that the prison official "must be subjectively aware that his conduct creates such a risk. *Id.* at 281 (citation omitted).

Houston has failed to demonstrate that any of the defendants violated his constitutional right to receive adequate medical care. Houston claims that defendants were deliberately indifferent to his medical needs by: (1) denying him preoperative therapy and an operation for his hernia for over two years; (2) failing to provide timely medical care after the March 14, 2007 incident; (3) failing to treat his arthritis and lower back pains in September 2007 and July 2008; and (4) failing to adequately treat his injured toe in July 2008.

With respect to the treatment provided for his hernia, Houston has failed to show that he was "actually deprived

of adequate medical care." *Id.* at 279. The evidence shows that Houston's hernia was timely diagnosed on May 2, 2006, and properly treated thereafter. Houston refused, on several occasions, to undergo the surgery required to repair the hernia. When Houston complained of abdominal pain on August 16, 2007, Houston was again scheduled for several surgery appointments, which he missed. Houston has failed to provide any evidence indicating that the treatment for his hernia was inadequate, offering only conclusory allegation that he was not provided "pre-operative therapy necessary to render the operation a success." This is insufficient to withstand summary judgment. *See Wright,* 554 F.3d at 266.

Houston's claim that defendants were deliberately indifferent to his medical needs following the March 14, 2007 incident is also without merit. Houston's allegation regarding this incident is a delay-in-treatment claim. He asserts that defendants prevented him from obtaining medical care for his alleged injuries until March 27. This assertion is belied by Houston's own testimony that he went to the clinic the day after the incident and received treatment. It is also undisputed that on March 27, Houston returned to the medical clinic, complaining of the same symptoms, and was again prescribed ibuprofen. Thus, Houston has failed to show that any of the defendants prevented him from getting adequate treatment for injuries sustained during the March 14, 2007 incident.

Houston has also failed to support his claim of deliberate indifference based on the treatment he received for his injured toe, or the alleged lack of care for his arthritis and back pain. With respect to his toe injury, Houston complains that he had to wait several hours before being examined by a clinician. Based on Houston's own deposition testimony, however, the delay of which Houston complains is attributable to his refusal to see any of the clinicians working on the earlier shift. Moreover, the alleged deprivation does not give rise to a constitutional violation because any inadequacy in the medical treatment for his injured toe was not "sufficiently serious."

**\*11** Likewise, although Houston's medical records do not indicate that he ever complained of arthritis or back pain in July 2007 or September 2008, even if he did, Houston has presented no evidence showing that these medical issues were sufficiently serious. "The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented." *Williams v. Smith,* No. 02 Civ. 4558(DLC), 2009 WL 2431948, at \*8 (S.D.N.Y. Aug. 10, 2009) (citing cases). In

this case, Houston has failed to provide any evidence that his back pain or arthritis were of such severity as to constitute a serious medical condition.

Moreover, Houston has failed to show that any of the defendants acted, or failed to act, with a sufficiently culpable state of mind. Houston has introduced no evidence to raise a question of whether any defendant acted or failed to act while actually aware of a substantial risk that Houston would suffer serious harm. While Houston alleges that certain corrections officers prevented him from seeking treatment after the March 14, 2007 incident, this allegation is belied by Houston's own testimony that he was able to seek treatment at the medical clinic the next day. Further, Houston points to no evidence to suggest that any defendant was reckless with respect to the treatment of Houston's hernia, or any of his other medical issues. To the contrary, the record shows that Houston received reasonable and appropriate medical treatment during his incarceration at Rikers Island. Summary judgment is therefore granted to defendants on the deliberate indifference claim.

### 4. *Excessive Force*

The standard for excessive use of force claims is the same for pretrial detainees under the Fourteenth Amendment as for convicted prisoners under the Eighth Amendment. *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright,* 554 F.3d at 268.

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* (citation omitted). In the prison context, the issue of "wantonness" turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (citation omitted).

The objective component focuses on the harm done, in light of "contemporary standards of decency." *Id.* (citation omitted). In assessing this component, the court must determine whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id.* (citation omitted). "[T]he Eighth Amendment's prohibition against cruel and unusual punishment does not extend to *'de minimis'* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 269 (citation omitted). Thus, the Second Circuit has repeatedly said that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* (citation omitted).

**\*12** Houston alleges that defendants violated his Eighth Amendment rights when certain corrections officers "grabbed him" and "pulled [his] lower back out" during the March 14, 2007 housing transfer. Houston's evidence is insufficient with respect to both the objective and subjective components of the Eighth Amendment claim. First of all, Houston has not shown that the corrections officers even used any force against Houston. Being grabbed, as Houston describes, is a *de minimis* use of force in the prison context, and certainly not a use of force that is "repugnant to the conscience of mankind." *Id.* at 269. Moreover, Houston has introduced no evidence to show that the alleged force used against him was employed "maliciously and sadistically to cause harm." *Id.* at 268. Instead, the corrections officers "grabbed" Houston when he refused to move from one side of a housing area to another. Summary judgment is therefore granted to defendants on the use of force claim.

### 5. *Municipal Liability*

Houston also asserts a § 1983 claim against the City, alleging that the City failed to intervene to stop the individual defendants from violating his constitutional rights. "Section 1983 'imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights.' " *Okin v. Village of Cornwall–Hudson Police Dep't,* 577 F.3d 415, 439 (2d Cir.2009) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692 (1978)). "To prevail against a municipality on a § 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline v. Gallo,* 546 F.3d 95, 103 (2d Cir.2008) (citation omitted). Because Houston has failed to demonstrate any underlying constitutional violation, his *Monell* claim fails. *See, e.g., Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").

*CONCLUSION*

Defendants' February 17, 2010 motion for summary judgment is granted. Houston's claims are dismissed with prejudice and his request for sanctions is denied. The Clerk of Court shall close the case.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1948612

Footnotes

1   "General Population" housing is for inmates who have undergone an initial risk screening and have been determined not to require any type of special housing. *See* Department of Corrections Directive No. 4020R–A, § III(M)(1) (2007) ("DOC Directive 4020R–A").

2   Upon arrival at Rikers Island, an inmate undergoes an initial risk screening. Based on this evaluation, an inmate is assigned a classification score which designates the inmate as belonging to one of five custody levels: Low, Low–Medium, High–Medium, High, or Incomplete. An inmate is assigned housing based on his or her classification score. Inmates assigned to general population are reclassified every sixty days, and all inmates are reclassified each time they are transferred to another facility. Inmates may also be reclassified at any time based on a variety of factors, such as disciplinary infractions, age, or court orders. Over the course of his incarceration, Houston's classification score placed him in the High–Medium and sometimes Low–Medium categories.

3   "Administrative Escort" housing is for inmates who require closer observation due to disruptive or troublesome behavior, and therefore require that they be escorted when leaving their housing area. *See* DOC Directive 4020R–A, § III(Q). Houston was placed in Administrative Escort housing on February 11, 2006 and moved back into General Population housing on March 22.

4   Inmates in DOC custody may file complaints about aspects of their incarceration with the Grievance Office located at each correctional facility. Each Grievance Office is staffed with a civilian Grievance Coordinator and a uniformed Grievance Officer. All inmate grievances are addressed pursuant to the IGRP, as set forth in Department of Corrections Directive No. 3375R–A (2008) ("DOC Directive 3375R–A").

5   Copies of the March 6 and March 30, 2006 grievances were attached to the amended complaint. DOC has no record that Houston filed these grievances.

6   Defendants have introduced evidence that four of the five housing transfers within GMDC were due to reclassification; the fifth was for security reasons.

7   A copy of the June 19, 2006 grievance was attached to the amended complaint. DOC has no record that Houston filed this grievance.

8   The defendants claim that the three housing transfers within MDC were pursuant to a DOC practice of periodically re-housing inmates who are incarcerated for long periods of time as a security measure. According to Jose Torres, a Captain in DOC's Office of the Chief of Custody Management and Environmental Health, periodically moving inmates among different housing areas and facilities is an effective way to minimize or eliminate certain disruptive and quasi-criminal activities among inmates.

9   Defendants have presented evidence that some of these transfers were due to changes in Houston's classification, while others were pursuant to DOC's practice of periodically re-housing inmates who are in custody for long periods of time. In addition, defendants assert that some transfers were the result of changes in RNDC's Departmental Classification Housing Plan, which was a facility-wide initiative that affected all inmates housed at RNDC.

10  DOC designates certain categories of inmate complaints as "non-grievable," meaning that they are not addressed through the IGRP process. *See* DOC Directive 3375R–A, § II(C)(1)-(2). These categories include: (1) issues or programs that already have their own administrative or investigative process; (2) allegations of assault or harassment by staff or inmates; and (3) requests to remove, censure, or discipline a staff member. *Id.* Issues with their own administrative or investigative process include classification designations, use of force allegations, and any matter under investigation by the DOC Investigation Division or New York City Department of Investigation. *See id.* at § II(C)(3). If an issue is nongrievable, the Grievance Coordinator must inform the inmate of the proper administrative mechanism to resolve the issue, if any.

11  By letter dated January 23, 2010, Houston moved to suppress his deposition testimony on the grounds that defendants' counsel "altered and tampered" with the deposition transcript. Houston submitted errata sheets in which he objected to approximately 80 percent of the transcript, and offered new testimony in substitution for the testimony to which he

objected. Assuming Houston's objection was timely under Fed.R.Civ.P. 32(d)(4), Houston's allegation of tampering is belied by the fact that the deposition transcript was prepared and signed by a certified court reporter. Further, while Fed.R.Civ.P. 30(e)(1)(B) permits a deponent to make changes to the substance of his or her testimony, the deponent is required to "list[ ] the changes *and the reasons for making them."* (Emphasis added.) Houston did not comply with this requirement. In any event, Houston has not objected to the portions of his deposition upon which this Opinion relies.

12    The September 9 grievance was resolved by restoring Houston's telephone service as requested in his grievance form.

13    "Close Custody/Protective Custody" housing is for inmates who require enhanced monitoring for their personal protection. *See* DOC Directive 4020R–A, at § III(N)(2).

14    Although defendants claim that DOC has no record of the July 14, 2008 grievance, the copy of the grievance that is attached to the amended complaint appears to have been stamped by the RNDC Grievance Coordinator. Further, a subsequent grievance dated August 8, 2008—which was included as a defense exhibit—has a handwritten notation which states that the July 14, 2008 grievance was "returned to [Houston] as non-grievable."

15    The PLRA's exhaustion requirement states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

16    Presumably, an inmate's designation for Close Custody confinement is non-grievable because an inmate may challenge the designation in a due process hearing, and may appeal any adverse decision by the hearing officer. The parties have presented no evidence, however, as to whether a due process hearing was held concerning Houston's designation for Close Custody or whether Houston appealed the result of such a hearing. *Cf. Davis v. Barrett,* 576 F.3d 129, 132 (2d Cir.2009) (finding exhaustion where issue was "non-grievable" under New York State's Inmate Grievance Program and inmate appealed the ruling entered in an administrative hearing).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    10

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Hart v. City of New York,  S.D.N.Y.,  November 18, 2013

2010 WL 234990
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Christopher JONES, Plaintiff,
v.
Superintendant Luis R. MARSHALL, Officer
Q. Quick, and Officer R. Perez, Defendants.

No. 08 Civ. 0562.
|
Jan. 19, 2010.

**Attorneys and Law Firms**

Christopher Jones, Attica, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, by: John E. Knudsen, Esq., New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

**\*1** Defendants Officer Quandera Quick ("Officer Quick"), and Officer R. Perez ("Officer Perez") (collectively, "Defendants") have moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the amended complaint of pro se plaintiff Christopher Jones ("Jones" or "Plaintiff") for violation of his constitutional rights stemming from a September 8, 2007 incident at the Sing Sing Correctional Facility ("Sing Sing").

On the facts and conclusions set forth below, Defendants' motion is granted.

**I. PRIOR PROCEEDINGS**
Plaintiff's original complaint was filed on January 23, 2008.

On December 11, 2008, Marshall's motion to dismiss was granted. Discovery proceeded with respect to the remaining defendants.

On September 25, 2008, Defendants were served by mail with an amended complaint (the "Complaint"). [1]

The instant motion was marked fully submitted on September 23, 2009.

**II. THE FACTS**
The facts as set forth below are taken from Defendants' Statement Pursuant to Local Rule 56.1 ("Def. Rule 56.1 Stmt"), the Declaration of Christopher Jones ("Jones Decl."), and the accompanying affidavits and exhibits. The facts are undisputed except where indicated.

Plaintiff is currently an inmate in the custody of the New York State Department of Correctional Services ("DOCS"). The present dispute arises out of Plaintiff's request to use the bathroom following a September 8, 2007 visit (the "September 8 visit") by Plaintiff's mother with Plaintiff in the Sing Sing visiting room.

The visiting room at Sing Sing has one bathroom for inmates and two bathrooms for visitors (one for females, and one for males). There are separate bathrooms for inmates and visitors for security reasons, and inmates are not allowed to use the visitors' bathrooms. According to Plaintiff, inmates are sometimes frisked before they are allowed to use the bathroom in order to limit smuggling of contraband.

Plaintiff testified that he had been to the visiting room at Sing Sing frequently and that the inmates' bathroom in the visiting room is closed at 2:30 p.m. "some" or "most" of the time. Knudsen Decl. Ex. C at 40; *id.* Ex. D at 11. According to Plaintiff, there is an announcement at 2:30 p.m. that the visiting room will begin closing, with visitors leaving by 2:45 p.m. Both DOCS and Sing Sing have issued directives pertaining to the Inmate Visitor Program. Neither of these indicates that the inmates' bathroom will be closed at 2:30 p.m. or after the visitors leave the visiting room.

During the September 8 visit, Plaintiff consumed two liters of iced tea beverage that had been purchased between 12:30 and 1 p.m. Plaintiff's mother left the visiting room at 2:35 p.m.

Following the departure of Plaintiff's mother, the account of the events by Plaintiff and Defendants differs considerably. According to Plaintiff, he asked Officer Quick for permission to use the bathroom, but was informed first that the bathroom was closed and then that the bathroom was not working. When Plaintiff asked when he would be allowed to use the bathroom, Officer Quick replied that he could use the bathroom whenever she felt like it and told Plaintiff to wait because an escort officer was coming to take him to his cell. Plaintiff also asked Officer Perez for access to the bathroom, but was told that he had to follow Officer Quick's decision since she was the officer in charge. Plaintiff estimates that he asked Officer Quick for permission to use the bathroom four or five times. Although Plaintiff was denied access to the bathroom, officers permitted another inmate in the visiting area to use the bathroom during that time.

**\*2** Plaintiff testified that he felt the need to urinate at 2:20 p.m., began to feel pain and cramping around 3:15 to 3:30 p.m., and eventually urinated on himself at 3:58 p.m. Plaintiff was escorted back to his cell between 4 and 4:10 p.m.

Officer Quick issued Plaintiff a misbehavior report that day. According to her testimony, Plaintiff walked up to her desk after all of the visitors had left and asked her to use the bathroom. Officer Quick informed Plaintiff that the bathroom was out of order and that he would be returning to his cell shortly. An inmate had previously informed Officer Quick that the toilet was not working properly, so she checked and confirmed that the toilet was malfunctioning. According to Officer Quick, Plaintiff began complaining and cursing about the bathroom being closed. He then attempted to recruit other inmates to join him in urinating on the floor before doing so himself. As a result of the misbehavior report, Plaintiff spent five months in a special housing unit ("SHU").

Plaintiff alleges that Officer Quick threatened to fabricate a misbehavior report for his verbal complaints concerning the lack of bathroom access. However, Plaintiff also testified that he had a "pretty good relationship" with Officer Quick while he was at Sing Sing, and she did not cause any problems for Plaintiff other than this incident. Knudsen Decl. Ex. C at 21. Plaintiff does not recall speaking with Officer Perez prior to the day of the incident.

On September 27, 2007, Plaintiff submitted a complaint concerning his frequent urination to DOCS' medical personnel. Urine tests were ordered for the Plaintiff at that time. In November 2007, following Plaintiff's transfer to the Upstate Correctional Facility, it was determined that Plaintiff had a urinary tract infection, which was resolved with antibiotics. Plaintiff alleges that the urinary tract infection was the result of Defendants' refusal to permit him access to the bathroom on September 8, 2007.

## III. DISCUSSION

### A. *Legal Standard*

Summary judgment is granted only where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Commc'ns, Inc. v. Herrick Co.,* 360 F.3d 329, 338 (2d Cir.2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060-61 (2d Cir.1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs-Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (internal quotes omitted); *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) ("Finally, mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot create a genuine issue of fact where none would otherwise exist." (internal quotes and citation omitted)). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."

*Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) (citations omitted).

**B.** *Plaintiff's Denial of Bathroom Use Does Not Constitute an Eighth Amendment Violation*

**\*3** "To prove a violation of the Eighth Amendment, an inmate must show (1) that the deprivation alleged is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and (2) that the defendant official possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain." *Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) (internal quotation marks omitted).

A condition of confinement rises to the level of an Eighth Amendment violation only when "extreme deprivations" are imposed, because "routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)) (objective prong satisfied only where inmate was denied "the minimal civilized measure of life's necessities"). Since the objective component of an Eighth Amendment claim is contextual, *see Hudson,* 503 U.S. at 8, determining whether the conditions of confinement in this matter are sufficiently serious depends on the length of the deprivation and the potential for harm. *See Whitted v. Lazerson,* 96 Civ. 2746(AGS), 1998 U.S. Dist. LEXIS 7437, at *4-5, 1998 WL 259929 (S.D.N.Y. May 21, 1998) ("Crucial considerations in the determination of whether a particular condition is so serious as to invoke the Eighth Amendment include the duration of the condition and the potential for serious physical harm.").

Plaintiff asserts that his Eighth Amendment rights were violated when he was denied the right to use the bathroom for approximately 90 minutes, from 2:30 p.m. to 3:58 p.m. However, case law has established that temporary denial of a bathroom does not establish the existence of an objective injury for purposes of an Eighth Amendment claim. *See, e.g. Whitted,* 1998 U.S. Dist. LEXIS 7437, at *2, *7-8, 1998 WL 259929 (no objective injury where plaintiff had to wait 90 minutes to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing"); *Odom v. Keane,* 95 Civ. 9941(SS), 1997 U.S. Dist. LEXIS

14077, at *11-13, 1997 WL 576088 (S.D.N.Y. Sept. 15, 1997) (no objective injury where plaintiff's toilet did not function for a ten-hour period between 9 p.m. and 7 a.m.); *Rogers v. Laird,* 07-CV-668 (LEK/RFT), 2008 U.S. Dist. LEXIS 20317, at *9, 2008 WL 619167 (N.D.N.Y. Feb. 8, 2008) ("The temporary deprivation of restroom privileges for a three hour period does not constitute an extreme deprivation of life's necessities." (citation omitted)); *Bourdon v. Roney,* 99-CV-0769 (LEK)(GLS), 2003 U.S. Dist. LEXIS 3234, at *30-31, 2003 WL 21058177 (N.D.N.Y. Mar. 6, 2003) (three hour deprivation of bathroom privileges did not constitute Eighth Amendment violation).

Plaintiff also alleges that he developed a urinary tract infection as a result of the ninety minute delay in bathroom use. Plaintiff's first complaint of frequent urination occurred nearly three weeks after the incident in the visiting room, and no evidence of medical treatment at that time exists on the record. Only in November 2007 was it determined that Plaintiff had a urinary tract infection, which was subsequently resolved with antibiotics. On this record, Plaintiff has failed to present any evidence on which a reasonable trier of fact could conclude that Plaintiff's urinary tract infection was a result of the September 8, 2007 incident.

**\*4** Because Plaintiff has failed to establish the existence of an "objectively sufficiently serious injury," his Eighth Amendment claim based on his denial of bathroom access is dismissed.

**C.** *Plaintiff Has Failed to Establish a Claim for Retaliation*

Plaintiff also alleges violation of his Eighth Amendment rights on the grounds that Officer Quick fabricated the misbehavior report filed against Plaintiff following the September 8, 2007 incident in retaliation for his verbal and written grievances concerning his lack of bathroom access.

As an initial matter, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). While an inmate has a due process right to a hearing before being deprived of a liberty interest based on a misbehavior report, *see id.,* Plaintiff has not alleged that his disciplinary hearing was unfair.

However, "[i]t is well-established that prison officials may not retaliate against inmates for exercising their constitutional

rights ." *Baskerville v. Blot,* 224 F.Supp.2d 723, 731 (S.D.N.Y.2002). At the same time, "because prisoner retaliation claims are 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,' we are careful to require nonconclusory allegations ." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("[W]e examine prisoners' claims of retaliation with skepticism and particular care ." (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983))).

In order to prevail on a claim of retaliation, Jones must first show (1) that he engaged in constitutionally protected conduct, and (2) that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials. *See Bennett,* 343 F.3d at 137; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). The burden then shifts to Defendants to show that Jones would have had a misbehavior report filed against him absent the retaliatory motivation. *See Bennett,* 343 F.3d at 137; *Gayle,* 313 F.3d at 682.

It is well-established that the filing of a grievance report by an inmate constitutes constitutionally protected conduct. *See, e.g., Gayle,* 313 F.3d at 682; *Baskerville,* 224 F.Supp.2d at 731. The question then becomes whether Jones has established a causal connection between his grievances and the misbehavior report filed by Officer Quick. In considering the existence of such a causal connection "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville,* 224 F.Supp.2d at 732.

**\*5** The close temporal proximity between Plaintiff's grievance and the misbehavior report is consistent with the existence of a causal connection. However, Jones's prior disciplinary record, as described in his Disciplinary Hearing, contains 21 Tier II dispositions and 11 Tier III dispositions since 1994. Knudsen Decl. Ex. F. Furthermore, based on the testimony of prison officials and inmates in the visiting room on September 7, 2008, Jones was found guilty at his Disciplinary Hearing of the violations set forth in the misbehavior report. These latter two factors weigh heavily against a finding that his grievance was the motivating factor for the misbehavior report filed against him.

Jones's sole evidence in support of a causal connection between his grievance and the misbehavior report is his assertion that Officer Quick threatened to fabricate a misbehavior report if he filed a grievance report. Jones has not, however, cited any additional facts on the record, such as the testimony of other inmates or officers on duty in the visiting room, to support his allegation. Officer Quick's alleged threat is also inconsistent with the finding at the Disciplinary Hearing that Plaintiff committed the violations set forth in the misbehavior report and his testimony that he otherwise had a good relationship with Officer Quick.

Viewing the factual record with "skepticism and particular care," *Colon,* 58 F.3d at 872, the Court finds Jones's single allegation to be insufficient, as a matter of law, to establish a causal connection between his grievance and the misbehavior report filed by Officer Quick. *See Gallo,* 22 F.3d at 1223-24. Because no genuine issue of material facts exists in connection with Plaintiff's claim of retaliation, summary judgment in Defendants' favor is appropriate.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 234990

### Footnotes

1    Plaintiff's amended complaint named Commissioner Fischer as an additional defendant. However, the amended complaint was never filed with the Court and there exists no record of service of the Complaint on Commissioner Fischer. He is therefore not deemed a party to this action.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 7211833
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

MPD ACCESSORIES B.V., Plaintiff,
v.
URBAN OUTFITTERS et al., Defendants.

No. 12 Civ. 6501(LTS)(KNF).
|
Dec. 17, 2013.

MEMORANDUM ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff MPD Accessories B.V. ("MPD" or "Plaintiff") objects, pursuant to Federal Rule of Civil Procedure 72, to Magistrate Judge Kevin Nathaniel Fox's October 24, 2013, Order, awarding Defendant Urban Outfitters, Inc. ("Urban Outfitters"), and Defendant GMA Accessories Inc. d/b/a Capelli New York ("GMA Accessories") (collectively, "Defendants") $9,039 in reasonable attorneys' fees incurred by Defendants in responding to Plaintiff's motion to compel. (See docket entry no. 135.)[1] Defendants oppose Plaintiff's objections and further object that Magistrate Judge Fox should not have reduced the fee award requested by Defendants.[2] This case arises out of Plaintiff's allegations that Defendants infringed on Plaintiff's copyrighted scarf designs.[3] The Court has subject matter jurisdiction of the case pursuant to 28 U.S.C. §§ 1331 and 1338(a). Having reviewed carefully the parties' submissions and arguments, the Court overrules Plaintiff's objections. Judge Fox's Order will stand.

*DISCUSSION*

A party may object to an order issued by a magistrate judge on a nondispositive motion and the district judge "must consider timely objections and modify or set aside any portion of the order that is clearly erroneous or is contrary to law." See Fed. R. Civ. P. 72(a); see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 116 (2d Cir.2010). An order is clearly erroneous where, based on the entire evidence, the district court is "left with the definite and firm conviction

that a mistake has been committed." Equal Emp't Opportunity Commission v. Teamsters Local 804, No. 04 civ. 2409(LTS), 2006 WL 44023, at *1 (S.D.N.Y. Jan. 9, 2006) (internal quotation marks and citations omitted). A finding is "contrary to law" if "it fails to apply or misapplies relevant statutes, case law or rules of procedure." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y.2002) (internal quotation marks and citation omitted). "Pursuant to this highly deferential standard of review, magistrates are afforded broad discretion in resolving discovery disputes and reversal is appropriate only if their discretion is abused." Universal Acupuncture Pain Services, P.C. v. State Farm Mut. Auto. Ins. Co., No. 01 Civ. 7677, 2002 WL 31309232, at *1 (S.D.N.Y. Oct. 15, 2002) (citation omitted).

Plaintiff raises two objections to Magistrate Judge Fox's October 24, 2013, Order: first, that the Order is clearly erroneous because it improperly awards attorneys' fees without sufficient evidence that such fees were actually incurred by Defendants and, second, that the Order is clearly erroneous because it improperly awards attorneys' fees incurred in opposing Plaintiff's May 31, 2013, brief on substantial justification, which the Court ordered the Plaintiff to submit. According to Plaintiff, the "carelessness" of the Defense attorneys' fee application; the confusion between the identity of the Defendants' Law firm (i.e., whether the fees were owed to "Bostany Law Firm LLC" or "Bostany Law Firm PLLC"); and the general failure to provide evidence of attorneys' fees actually incurred by Defendants resulted in a "lack of proof before the Court," which means that the "Order must have made speculative assumptions about what attorneys' fees Defendants could hypothetically have incurred in similar circumstances ..." (Pl. Obj. at 4–5.) Plaintiff also contends that Judge Fox's October 24, 2013, Order is clearly erroneous because Judge Fox had ordered Plaintiff to address whether any exception to awarding mandatory attorney's fees to the Defendants existed, and thus, Plaintiff should not be penalized for doing so. In support of this argument, Plaintiff relies on *Mantell v. Chassman,* 512 F. App' 21, 24 (2d Cir.2013), where the Second Circuit held that the district court erred in its calculation of attorneys' fees because it included fees associated with a reply to objections to a fee declaration when the magistrate judge invited the party to file the reply and the sanction award did not encompass post-declaration filings, like the reply.

**\*2** Here, the Court finds that the law and the record support Magistrate Judge Fox's determinations in all material respects. When calculating the award of fees, Judge Fox

employed the widely accepted "lodestar" method, which entails multiplying "a reasonable hourly rate and the reasonable number of hours required by the case" (Oct. 24, Order at 9 (quoting *Millea v. Metro–North R.R. Co.,* 658 F.3d 154, 166 (2d Cir.2011)) and also appropriately considered case-specific factors (*id.* (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 186–90 (2d Cir.2008)). Judge Fox's October 24, 2013, Order explicitly cites and applies the legal standard set forth in *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F .2d 1136, 1154 (2d Cir.1983) (namely, that a fee application must be supported by evidence of "contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done").

Although Magistrate Judge Fox notes "the carelessness with which [defense counsel] prepared their submissions" and the fact that the "time records are not a model of clarity and completeness," defense counsel has submitted declarations attesting to the hours worked and contemporaneous itemized time records showing specific legal work performed. (Oct. 24, 2013, Ord. at 12–13.)[4] "Attorney's fees [are conditioned] on contemporaneous records" and so long as evidence exists of "some contemporaneous records," they are considered by the Court. *Scott v. City of New York,* 643 F.3d 56, 58 (2d Cir.2011). Therefore, Judge Fox had sufficient evidence on which to base the fee award. The Court also does not find Magistrate Judge Fox's decision to include fees expended by Defendants in responding to Plaintiff's argument that its motion was substantially justified to be unreasonable. (Oct. 24, 2013, Ord. at 13.) Plaintiff sought an exemption from the mandatory award of attorney fees under Federal Rule of Civil Procedure 37 and submitted an extensive brief in support of this request, which was not limited to arguments

concerning the statutory exception to Rule 37, but also sought to reargue its motion to compel. (*See* docket entry no. 94 .) This is different from the situation in *Mantell,* 512 F. App'x at 24, where the Second Circuit rejected the inclusion of fees incurred by the defense attorney when replying to objections to the defendant's fee declaration. As Judge Fox found here, "but for the plaintiff's request for an exemption from the mandatory fees under Rule 37, the defendants would not have expended time and incurred additional attorney's fees and those additional fees they did incur are incident to the plaintiff's motion to compel." (Oct. 24, Order at 13.) Accordingly, the Court finds that—particularly in light of the 50% across-the-board reduction in fees and Judge Fox's detailed analysis of the various time entries—the October 24, 2013, Order is neither clearly erroneous, nor contrary to the law. For these reasons, Plaintiff's objections are overruled in their entirety.

*CONCLUSION*

**\*3** Accordingly, the Court overrules Plaintiff's objections. This Order resolves docket entry no. 152. Plaintiff must pay the Defendants $9,039 in reasonable attorney's fees as determined by Magistrate Judge Fox, on or before **December 31, 2013.** The parties are reminded that the final pretrial conference for this matter is currently scheduled for **June 27, 2014, at 10:00 a.m.**

SO ORDERED.

**All Citations**

Slip Copy, 2013 WL 7211833

Footnotes

1    On October 9, 2013, the Court overruled Plaintiff's objections to an earlier July 22, 2013, Order by Magistrate Judge Fox, awarding Plaintiff reasonable attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 37(a)(5)(B). (*See* docket entry nos. 112, 133.)

2    Defendants' objection to Magistrate Judge Fox's Order, which is included as part of its November 19, 2013, opposition to Plaintiff's Objection, is untimely. *See* Fed. R. Civ. P. 72(a) ("[a] party may serve and file objections to the order within 14 days ... [and a] party may not assign as error a defect in the order not timely objected to"). Therefore, the Court does not consider Defendants' objection to the reduction in fees in the October 24, 2013, Order (Point III of Defendants' opposition) as an independent objection and reads Defendants' papers only as an opposition to Plaintiff's objections.

3    Plaintiff also originally claimed that Defendants engaged in unfair competition, but Plaintiff states that it is withdrawing this claim in its pending motion for summary judgment. (*See* docket entry no. 137; Pl. Motion for Summary Judgment. at 2.)

4    Because the Defendants' reply papers improperly included new evidence in an effort to cure the evidentiary deficiencies in their original submission, Magistrate Judge Fox did not err by refusing to consider portions of these reply papers because

plaintiff did not have an opportunity to address such evidence and because "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir.1993).

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,
v.
Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is defendants' motion for summary judgment dismissing this action (Docket No. 37 [1]). Responses to this motion were due by April 3, 2012, and any reply was due by April 16, 2012 (Docket No. 47). After denying (Docket No. 53) plaintiff's motions (Docket No. 47) for appointment of counsel and to stay the defense summary judgment motion (Docket No. 50), responses were due by May 14, 2012, and replies by May 25, 2012 (id.). The parties consented to proceed before the undersigned as Magistrate Judge on August 15, 2011 (Docket No. 30).

Plaintiff filed a renewed motion to stay the defense motion (Docket No. 57); that motion is **denied.**

**BACKGROUND**

Plaintiff, proceeding *pro se,* commenced this action alleging that defendants were deliberately indifferent to his medical condition while he was incarcerated at the Orleans Correctional Facility ("Orleans") in 2009 (Docket No. 14, Am. Compl.; Docket No. 39, Defs. Statement ¶¶ 1, 3). The Amended Complaint alleges claims against Superintendent S. Khuhaifa, Dr. Winston Douglas and Dr. Dwight Lewis,

inmate grievance supervisor Fitts, Sergeant Austin, and corrections officer Wilson (Docket No. 14, Am. Compl.). He claims that Drs. Douglas and Lewis exhibited deliberate indifference to plaintiff's right shoulder from February 2009 to June 2010 by failing to treat his shoulder and depriving plaintiff of pain medication. He alleges that the original injury arose from a prison assault while he was at Fishkill Correctional Facility, but he alleges here only claims arising in this District surrounding the treatment he received (or did not receive) while at Orleans (id. ¶¶ 16–17). Since plaintiff did not receive what he believed to be adequate pain medication, he substituted illegal marijuana to self-medicate his pain and was disciplined for marijuana possession (id. ¶ 20). Plaintiff moved for leave to proceed *in forma pauperis* (Docket Nos. 2, 5) and leave was granted (Docket No. 7).

*Defense Motion for Summary Judgment*
According to defendants' Statement of Undisputed Facts (Docket No. 39), plaintiff alleges that defendants were deliberately indifferent to the condition of his right shoulder, alleging that Superintendent Khahaifa instituted a policy which forbade prescribing narcotics to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No. 14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (id. ¶ 9; Docket No. 42, Khahaifa Decl. 12).

**\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (id. ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed

unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (*id.* ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (*id.* ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (*id.* ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (*id.* ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (*id.* ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (*id.* ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (*id.* ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder differently (*id.* ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (*see* Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with medical instructions (Docket No. 39, Defs. Statement ¶ 39; *see id.* ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (*id.* ¶¶ 44, 42). Plaintiff also lifted weights (*id.* ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (*id.*). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr. Stegamann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

**\*3** Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was

given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (*id.* ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape) [2] ). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (*see* Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled to qualified immunity if a constitutional violation is found here (*id.* at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (*id* . at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support

of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

**\*4** Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action[3].

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (*id.* FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined there at that time (*id.* FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (*id.* FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (*id.* FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA[4] by having security personnel investigate plaintiff's medical claims (*id.* FACT EIGHT). Plaintiff then alleges that, on April 11, 2012, he was assaulted by prison guards during a cell search (*id.* FACT 14).

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (*id.* FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (*id.* FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (*id.* FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (*id.* [first] ¶ 10). Plaintiff alleges that since his reassignment to Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

**\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute,

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

**\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

> "Federal Rule of Civil Procedure 8(a) (2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a

> defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

> "The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; *see Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

II. Deliberate Indifference Standard
Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious

medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

### III. Application

#### A. Procedural Grounds

**\*7** Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277

(consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/listed below are true, correct, and complete to the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's

pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

### B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

### C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the

violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants' contention that supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**

### D. Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483

U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.

### IV. Post Script—2012 Allegations

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers, he discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

**\*10** Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 2401574

---

### Footnotes

1    In support of this motion, defendants submitted their Memorandum of Law, Docket No. 38; their Statement of Facts, Docket No. 39; the declarations of defendants sergeant Darin Austin, Docket No. 40; inmate grievance resolution program supervisor Brian Fitts, Docket No. 41; retired Superintendent Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis, Docket No. 43; corrections officer Todd Wilson, Docket No. 44; and a declaration of their counsel, with exhibit (videotape of May 7, 2009), Docket No. 45; the declaration of Dr. Winston Douglas with exhibits, plaintiff's medical record, filed under seal, Docket No. 48; their attorney's reply Declaration, Docket No. 58.
     In opposition, plaintiff submits his motion to stay summary judgment and for appointment of counsel and its supporting papers, Docket Nos. 50, 51, 52; his letter to Chambers, dated Apr. 11, 2012, Docket No. 54; and his "Affidavit of Truth Amendment in Opposition to Respondents Summary Judgment," with enclosed Affidavit of Junior Lorenzo Cepeda and exhibit of a grievance, Docket No. 55; his amendment renewed motion for stay of defense motion, Docket No. 57.

2    Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).

3    Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, *see* Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; *see generally id.,* Ex. A.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

4    Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, *Wright v. Szczur,* No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at \*15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

---

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4059977
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina.

Cass Franklin SMITH, Plaintiff,

v.

Ben CLARY, County Administrator;
Steven Mueller, Sheriff, Defendants.

C/A No. 9:12–1779–RBH–BM.
|
Aug. 16, 2012.

**Attorneys and Law Firms**

Cass Franklin Smith, Gaffney, SC, pro se.

### REPORT AND RECOMMENDATION

BRISTOW MARCHANT, United States Magistrate Judge.

**\*1** Plaintiff, Cass Franklin Smith, is a pretrial detainee in the Cherokee County Detention Center ("CCDC") in Gaffney, South Carolina. Plaintiff, who is proceeding *pro se* and *in forma pauperis* pursuant to 28 U.S.C. §§ 1915 and 1915A, brings this action under 42 U.S.C. § 1983, seeking monetary damages and injunctive relief. [1]

Under established local procedure in this judicial district, a careful review has been made of the *pro se* complaint pursuant to the procedural provisions of 28 U.S.C. § 1915; 28 U.S.C. § 1915A; the Prison Litigation Reform Act (PLRA), Pub.L. No. 104–134, 110 Stat. 1321 (1996); and in light of the following precedents: Denton v. Hernandez, 504 U.S. 25, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992); Neitzke v. Williams, 490 U.S. 319, 324–25, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Nasim v. Warden, Md. House of Corr., 64 F.3d 951 (4th Cir.1995); and Todd v. Baskerville, 712 F.2d 70 (4th Cir.1983). Further, although this Complaint has been filed pursuant to 28 U.S.C. § 1915, which permits an indigent litigant to commence an action in federal court without prepaying the administrative costs of proceeding with the lawsuit, to protect against possible abuses of this privilege, the statute allows a district court to dismiss a case upon a finding that the action is "frivolous or malicious" or "fails to state a claim on which relief may be granted" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i), (ii), (iii). A finding of frivolity can be made where the complaint "lacks an arguable basis either in law or in fact," Denton, 504 U.S. at 31; and a claim based on a meritless legal theory may be dismissed *sua sponte* under 28 U.S.C. § 1915(e)(2)(B). See Neitzke, 490 U.S. at 319; Allison v. Kyle, 66 F.3d 71 (5th Cir.1995).

Finally, this Court is also required to liberally construe pro se documents, Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), holding them to a less stringent standard than those drafted by attorneys, Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). This mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. However, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir.1990).

### BACKGROUND

Plaintiff alleges that he "has been unfairly and discriminately (sic) segregated from other population in the jail by a classification system recently put in place by the Defendants." Complaint, Statement of Claim; ECF No. 1, p. 3. Plaintiff alleges that, since he was incarcerated in April 2010, he was housed in "medium-medium high security," until approximately thirty days before filing his Complaint, when the new classification system was implemented and Plaintiff was moved to "maximum-medium high security." [2] *Id.* Plaintiff alleges that he "has not had any disciplinary write ups or warnings since initially coming in to the jail [ ] but yet he has been sep[a]rated and punished when other inmates having the same charge as the [P]laintiff have not been sep[a]rated and punished." *Id.* Plaintiff alleges that he "has been discriminated against because the [D]efendants hold certain personal views against him and his alle[ ]ged crime." *Id.* Plaintiff alleges that he filed grievances "multiple times" with "none returned." Complaint, Place of Confinement; ECF No. 1, p. 2. Plaintiff seeks monetary and injunctive relief, *i.e.* "punitive damages of $1,000,000.00 (one million dollars)," and "legal fees incurred in filing and prosecuting this lawsuit," and "a temporary order from this court barring the new classification system at the jail in question from being

implemented any further." Complaint, Relief; ECF No. 1, p. 4.

**\*2** The caption and "list of parties" section of Plaintiff's Complaint names only Defendants Clary and Mueller. However, the body of the Complaint alleges that "[P] laintiff has had his constitutional rights violated by the [D]efendants Mueller, Padgett, Clary and Spencer." Complaint, Statement of Claim; ECF No. 1, p. 3. Plaintiff submitted proposed summonses and Forms USM–285 for Sheriff Mueller, County Administrator Clary, Major Robert E. Padgett and Tim Spencer. Plaintiff's proposed service documents refer to Defendant Spencer as "Chairman," as this Defendant is apparently the Chairman of the Cherokee County Council. Thus, the undersigned liberally construes Plaintiff's Complaint as an attempt to also state § 1983 claims against Major Padgett and Mr. Spencer.

## DISCUSSION

Claims concerning conditions of confinement imposed upon pretrial detainees are examined under the Due Process Clause of the Fourteenth Amendment as opposed to the cruel and unusual punishment prohibition of the Eighth Amendment, which applies to convicted inmates. *See Bell v. Wolfish,* 441 U.S. 520, 535–38, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Fourteenth Amendment proscribes punishment of a detainee prior to an adjudication of guilt, without due process of law. *Id.* "However, not every hardship encountered during pretrial detention amounts to 'punishment' in the constitutional sense." *Hill v. Nicodemus,* 979 F.2d 987, 991 (4th Cir.1992) (citing *Bell* ). "And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.' " *Bell,* 441 U.S. at 537. Therefore, "a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose;" *Id.* at 538; and in considering this issue, it is important to remember that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546.

As a practical matter, the contours of pretrial detainees' rights under the Due Process Clause are coextensive with the Eighth Amendment protections applicable to convicted inmates. *See, e. g., Hill,* 979 F.2d at 991–92 (medical needs). However, incarcerated persons in general do not have a constitutionally recognized liberty interest in a particular security classification. *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Confinement in even administrative segregation for medical and security reasons does not violate a detainee's or prisoner's constitutional rights; no infringement on the prisoner's liberty interests has taken place because confinement, restriction of movement and/or access to privileges, and heightened security measures are quintessential to the nature of prison life. *See Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). For instance, placement on administrative segregation is a common occurrence for inmates and detainees, "well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt,* 459 U.S. at 468. *See also Beverati v. Smith,* 120 F.3d 500 (4th Cir.1997) (no liberty interest implicated in administrative segregation). Thus, Plaintiff's claims to a particular classification, or any classification other than the one to which he has been assigned under CCDC's new classification system, must fail, as no constitutional right of liberty was or is infringed upon by the decision of CCDC administrative staff to move Plaintiff from "medium-medium high security" to "maximum-medium high security."

**\*3** Therefore, to prevail on a conditions of confinement claim, Plaintiff must show either (1) an expressed intent to punish, or (2) lack of a reasonable relationship to a legitimate non-punitive governmental objective, from which a punitive intent may be inferred. *Hill,* 979 F.2d at 991 (citing *Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir.1988)). Plaintiff's allegation that the Defendants "discriminated against [Plaintiff] because the [D]efendants hold certain personal views against him and his alle [ ]ged crime" does not state a plausible claim of violation of due process under 42 U.S.C. § 1983. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.* Rather, it requires the plaintiff to articulate facts that, when accepted as true, "show" that the plaintiff has stated a claim entitling him to relief. *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir.2009) (quoting *Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 557). At most, Plaintiff's allegations of "punishment" and "discrimination"

merely attribute, in purely conclusory fashion, alleged ill will to the Defendants because they believe the crimes with which he is charged (three (3) counts of murder) warrant a higher security classification under the new classification system. While Plaintiff makes the further claim that he has somehow or in some fashion been singled out, the court "need not accept the [plaintiff's] legal conclusions drawn from the facts," nor need it "accept as true unwarranted inferences, unreasonable conclusions, or arguments" without some specific factual allegations to support them. *Kloth v. Microsoft Corp.,* 444 F.3d 312, 319 (4th Cir.2006). *See also Walker v. Prince George's Cnty.,* 575 F.3d 426, 431 (4th Cir.2009) (citing *Semple v. City of Moundsville,* 195 F.3d 708, 712 (4th Cir.1999)). Plaintiff complains not about an individual or arbitrary action taken against him, but about the implementation of a new classification system which has resulted in a change in his classification.

While the purpose of pretrial confinement is to ensure the detainee's presence at trial, the detention center may impose restraints on the detainee that are reasonably related to the detention center's interest in maintaining the facility's security, even if the restraints "are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell,* 441 U.S at 539–40. If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." *Id.* at 539. Defendants have legitimate interests in the implementation and enforcement of a classification system, which stem from their need to manage the facility in which Plaintiff is detained. *Id.* at 540. There is nothing in Plaintiff's factual allegations to show a plausible claim that this new classification system was designed or implemented in order to "punish" the Plaintiff, who is after all being held on multiple counts of a serious, violent crime.

**\*4** Furthermore, there is a *de minimis* level of imposition with which the Constitution is not concerned. *Id.* at 539 n. 21. In order to prevail on a procedural due process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by governmental action. *Bevrati v. Smith,* 120 F.3d 500, 502 (4th Cir.1997). Although prisoners are afforded some due process rights while incarcerated, those liberty interests are limited to "the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the

Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. Changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." *Gaston v. Taylor,* 946 F.2d 340, 343 (4th Cir.1991). Further, prisoners do not have a constitutionally recognized liberty interest in a particular security classification nor a constitutional right to be confined in a particular prison. *Meachum,* 427 U.S. at 224.

In this case, Plaintiff essentially claims that he has a right to be housed in the general population, and that his higher security status under the new classification system violates his right to due process. He additionally appears to claim that his higher security confinement under the new classification system constitutes cruel and unusual punishment. [3] Such claims are without merit in the carefully circumscribed atmosphere of a heavily populated detention center, in which numerous detainees with a broad range of pending criminal charges are housed in close quarters. If long-standing judicial deference to detention center and prison officials' administrative realities means anything, then the risk to others' safety and well being presented by a detainee who is charged with three counts of murder and attempted escape cannot be subservient to that person's liberty. *See, e.g., Anderson v. County of Kern,* 45 F.3d 1310, 1316 (9th Cir.1995) (prison officials have legitimate penological interests in administrative segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"), reh'g denied, 75 F.3d 448 (9th Cir.1995), cert. denied *County of Kern v. Anderson,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995).

## RECOMMENDATION

Accordingly, it is recommended that the Court dismiss the Complaint in this case, without prejudice and without issuance and service of process.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 4059977

## Footnotes

1    Section 1983 is the procedural mechanism through which Congress provided a private civil cause of action based on allegations of federal constitutional violations by "person(s)" acting "under color of state law." *See Jennings v. Davis,* 476 F.2d 1271 (8th Cir.1973). The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. *See McKnight v. Rees,* 88 F.3d 417(6th Cir.1996). In order to state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that: (1) individual defendant(s) deprived him of a federal right, and (2) did so under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *see Hall v. Quillen,* 631 F.2d 1154, 1155–56 (4th Cir.1980).

2    Plaintiff's Complaint was filed on June 28, 2012. The Cherokee County Detention Center's Inmate Search website indicates that Plaintiff has been confined since April 19, 2010 on three murder charges (warrant nos. M132330, 132331, and 132332), and that Plaintiff also has pending charges of assault upon a correctional employee (warrant no. M132339) and attempted escape (warrant no. M132340, date of arrest April 23, 2010). *See* http://www.cherokeecountysheriff.net/ detail.php?id=19184 (last visited Aug. 8, 2012). The Cherokee County Seventh Judicial Circuit Court Public Index shows that Plaintiff was indicted on the three murder charges (indictment nos. 2010–GS–11–0344, 0345, and 346) and on the attempted escape charge (indictment no. 2010–GS–11–0601, date of issue July 8, 2010). The Public Index shows that the charge against Plaintiff for assaulting a correctional officer was "dismissed not indicted" on June 8, 2012. *See* http:// publicindex.sccourts.org/cherokee/publicindex/PISearch.aspx (last visted Aug. 8, 2012). The undersigned takes judicial notice of the online records of Plaintiff's pending state court proceedings and CCDC's factual information concerning Plaintiff's custody status. *See Colonial Penn Ins. Co. v. Coil,* 887 F.2d 1236, 1239 (4th Cir.1989) ("We note that 'the most frequent use of judicial notice is in noticing the content of court records.' "); *Williams v. Long,* 585 F.Supp.2d 679, 685–89 (D.Md.2008) (noting that some courts have found postings on government websites to be inherently authentic or self-authenticating).

3    To state a claim that conditions of confinement violate constitutional requirements prohibiting cruel and unusual punishment, "a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' " *Strickler v. Waters,* 989 F.2d 1375, 1379 (4th Cir.1993) (quoting *Williams v. Griffin,* 952 F.2d 820, 824 (4th Cir.1991)). Further, a plaintiff must demonstrate that he suffered a serious or significant physical or mental injury as a result of the challenged condition. *See Id.* at 1380–81. Plaintiff's Complaint makes no such factual allegations.

**End of Document**                                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens, Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

**1**   **Executors and Administrators**
    👉 Time for making distribution

In a dispute between relatives, the executor of the decedent's estate did not breach his fiduciary duties by failing to distribute estate assets on the ground that he was not required to distribute the assets under New York law until there was a final accounting. The executor made certain distributions to beneficiaries of the decedent's will. The executor had not made any distributions to himself or taken any fees. It was the conduct of the cousin bringing the suit, including his failure to pay the outstanding judgment that he owed to the estate totally over $750,000, that prevented the executor from conducting a final accounting and in turn making the final distributions under the will. McKinney's EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX, pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1**   Before the Court are objections by plaintiff to a Report and Recommendation of United States Magistrate Judge A. Kathleen Tomlinson dated March 16, 2009 ("the Report") that recommends: (1) granting defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and dismissing plaintiff's amended complaint in its entirety; (2) denying plaintiff's motion to amend the amended complaint to add Patrick McCarthy, Esq. as a defendant; and (3) denying plaintiff's motion to compel discovery responses and to impose sanctions upon defendant. For the reasons stated herein, the Report of Magistrate Judge Tomlinson is accepted in its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). Any portion of a report and recommendation on dispositive matters, to which a timely objection has been made, is reviewed de novo. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. See, Thomas v. Arn, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. See, Fed.R.Civ.P. 72(b); Baptichon v. Nevada State Bank, 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), aff'd, 125 Fed.Appx. 374 (2d Cir.2005); Nelson v. Smith, 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, inter alia, in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the

purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj ., ¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

**\*2** Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court. [1]

II. Conclusion

Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

---

### *REPORT AND RECOMMENDATION*

[A. KATHLEEN TOMLINSON](), United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

### I. *BACKGROUND*

**A. *Factual Background***
The facts of this case are set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent"). [1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the

"Suffolk Supreme Court Action"). (Schmidt Decl. [2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.*; Jurgens Aff. [3] ¶ 3; Def.'s 56.1 Stat. [4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1 Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the

> Surrogate's Court is directed to serve a
> copy of the Court's decision upon the
> Suffolk County District Attorney for
> further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg left New York shortly after entry of the Judgment on August 22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Witzenburg has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the instant action), it will ultimately be able to offset the amount of the Judgment against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Since his preliminary appointment in January 2001 and continuing through the present date, Jurgens, in his capacity as Executor, avers that he has consistently acted in the interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶ 22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains the Estate accounts, files and pays fiduciary taxes, and assists and pays for the various lawsuits and proceedings in which the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23.) In addition, Jurgens oversaw certain distributions of Louise's Will to beneficiaries during the period December 2001 through January 2004, pending a final accounting in Surrogate's Court. Jurgens has not made any distribution to himself personally and has not taken any Executor fees. (Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome of the instant action. Once this case is resolved, Jurgens intends to render a final accounting of the Estate's property (the proceeds of which are currently held in the Estate accounts at Citibank or Smith Barney) in Surrogate's Court. (Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the final accounting, Witzenburg's share of the Estate will be determined, against which the Suffolk County Judgment can be applied. Then, according to Jurgens, the Estate can render final distributions of the Estate property and he can close the Estate in Surrogate's Court and complete his duties as Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

**B.** *Procedural Background*

**\*5** The procedural background of this action is also set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order [DE 73] granting in part and denying in part Defendant's motion to dismiss. Only the procedural background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action against Defendant Jurgens, individually and as Executor of the Estate, as well as against Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith Barney Citigroup ("Smith Barney") in the United States District Court for the Southern District of Texas. On April 27, 2005, Plaintiff filed a First Amended Verified Complaint (the "Amended Complaint"). With respect to Jurgens, Plaintiff alleges that Jurgens and his attorneys were a "corrupt enterprise" and that they depleted Louise's assets, converted assets, committed "frauds" and breached a "fiduciary duty." (Amended Complaint, dated April 27, 2005 ("Am.Compl."), at 4.) On September 15, 2005, Jurgens' motion to transfer venue was granted and the action was transferred to this Court [DE 45].

**1.** *Defendant's Prior Motion To Dismiss*

By motion dated February 3, 2006 [DE 62–65], Defendant Jurgens moved to dismiss the Complaint as against him on the grounds that the Court: (1) lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine and the probate exception to diversity jurisdiction; or in the alternative, (2) should abstain from hearing this dispute because it concerns the administration of an estate; or in the alternative, (3) should dismiss the amended complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein held that, "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the alleged conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein explained that, to the extent Plaintiff seeks damages resulting from a diminished inheritance, he lacks standing because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12). In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

**\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].

## 2. *The Preclusion Order Against Plaintiff*
On multiple occasions during the course of the present action, specifically between October 2007 and February

2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment

motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

### C. *Summary Of Plaintiff's Allegations*

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will," including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stirpes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34). [5]

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly, Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) above), and whether Plaintiff is entitled to $350,000, or any

portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

- Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

- McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

- Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

- Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

- In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's

length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

- Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*

**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co. .,* 434 F.3d 165, 170 (2d Cir.2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at \*3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from

that inference in the light most favorable to the non-moving party. *Id .* at 157; *Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id. See also McPherson v. N.Y. City Dep't Of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." *Fed.R.Civ.P. 56(e)(2).* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at \*5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

## B. *Procedural Issues*

On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se litigant* which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

> [y]ou are required to serve any opposition papers on my office **within 10 days of my service of this motion,** without filing any of your opposition papers with the Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec.[6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of 28 U.S.C. § 1746 or, at minimum, "substantially compl[y] with the[] statutory requirements [of 28 U.S.C. § 1746] ...." *LeBoeuf, Lamb, Greene & MacRae,*

*LLP v. Worsham,* 185 F.3d 61, 65 (2d Cir.1999); *see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under 28 U.S.C. § 1746 and Second Circuit case law.

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,* No. 07–3756–cv, 2009 WL 27704, at \* 3 (2d Cir. Jan.6, 2009). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cior.2008) A court's decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. the Shaar Fund, Ltd.,* 547 F.3d 109, 112 n. 3 (2d Cir.2008) (citing *Ali v. Mukasey,* 529 F.3d at 490). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.,* No. 02–CV–5171, 2009 WL 425879, at \* 6 (E.D.N.Y. Feb. 19, 2009). Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed

deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1991) (quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964)). Here, Plaintiff presents no new evidence or facts to serve as any reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of Rule 56 and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,* 151 F.Supp.2d 183, 200–01 (D.Conn.2001) (disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion.[7]

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b).[8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008, at \*3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not

be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

### C. *Breach of Fiduciary Duty Claims*

As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

- with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

- to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register

and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

- to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the state.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello,* 227

A.D.2d 553, 554, 642 N.Y.S.2d 953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott,* 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996 (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act, [9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b)(3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller,* 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at \*3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3)(A)). The statute also provides, in relevant part, as follows:

> [t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable to a beneficiary to the extent the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument.

N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice

to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. Donner, 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; Janes, 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

### III. DISCUSSION

 *15  The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's factual assertions must be accepted as true. See Local Rule 56.1(c).

### A. Jurgens' Conduct As Executor

Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was

required to collect and preserve the assets of the estate. See, e.g. Donner, 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (Id.)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." See N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

### B. Breach Of Fiduciary Duty Claims

#### 1. The Purported False Will

 *16  Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's "true will," he is entitled to an inheritance in the amount of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County

Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A). Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See Groman v. Cola,* 07 CV 2635, 2007 WL 3340922, at *4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate") (citing *Marshall v. Marshall,* 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N.Y .,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts) (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at *1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at *2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### 2. McCarthy's Final Accounting

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts,

"mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

 **\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court concludes that the conduct alleged here occurred during the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (*Id.*)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor—there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### 4. The Alleged Non–Existent Forensic Accountant

 **\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent by the Court to a non-

existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (*Id.* at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (*Id .;* Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### 5. Sale Of Decedent's Residence As An Arm's Length Transaction

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to

show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (*Id.*) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to the sale of Louise's home, and Plaintiff has not presented any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

**\*20** Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens." (*Id.* at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.)

However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. Purported Accounting Discrepancies

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

**\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. Jurgens' Purported Improper Motives

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy

served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for various assets of the Estate. In that capacity, I learned that Plaintiff had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the

Suffolk County District Attorney for further investigation[.]"

**\*22**  (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.) To date, Plaintiff has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Plaintiff has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the present action), it will ultimately be able to offset the amount of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court Action strongly suggests that Plaintiff brought the instant case in an effort to further elude the Judgment entered in Surrogate's Court, Jurgens, as Executor, was well within his authority to bring that case against Plaintiff. The New York Fiduciary Powers Act specifically provides that "every fiduciary is authorized ... [t]o contest, compromise or otherwise settle any claim in favor of the estate ...." N.Y. EPTL § 11–1.1(13). Thus, once Jurgens obtained information that Plaintiff had withheld funds which properly belonged to Louise's Estate, he acted properly in brining the Surrogate's Court Action against Plaintiff to recover those funds.

### C. Conclusion

For the foregoing reasons, Plaintiff has not provided any evidentiary basis which would enable this Court to find that Jurgens breached his fiduciary duties in his role as executor of Louise's Estate and that Jurgens' actions caused Witzenburg or any other beneficiary to incur damages. Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens' conduct as executor "measures up to the appropriate standards of prudence, vigilance, and care" as required by New York law. *See Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and in opposition to Defendant's Motion for Summary Judgment on the remaining claims in this action, and reviewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has met his burden of showing that there is no genuine issue of material fact to be tried in this case regarding Plaintiff's claims that Defendant breached his fiduciary duties to the Estate of Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion for summary judgment on the remaining claims be GRANTED and that the Amended Complaint be dismissed in its entirety.

### IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick McCarthy, Esq. as a party defendant. McCarthy served as the court-appointed property guardian of Louise's property for thirteen months before her death. Defendant's motion papers [DE 117] do not include a proposed Second Amended Complaint containing the requested changes. Counsel for Patrick McCarthy filed a letter [DE 119] requesting permission to oppose the motion and to extend the time to submit his opposition. By Order dated June 20, 2008 [DE 120], Judge Boyle granted McCarthy's motion without objection from Plaintiff and extended the deadline for the opposition to July 15, 2008. Defendant Jurgens has not filed papers in opposition to Witzenburg's motion to amend.

**\*23**  Plaintiff seeks to amend his pleading for a second time on the grounds that, as guardian of Louise's property, McCarthy "created a false business document identified as 'The Final Accounting,' and filed said false business document with the New York State Supreme Court." [DE 117] Because the deadline to amend the pleadings has expired, [10] the amendment is permissible only if it "relates back" to the original Complaint as defined in Rule 15(c). Under Rule 15(c)(1), an amendment "relates back" to the original pleading when, *inter alia,*

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection (B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, "a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at *20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c) (3) [11] Advisory Committee's note (1991 Amendment) (this provision was revised to address "the problem of the misnamed defendant").

**\*24** In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at *20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action— a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C) (ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]t Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt, attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would have been brought against him, but for a mistake concerning the proper party's identity ....'

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time

he served as Louise's property guardian (December 1999–January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." *Colombo,* 221 F.R.D. at 377 (granting motion to add individual defendants under *Rule 15(c)* where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25** Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens' former attorney. [12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c) and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

### V. *PLAINTIFF'S MOTION TO COMPEL*

Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

**\*26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

**V. CONCLUSION**

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10)

days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections shall be filed with the Clerk of the Court via ECF, ***except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenberg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal.*** *Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.), cert. denied, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996).*

**\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

---

Footnotes

1    Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

1    The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

2    Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

3    Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

4    Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

5    The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier,* No. 84 Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at \*6 (S.D.N.Y. Jan. 15, 1988); *see also Lerman v. Board of Elections in the City of N.Y.,* 232 F.3d 135, 140 (2d Cir.2000).

**6**    Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

**7**    Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

**8**    Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

**9**    The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b) (3)(C).)

**10**   Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

**11**   Although numbered differently from the current version of Rule 15(c), the wording is the same.

**12**   In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.

---

       © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.      20